Asociación de Maestros de Puerto Rico, demandante y apelada, v. José Arsenio Torres, en su carácter oficial como Secretario del Departamento de Educación, y otros, demandados y apelantes, y Olga Estelle González Ruiz y otros, interventores y apelantes; Asociación de Maestros de Puerto Rico, demandante y apelada, v. Olga Estelle González Ruiz, por sí y en representación de su hijo menor de edad Irving Joel Betancourt González, y otros, interventores y apelantes.

Números: AC-94-371    Resueltos: 30 de noviembre de 1994
AC-94-326

*Pedro R. Pierluisi, Secretario de Justicia,* y *Pedro A. Delgado Hernández, Procurador General,* abogados de los demandados apelantes; *Arturo J. García Solá, Gilberto J. Marxuach Torrés* y *Pedro E. Ruiz Meléndez,* de *Mc Connell Valdés,* abogados de los interventores apelantes; *Rafael A. Nadal Arcelay, Jorge Toro McCown,* de *Cancio, Nadal, Rivera & Díaz,* abogados de la demandante apelada; *Juan H. Saavedra Castro,* de *Americans United for Separation of Church and State,* en calidad de *amicus curiae; Héctor J. Pérez,* de la *American Civil Liberties Union,* en calidad de *amicus curiae.*

El Juez Asociado Señor Hernández Denton emitió la opinión del Tribunal.

Nos toca resolver si es constitucional la disposición de la Ley Núm. 71 de 3 de septiembre de 1993 (18 L.P.R.A. sec. 911 *et seq.*) (en adelante Ley Núm. 71), conocida como la Ley de Becas Especiales y Libre Selección de Escuelas, que crea ciertos incentivos económicos para ayudar a los padres de estudiantes de escuela pública a transferir a sus hijos a una escuela privada. Analizaremos si esta disposición es compatible con la Sec. 5 del Art. II de la Constitución del Estado Libre Asociado de Puerto Rico, L.P.R.A., Tomo 1, que prohíbe la utilización de fondos públicos para el sostenimiento de instituciones educativas que no sean del Estado.

Independientemente de los méritos educativos que pueda tener el Programa de Becas Especiales y Libre Selección de Escuelas, resolvemos que el Art. 6(c) de la Ley Núm. 71, *supra,* 18 L.P.R.A. sec. 911d, infringe la prohibición clara del Art. II, Sec. 5 de la Constitución del Estado Libre Asociado, *supra.*([1]) No obstante, quedan en vigor las otras partes de la Ley de Becas Especiales y Libre Selección de Escuelas que permiten el traslado de estudiantes

---

([1]) El referido Art. 6(c) autoriza el desembolso de fondos públicos para contribuir hacia el pago de matrícula y otros gastos relacionados de estudiantes que decidan cambiarse de escuelas públicas a privadas.

de una escuela pública a otra de su preferencia, y las que promueven que estudiantes talentosos tomen cursos en instituciones universitarias.([2])

## I

En septiembre de 1993 se creó el Programa de Becas Especiales y Libre Selección de Escuelas (en adelante Programa) mediante la aprobación de la citada Ley Núm. 71. El Programa, que es administrado por una oficina adscrita al Departamento de Educación de Puerto Rico (en adelante Departamento), cuenta con cuatro (4) modalidades que consisten en (1) permitir el traslado de estudiantes de escuela pública a cualquier otra escuela pública de su preferencia; (2) permitir el traslado de estudiantes de escuela privada a cualquier escuela pública; (3) facilitar, mediante un incentivo monetario, que un estudiante se transfiera de una escuela pública hacia una privada, y (4) permitir y promover que estudiantes talentosos tomen cursos en instituciones universitarias.

Al estudiante que se aprovecha de cualquiera de las primeras dos (2) modalidades del Programa se le concede un "vale educativo", el cual, cuando se le entrega a la escuela pública escogida, le da derecho a ésta a reclamar al sis-

---

([2]) Recientemente dispusimos que la prueba para determinar si un estatuto con defectos constitucionales es total o parcialmente nulo por virtud de tales defectos tiene dos (2) fases: (1) la susceptibilidad de la ley de mantenerse en vigor sin la cláusula defectuosa, y (2) la probabilidad de que la Legislatura hubiera aprobado la ley sin tales disposiciones. Respecto a esta última fase, se presume que si la Asamblea Legislativa incluyó una cláusula de separabilidad es porque deseaba que la ley permaneciera en vigor independientemente de que la misma se decretase parcialmente nula. Véase *Berríos Martínez v. Gobernador II*, 137 D.P.R. 195 (1994).

Si aplicamos dicha prueba al caso de autos, resulta claro que la Ley Núm. 71 de 3 de septiembre de 1993 (18 L.P.R.A. sec. 911 *et seq.*) (en adelante Ley Núm. 71) cumple cabalmente con ambos requisitos. Por un lado, la inconstitucionalidad del Art. 6(c) de la Ley Núm. 71, *supra*, 18 L.P.R.A. sec. 911d, no impide que las demás cláusulas se mantengan en vigor. Por otro lado, el Art. 19 de la Ley Núm. 71, *supra*, 1993 Leyes de Puerto Rico 327, expresamente dispone que "[s]i alguna parte de esta Ley fuese declarada nula o inconstitucional, las demás disposiciones de la misma quedarán en vigor y efecto". Por lo tanto, concluimos que la inconstitucionalidad parcial del estatuto no altera su validez.

tema un crédito de $1,500 para el mejoramiento de sus ofrecimientos educativos. La tercera modalidad de esta ley crea una beca especial de hasta $1,500 para sufragar los gastos de matrícula, libros y materiales escolares de los estudiantes de escuela pública que se transfieran a una privada. La cuarta modalidad también ofrece unas becas especiales de hasta $1,500 para los estudiantes que tomen cursos universitarios.

La demandante solamente impugna la constitucionalidad de las becas especiales que sirven de incentivo para el traslado de estudiantes de escuela pública a escuelas privadas, creadas mediante el Art. 6(c) de la Ley Núm. 71, *supra*. Para hacer uso de esta beca, el estudiante deberá cumplir con ciertos requisitos previos,[3] llenar una solicitud y ser seleccionado por el Departamento mediante un proceso "objetivo y equitativo". Art. 4 de la Ley Núm. 71, *supra*, 18 L.P.R.A. sec. 911b. El Departamento entrega a cada estudiante escogido un certificado para que éste lo entregue a la escuela privada. A su vez, la escuela privada recibe el certificado del estudiante y lo presenta, entonces, al Departamento con las facturas correspondientes de los gastos en que ha incurrido en relación con el estudiante. Art. 9 de la Ley Núm. 71, *supra*, 18 L.P.R.A. sec. 911g. Presentados estos documentos, el Departamento procede a reembolsar directamente a la escuela el importe de dichos gastos, hasta la cantidad de $1,500.

La Asociación de Maestros de Puerto Rico (en adelante la Asociación) presentó una demanda de sentencia declaratoria contra el Estado Libre Asociado mediante la cual impugnó la constitucionalidad del citado Art. 6(c) de la Ley Núm. 71, el cual autoriza la concesión de becas especiales para sufragar la matrícula y los gastos escolares de los estudiantes de escuela pública que se transfieren a una privada. La Asociación señaló que estas becas especiales,

---

[3] Principalmente, éstos deben pertenecer a una familia cuyo ingreso bruto anual no exceda de $18,000 y ser admitido a alguna escuela privada.

creadas por esa disposición, infringen la Primera Enmienda de la Constitución federal (que prohíbe el establecimiento por el Estado de cualquier religión) así como la Sec. 3 del Art. II de la Constitución del Estado Libre Asociado, L.P.R.A., Tomo 1, que establece completa separación entre la Iglesia y el Estado, y la Sec. 5 del mismo artículo, *supra*, que prohíbe la utilización de propiedad o fondos públicos para el sostenimiento de escuelas que no sean las del Estado.

Por su parte, el Estado y algunos padres de niños beneficiados por el Programa, que participaron en calidad de interventores, defendieron la constitucionalidad de la ley impugnada y cuestionaron la legitimación activa de la Asociación para instar la demanda. El Tribunal Superior acogió también la comparecencia como *amicus curiae* de la "Americans United for the Separation of Church and State" y de la "American Civil Liberties Union".

Después de celebrar las vistas de rigor, el Tribunal Superior concluyó que la Asociación tenía legitimación activa para instar la demanda. Concluyó, además, que las tres (3) modalidades de la ley,[4] relativas a la libre selección de escuelas públicas por estudiantes de escuela privada o pública y a las becas especiales para estudiantes talentosos que tomen cursos universitarios, son programas constitucionalmente válidos. Esta parte de la sentencia del foro de instancia no ha sido impugnada ante nos.

Por otro lado, el tribunal resolvió que la modalidad establecida por el Art. 6(c) de la Ley Núm. 71, *supra*, mediante la cual se otorgan unas becas especiales para facilitar el traslado de estudiantes de escuela pública a escuela privada, es inconstitucional por infringir la Sec. 5 del Art. II de nuestra Constitución, *supra*. En vista de esta conclusión, el foro de instancia encontró innecesario resolver sobre la compatibilidad del programa de becas especiales

---

[4] Estas modalidades corresponden a los incisos (a), (b) y (d) del Art. 6 de la Ley Núm. 71.

creado por el citado Art. 6(c) con las demás disposiciones constitucionales citadas por la demandante. Finalmente, el Tribunal Superior ordenó al Estado y a todas las partes demandadas a abstenerse de implantar o poner en vigor la modalidad de la beca que se decretó inconstitucional.

Inconforme con este dictamen, el Estado y los interventores presentaron sendos escritos de apelación en los que señalaron que el tribunal de instancia erró "al determinar que aquella parte del Programa ... que autoriza la concesión de 'becas especiales' para ayudar a padres de escasos recursos que deseen trasladar a sus hijos de una escuela pública a una privada contraviene la Sección 5 del Artículo II de la Constitución del E.L.A". También reiteraron su argumento de que la Asociación no tenía la legitimación activa necesaria para instar la presente causa de acción.

Oportunamente, acogimos la apelación presentada por el Estado. Una vez las partes sometieron sus alegatos, celebramos una extensa vista oral el 31 de mayo de 1994. Concluida la vista, las partes tuvieron una oportunidad adicional de someter escritos suplementarios, y el 18 de julio de 1994 el recurso quedó sometido para nuestra adjudicación final.

Por tratarse de un asunto de índole jurisdiccional evaluaremos primero si la Asociación cuenta con legitimación activa para demandar.

## II

Hemos resuelto que una parte demandante posee legitimación activa si se cumplen los requisitos siguientes: la parte ha sufrido un daño claro y palpable, no abstracto ni hipotético; existe un nexo causal entre la causa de acción que se ejercita y el daño alegado, y finalmente, la causa de acción surge al amparo de la Constitución o de alguna ley. *Noriega v. Hernández Colón*, 135 D.P.R. 406 (1994); *Hernández Torres v. Hernández Colón et al.*, 131

D.P.R. 593 (1992); *Hernández Torres v. Gobernador*, 129 D.P.R. 824 (1992).

■ En cuanto a organizaciones, hemos expresado que éstas pueden demandar a nombre propio o a nombre de sus miembros o integrantes. En este último caso, para tener legitimación activa, la organización deberá demostrar que: (1) los miembros de la organización tendrían legitimación activa para demandar a nombre propio; (2) los intereses que se pretende proteger están relacionados con los objetivos de la organización, y (3) la reclamación y el remedio solicitado no requieren la participación individual de los miembros en el pleito. *Col. Ópticos de P.R. v. Vani Visual Center*, 124 D.P.R. 559 (1989).

En el caso de autos la Asociación invoca en su causa de acción la Sec. 3 del Art. II de nuestra Constitución, *supra*, relativa a la separación de Iglesia y Estado, y la Sec. 5 del Art. II, *supra*, que prohíbe el sostenimiento de escuelas privadas con fondos públicos. Al evaluar si la organización tiene legitimación activa, debemos considerar, por un lado, que rige en nuestra jurisdicción la Ley de Pleitos contra el Estado Libre Asociado de Puerto Rico, que prohíbe los pleitos de contribuyentes, y por otro lado, la norma vigente pautada por el Tribunal Supremo de Estados Unidos cuando la parte demandante invoca en su causa de acción la cláusula de establecimiento de la Primera Enmienda de la Constitución federal.

La Ley de Pleitos contra el Estado Libre Asociado de Puerto Rico, Ley Núm. 2 de 25 de febrero de 1946, dispone lo siguiente:

> Ningún tribunal de Puerto Rico tendrá jurisdicción para conocer ... de ninguna acción o procedimiento en que se impugne la validez o constitucionalidad de cualquier ley ... o de cualquier actuación de un funcionario público autorizada por ley ... cuando el demandante no alegue otro interés en la acción o procedimiento, ni otra capacidad para demandar, que la de ser contribuyente o representar a los contribuyentes como clase y

que, como tal, sufre o pueda sufrir daños por virtud de dicha ley
... o actuación. 32 L.P.R.A. sec. 3075.

¿Es esta disposición estatutaria un obstáculo para que adoptemos la norma federal sobre legitimación activa para casos en que se alega una violación a la cláusula de establecimiento? Tomando en consideración la razón de ser de la doctrina federal establecida en *Flast v. Cohen*, 392 U.S. 83 (1968), así como nuestra política pública de proveerle a nuestros ciudadanos acceso al tribunal para vindicar sus derechos constitucionales, resolvemos la anterior interrogante en la negativa. Veamos.

■ En términos generales, en la jurisdicción federal se niega legitimación activa al demandante que solamente tiene interés en el resultado del pleito por su condición de contribuyente, sin que su interés se distinga de modo alguno del que pudiera tener cualquier otro ciudadano. *Massachusetts v. Mellon*, 262 U.S. 447 (1923). No obstante, el Tribunal Supremo federal estableció una excepción a la antedicha norma general cuando resolvió que un contribuyente tiene legitimación activa para impugnar un gasto gubernamental cuando lo hace bajo la cláusula de establecimiento. *Flast v. Cohen*, supra; *Valley Forge College v. Americans United*, 454 U.S. 464 (1982).[5]

---

[5] Aunque *Valley Forge College v. Americans United*, 454 U.S. 464 (1982), restringió el ámbito del criterio general expuesto en *Flast v. Cohen*, 392 U.S. 83 (1968), permaneció inalterada la norma de que los contribuyentes estatales tienen legitimación activa para impugnar en un tribunal federal un gasto estatal bajo la cláusula de establecimiento. Así lo había resuelto el propio Tribunal Supremo federal antes de *Valley Forge College v. Americans United*, supra, y así lo ha resuelto posteriormente. Véanse: *Grand Rapids School District v. Ball*, 473 U.S. 373, 380 y esc. 5 (1985) ("Petitioners alleged that respondents lacked taxpayer standing under [*Flast* and *Valley Forge*]. The District Court and the Court of Appeals rejected the standing challenge. We affirm this finding, relying on the numerous cases in which we have adjudicated Establishment Clause challenges by state taxpayers to programs for aiding nonpublic schools."), y *Meek v. Pittenger*, 421 U.S. 349, 351 y 355–356 esc. 5 (1975) ("The District Court properly concluded that both the individual [resident taxpayers of Pennsylvania] and the organizational plaintiffs [groups which have members who are taxpayers of Pennsylvania, among them the A.C.L.U. and the Americans United for Separation of Church and State] had standing to bring this challenge ....").

En *Flast v. Cohen*, supra, el Tribunal Supremo federal se enfrentó a la interrogante de si poseía legitimación activa quien, fundamentado únicamente en su *status* como contribuyente federal, pretende impugnar la constitucionalidad de un gasto federal. Se resolvió que la resolución al problema dependerá de si dicho litigante puede demostrar que, como contribuyente, posee el interés necesario en el resultado del pleito. *Flast*, supra, pág. 102. El Tribunal resolvió:

> ... a taxpayer will have standing ... to invoke federal judicial power when he alleges that congressional action under the taxing and spending clause is in derogation of those constitutional provisions which operate to restrict the exercise of the taxing and spending power. The taxpayer's allegation in such cases would be that his tax money is being extracted and spent in violation of specific constitutional protections against such abuses of legislative power. *Flast v. Cohen*, supra, págs. 105–106.

El Tribunal Supremo federal expresó, fundamentándose en su historial, que los que crearon la cláusula de establecimiento temían que el poder del Congreso de imponer contribuciones y gastar se usara para favorecer una religión sobre otra o para apoyar la religión en general. *Flast v. Cohen*, supra, págs. 103–104.

En apoyo de la norma adoptada por el Tribunal, el Juez Fortas emitió una opinión concurrente en la cual expresó:

> In terms of the structure and basic philosophy of our constitutional government, it would be difficult to point to any issue that has a more intimate, pervasive, and fundamental impact [than the church-state issue] upon the life of the taxpayer—and upon the life of all citizens.
>
> Perhaps the vital interest of a citizen in the establishment issue, without reference to his taxpayer's status, would be acceptable as a basis for this challenge. We need not decide this. ... [T]he issue here presented —the separation of state and church— ...is not a question which we, if we are to be faithful to our trust, should consign to limbo, unacknowledged, unresolved, and undecided.
>
> On the other hand ... [t]he status of taxpayer should not be

accepted as a launching pad for an attack upon any target other than legislation affecting the Establishment Clause. *Flast v. Cohen*, supra, págs. 115–116.

Acertadamente se ha expuesto que, según este caso y conforme con la Primera Enmienda de la Constitución federal,

... [exists] a fundamental personal right not to be a part of a community whose official organs endorse religious views that might be fundamentally inimical to one's deepest beliefs. ... [T]he experience of living in a political community which endorses or affirmatively supports religious positions with which one disagrees may be regarded as a peculiar offense to freedom of conscience. L.H. Tribe, *American Constitutional Law*, 2da ed., Nueva York, 1988, pág. 1283.

■ Encontramos persuasivo el argumento del Tribunal Supremo federal y del Juez Fortas en *Flast v. Cohen*, supra, así como la explicación provista por el profesor Tribe para la norma que allí se establece. Tal razonamiento es cónsono con nuestro historial constitucional y, particularmente, con la preocupación de nuestra Convención Constituyente por salvaguardar la separación entre la Iglesia y el Estado. 2 Diario de Sesiones de la Convención Constituyente 1483–1484 (1961) (en adelante Diario de Sesiones). Adoptamos, por lo tanto, esta norma para casos en que se alegue una violación a la Sec. 3 del Art. II de nuestra Constitución, *supra*, relativa a la separación entre Iglesia y Estado.

■ Además, por el vínculo estrecho que existe entre esa sección y la que prohíbe el sostenimiento de escuelas privadas por parte del Estado, también adoptamos la norma para reclamos bajo la Sec. 5 del Art. II, *supra*. Del historial de la Convención Constituyente se desprende que uno de los propósitos de esta disposición constitucional fue evitar que se utilizaran fondos públicos para sostener escuelas privadas operadas por distintas dependencias religiosas y, de este modo, salvaguardar la separación entre

Iglesia y Estado. R. Serrano Geyls, *Derecho Constitucional de Estados Unidos y Puerto Rico*, San Juan, Ed. C. Abo. P.R., 1988, Vol. II, págs. 1608–1728.

También constituye razón de peso para adoptar esta norma excepcional sobre legitimación activa el hecho de que, de lo contrario, estaríamos obligando al que quiera impugnar nuestras leyes bajo la cláusula de establecimiento a acudir al tribunal federal, único foro al que le competería entonces resolver sobre la constitucionalidad de nuestra legislación.

■ En *Pedraza Rivera v. Collazo Collazo*, 108 D.P.R. 272 (1979), establecimos una excepción al principio de la necesidad de agotar remedios administrativos para casos instados bajo la Ley Núm. 12 de 8 de agosto de 1974. Dicha ley permite a los tribunales emitir un *injunction* contra el Gobierno cuando se alegue que el Estado esté privando al peticionario de algún derecho, constitucional o estatutario, federal o local. Aunque la ley citada no hacía referencia a ello, la interpretamos como incorporando una excepción al agotamiento de remedios. Fundamentamos dicha determinación en nuestra política pública de proveer un foro alterno al litigante que de otro modo solamente tendría disponible el tribunal federal (en dicho foro no se exige que se agoten los remedios administrativos estatales). Expresamos allí lo siguiente:

> Motivó esta ley [Núm. 12] el deseo de proveer un remedio local para violaciones de derechos constitucionales, remedio hasta entonces disponible tan solo en la Corte de Distrito de Estados Unidos para el Distrito de Puerto Rico, lo que necesariamente forzaba al litigante a acudir en estos casos únicamente a tal foro. ... De lo anterior se desprende que para tener efectividad el remedio local tiene que ser consustancial con el federal. La clara intención de nuestro estatuto fue crear remedios paralelos.
>
> .    .    .    .    .    .    .    .
>
> ... La naturaleza y propósito de la Ley Núm. 12 ... exigen en consecuencia el reconocimiento de que el remedio que la misma provee es independiente y suplementario a cualquier otro dis-

ponible .... Tal remedio no está sujeto, como regla general, a las normas de jurisdicción primaria y agotamiento de remedios administrativos cuando el planteamiento constitucional no carece obviamente de sustancia ni es patentemente inmeritorio. *Pedraza Rivera v. Collazo Collazo*, supra, págs. 275–276.

En ausencia de un mandato legislativo expreso, nuestra política pública de proveer, en los casos apropiados, una alternativa al litigante para atacar la constitucionalidad de una ley local en nuestros tribunales exige que no le cerremos las puertas, obligándolos a buscar auxilio en el foro federal. Al amparo de *Flast v. Cohen*, supra, un contribuyente en Puerto Rico tendría acción legitimada para cuestionar la constitucionalidad de la Ley Núm. 71, *supra*, bajo la cláusula de establecimiento de la Constitución de Estados Unidos.

De hecho, aún si decretáramos sin lugar la demanda por falta de legitimación activa, todavía la parte demandante en este pleito, o cualquier otra, podría acudir al foro federal y atacar allí la constitucionalidad de la citada Ley Núm. 71, sin que una decisión que deniegue legitimación activa fuera impedimento para ello, ya que dicho fallo no sería una decisión "en los méritos" que constituya cosa juzgada. 18 *Wright, Federal Practice and Procedure Civil 2d* Sec. 4436, págs. 338–339 y 344 (1981); 1B *Moore's Federal Practice* Sec. 0.409[1–2], págs. III-128, III-129 y III-138 (2da ed. 1993); *McCarney v. Ford Motor Co.*, 657 F.2d 230, 232–234 (8vo Cir. 1981).

■ El propio Tribunal Supremo federal ha reconocido la deseabilidad de que sean nuestros tribunales los que determinen la validez constitucional de nuestra legislación.

"For a due regard for the status of [the] Commonwealth [of Puerto Rico] under its compact with the Congress of the United States dictates, we believe, that it should have the primary opportunity through its courts to determine the intended scope of its own legislation and to pass upon the validity of that legislation under its own constitution as well as under the Cons-

titution of the United States." *Calero-Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 674 (1974), citando con aprobación de *Wackenhut Corp. v. Aponte*, 386 U.S. 268 (1967).

Más aún, estudiosos de este tema han expresado la deseabilidad de que nuestros tribunales sean los primeros en determinar el ámbito y la validez de la legislación en cuestión a la luz de nuestra Constitución y la de Estados Unidos, dada la relación tan particular que existe entre ambas jurisdicciones. La norma que hoy adoptamos le otorga renovada vigencia y fortalece la aspiración de que nuestros tribunales sean los que forjen e interpreten nuestra política pública. Véase M. Naveira de Rodón, *Inter-relación entre el foro local, el foro federal y la reforma judicial*, 36 (Núm. 4) Rev. C. Abo. P.R. 951 (1975).

■ La política pública de rango constitucional sobre legitimación activa en esta clase de casos nos lleva a resolver que el estatuto que prohíbe los pleitos de contribuyentes no aplica cuando el pleito se funda en principios constitucionales de separación entre Iglesia y Estado o en la cláusula que le prohíbe al Estado sostener escuelas privadas. Sec. 5 del Art. II de nuestra Constitución, *supra*.

### III

Al amparo de la doctrina anteriormente expuesta, la Asociación tiene legitimación activa para demandar a nombre de sus integrantes. En primer lugar, el interés principal de la Asociación en proteger el sistema de instrucción pública, impidiendo el gasto inconstitucional de fondos públicos para beneficiar escuelas privadas, está relacionado con los objetivos de la organización de mantener en la mejor condición posible a las escuelas del Estado.

En segundo lugar, la reclamación y el remedio solicitado no requieren la participación individual en el pleito de los miembros de la Asociación, en vista de que el plantea-

miento que se hace es puramente de derecho, relativo a la constitucionalidad de una ley.

Finalmente, los miembros de la organización tendrían legitimación activa para demandar a nombre propio, ello debido a su condición de contribuyentes del Estado Libre Asociado de Puerto Rico.[6] El reclamo de la Asociación está fundamentado en la cláusula de establecimiento de la Primera Enmienda de la Constitución federal, así como en las cláusulas de separación y sostenimiento de nuestra Constitución. Como ya discutimos, los principios constitucionales de separación entre Iglesia y Estado permiten que, por excepción, cualquier contribuyente tenga legitimación activa para plantear una violación a una de las anteriores disposiciones.

■ El Estado sostiene que la anterior conclusión es improcedente dado que no se alegó que la Asociación o alguno de sus miembros fuera un contribuyente federal o que el programa impugnado utilizara fondos federales. Este planteamiento carece de méritos. El Tribunal Supremo federal ha resuelto expresamente, y en repetidas ocasiones, que los contribuyentes estatales tienen legitimación activa para impugnar, bajo la cláusula de establecimiento de la Primera Enmienda, los programas estatales que no utilizan fondos federales. *Grand Rapids School District v. Ball*, 473 U.S. 373, 380 esc. 5 (1985); *Mueller v. Allen*, 463 U.S. 388, 392 (1983); *Roemer v. Maryland Public Works Bd.*, 426 U.S. 736, 744 (1976); *Meek v. Pittenger*, 421 U.S. 349, 351 y 355–356 esc. 5 (1975); *Committee for Public Education v. Nyquist*, 413 U.S. 756, 762 (1973); *Levitt v. Committee for Public Education*, 413 U.S. 472, 478 (1973); *Ameri-*

---

[6] Por no ser necesario, no abordamos el argumento planteado por la Asociación de Maestros de Puerto Rico de que sus miembros tienen legitimación activa dado que la citada Ley Núm. 71: (1) al sustraer fondos públicos del sistema educativo, limita los recursos disponibles al maestro en el salón de clase, y (2) al provocar que estudiantes talentosos abandonen el sistema público, pierde el maestro una pieza indispensable para que el proceso de enseñanza se logre en el salón de clase.

*can Civil Lib. Union v. City of St. Charles*, 794 F.2d 265, 267–269 (7mo Cir. 1986).

Por lo anteriormente expuesto, resolvemos que la Asociación posee la legitimación activa necesaria para instar el presente recurso. Resuelto este planteamiento, nos corresponde evaluar los méritos del presente caso.

## IV

La Asociación fundamenta su acción, de manera primaria, sobre la disposición constitucional siguiente:

> Habrá un sistema de instrucción pública el cual será libre y enteramente no sectario. La enseñanza será gratuita en la escuela primaria y secundaria y, hasta donde las facilidades del Estado lo permitan, se hará obligatoria para la escuela primaria. ... No se utilizará propiedad ni fondos públicos para el sostenimiento de escuelas o instituciones educativas que no sean las del Estado. Nada de lo contenido en esta disposición impedirá que el Estado pueda prestar a cualquier niño servicios no educativos establecidos por ley para protección o bienestar de la niñez. Art. II, Sec. 5 de la Carta de Derechos, Const. E.L.A., *supra*, pág. 271.

Específicamente, aduce que el Art. 6(c) de la Ley Núm. 71, *supra*, crea un esquema prohibido por la citada disposición constitucional, pues dispone de fondos públicos para sostener escuelas privadas. Esta cláusula no tiene disposición análoga en la Constitución federal.

Nos corresponde, por lo tanto, impartir contenido a esta disposición y delimitar el alcance del concepto "sostenimiento". En primer lugar, debemos notar que la palabra "sostenimiento" no está cualificada en el texto constitucional. Todo sostenimiento está prohibido. Naturalmente, el problema consiste en delimitar qué interacción entre las escuelas privadas y el Estado es permisible y qué cooperación no lo es por constituir el sostenimiento que nuestra Constitución proscribe.

Un examen del historial de los debates en la Convención

Constituyente sobre la cláusula del sostenimiento apoya una interpretación amplia del alcance de la prohibición. Diario Sesiones, *supra*, págs. 1476–1501. Originalmente, la medida propuesta, según redactada por la Comisión, prohibía el gasto de fondos públicos para la "enseñanza" en escuelas privadas. El pleno de la Convención cambió este vocablo a "sostenimiento", bajo el entendido de que se estaba ampliando la prohibición. J. Trías Monge, *Historia Constitucional de Puerto Rico*, Río Piedras, Ed. U.P.R., 1982, Vol. III, págs. 179–180. Aunque se derrotó la idea de ampliar aún más la disposición para que la prohibición abarcara el "sostenimiento o beneficio" de estas escuelas, los debates indican que no se añadió la palabra "beneficio" por considerarse que ya estaba incluida en el concepto "sostenimiento". Trías Monge *op. cit.*, pág. 180. Véase, además, Diario de Sesiones, *supra*, pág. 1481.

La cláusula siguiente a la del sostenimiento, que dispone que el Estado podrá prestar servicios no educativos para el beneficio de la niñez (*cláusula de los servicios*), no le resta fuerza a nuestra conclusión de que el concepto de sostenimiento debe interpretarse ampliamente. Según el historial, la Convención Constituyente pretendía solamente aclarar que, por el mero hecho de que un niño asistiera a una escuela privada, el Estado no estaría impedido de prestarle ciertos servicios no educativos disponibles a todos los niños del sistema de instrucción pública. El debate en el Pleno de la Convención Constituyente nos provee unos ejemplos sobre los servicios que los delegados consideraban "no educativos": comedor escolar, transportación, dentista, estaciones de leche. Diario de Sesiones, *supra*, págs. 1479, 1480, 1487 y 1491. Debe enfatizarse que esta cláusula presupone, al menos, que (1) el servicio sea no educativo y (2) que el servicio esté generalmente disponible, sin distinciones, tanto para niños de escuela pública como de escuela privada. Así se refleja en el Informe de la Comisión de la Carta de Derechos a la Con-

vención Constituyente, págs. 2564–2565, en el cual se señaló que:

> La última disposición de la sección 5 deja explícito el hecho de que ni la separación entre la Iglesia y el Estado ni el carácter no sectario del sistema de instrucción pública ni la prohibición de uso de fondos o propiedades públicas en escuelas particulares será óbice para que el Estado pueda extender los servicios propios de la niñez a los niños que asisten a tales escuelas. Se trata aquí de la autoridad del Estado para atender el bienestar del niño y no hay limitación constitucional alguna hacia este propósito.

Fundamentándose en el historial de la cláusula de sostenimiento, el Estado alega que ésta se incluyó en nuestra Constitución con el único propósito de incorporar los criterios de separación de Iglesia y Estado desarrollados por el Tribunal Supremo federal, en su interpretación de la cláusula de establecimiento de la Primera Enmienda de la Constitución federal. No tiene razón.

Para sustentar su teoría, el Estado cita unas expresiones del debate en el Pleno de la Convención Constituyente respecto al modo en que la cláusula del sostenimiento, y la citada Sec. 5 en general, reflejaría el principio de separación de Iglesia y Estado. Aunque es cierto que en el debate hubo unas expresiones aisladas a estos efectos,[7] ello no es suficiente para concluir que nuestra cláusula de sostenimiento está vacía de contenido porque ya está todo incorporado en la cláusula de la separación de nuestra Constitución (Art. II, Sec. 3). Las expresiones sobre la manera en que la cláusula del sostenimiento refleja el principio de separación de Iglesia y Estado no significan que incorporar y fortalecer dicho principio, según se ha desarrollado en el ámbito federal, haya sido el *único* objetivo y propósito de nuestra cláusula.

█ Tampoco podemos ignorar el texto claro de la cláusula del sostenimiento y resolver que los delegados no

---

[7] 2 Diario de Sesiones de la Convención Constituyente 1483–1484 (1952).

fueron conscientes de que ésta también incluía en su ámbito a las instituciones privadas no religiosas. No hay duda de que la Sec. 5 del Art. II de nuestra Constitución, *supra*, no permite que el Estado sostenga ninguna institución educativa privada, sea religiosa o no. Su objetivo va más allá de la separación de Iglesia y Estado, pretendiendo proteger y fortalecer al máximo nuestro sistema de instrucción pública frente a toda institución educativa privada. Así lo cree también Trías Monge, *op. cit.*, págs. 179–180:

> La Convención Constituyente ... hizo aún más clara su voluntad de cerrar todo camino a la utilización de fondos públicos para el sostenimiento o beneficio de escuelas privadas, confesionales o laicas, o de institución sectaria alguna, excepto al grado en que éstas pudiesen derivar provecho indirectamente de servicios no educativos ofrecidos para protección o el bienestar de la niñez. ... La enmienda [que sustituye en la Sec. 5 la palabra "sostenimiento" por la anterior, "enseñanza"] se hizo con el propósito expreso de ampliar el ámbito de la prohibición y establecer aún más claramente el principio de la separación del estado y la iglesia.

En vista de lo anterior, concluimos que nuestra cláusula del sostenimiento tiene un contenido independiente y adicional al de la cláusula de establecimiento de la Primera Enmienda de la Constitución federal.

■ A la luz de los materiales revisados, se pueden derivar ciertos principios fundamentales que sirven de guía al evaluar un reclamo de que se ha violado la Sec. 5 del Art. II de nuestra Constitución, *supra*. La cláusula del sostenimiento impide que el Estado provea beneficios, ayudas o apoyo a una escuela privada. Naturalmente, no estaría prohibido por lo anteriormente expuesto que la escuela privada se beneficie indirecta e incidentalmente de los servicios que el Estado provee a toda la ciudadanía, como los de policía y bomberos. Sí estaría el Estado impedido de prestar servicios o ayuda a una escuela privada que, al contribuir directamente a la misión educativa de la institución, constituyan el sostenimiento prohibido por nuestra

Constitución. A manera de ejemplo, el Estado no podría asignar fondos públicos para la construcción de escuelas privadas.

Además, concluimos que la cláusula del sostenimiento le impide al Estado preferir, u otorgar privilegios particulares, a las escuelas privadas sobre el sistema público de enseñanza. Lo que está prohibido es que se aísle la escuela privada para algún beneficio especial. El Estado no puede, mediante sus actuaciones, favorecer indebidamente a la escuela privada, sosteniéndola impermisiblemente.

Claro está, conforme a la cláusula de los servicios no educativos, el Estado puede proveer unos servicios no educativos siempre que estén generalmente disponibles de un modo neutral a todos los niños de Puerto Rico, sin aislar a los estudiantes de escuelas privadas para beneficios o privilegios adicionales o especiales. Lo que persigue esta disposición es que un niño, por el mero hecho de asistir a una escuela privada, no se vea privado de un servicio no educativo que el Estado presta de manera universal.

## V

■ El citado Art. 6(c) del Programa impugnado es inconstitucional porque tiene el efecto de sostener escuelas privadas, lo cual está prohibido por la Sec. 5 del Art. II de nuestra Constitución, *supra*. Tal Programa presta una ayuda sustancial a las escuelas privadas, lo cual contribuye directamente a adelantar la misión educativa de éstas. Además, favorece indebidamente a las escuelas privadas, al concederles un beneficio especial no disponible para las escuelas públicas.

■ El Art. 6(c) de la Ley Núm. 71, *supra*, claramente autoriza el gasto de fondos públicos para sostener a escuelas privadas. Mediante las becas especiales, el Estado posibilita un aumento en el número de estudiantes del sistema educativo privado, al pagarle directamente a la

escuela privada por los gastos educativos en que incurren los nuevos estudiantes. Sobre este aspecto, suscribimos las expresiones siguientes de la Sentencia apelada y resolvemos que bajo el Art. 6(c) de la Ley Núm. 71, *supra*:

> ... se utilizan fondos públicos para pagar directamente a escuelas privadas, laicas o sectarias, por los servicios educativos prestados a los estudiantes que estando previamente en escuelas públicas, asisten ahora a esas escuelas privadas por ellos seleccionadas. Se utilizan así fondos públicos para la enseñanza en, sostenimiento y beneficio de la escuela privada, no del Estado, lo que expresamente está prohibido por la Sección 5 del Artículo II de la Constitución.
>
> ... Eso precisamente, el enriquecer el activo de escuelas privadas con fondos públicos por prestar los servicios educativos que el Estado también brinda, es lo que está prohibido por la Sección 5 [la cual] establece la obligación del Estado para atender únicamente al sostenimiento y al beneficio de aquellas escuelas que estén bajo su dominio exclusivo.[8]

La beca especial constituye un pago del Gobierno a la escuela privada, de hasta $1,500, para cubrir los gastos educativos de estudiantes provenientes de escuelas públicas. Este gasto constituye el tipo de beneficio a las escuelas privadas que tiene el efecto de sostener dichas instituciones, en violación a la cláusula del sostenimiento.

Se ha llegado a igual resultado en otras jurisdicciones. Bajo una disposición constitucional del estado de Washington, parecida a la nuestra (*All schools maintained or supported wholly or in part by the public funds shall be forever free from sectarian control or influence*), se resolvió que un programa de becas para estudiantes de escasos recursos que cubría gastos de matrícula, materiales y otros gastos relacionados, contravenía dicho mandato constitucional. Se *concluyó* que el programa impugnado sostenía (*supported*) escuelas privadas sectarias:

> Respondents argue that only the recipient student benefits from the grant, and that the student's school receives no

---

[8] Apéndice del Escrito de apelación, págs. 21–22.

benefit. But students are the lifeblood of a private school. ... [A] direct financial grant which enables a needy student to pay tuition and thereby remain in a private school obviously supports the school. *Weiss v. Bruno*, 509 P.2d 973, 978 (1973).

El Programa impugnado aquí también sostiene a las escuelas privadas al promover, mediante incentivos económicos, que estudiantes acudan a dichas escuelas. Ello constituye un gasto de fondos públicos dirigido a apoyar y beneficiar, de una manera sustancial y significativa, a las instituciones educativas que no son del Estado.

La disposición de la Ley Núm. 71, *supra*, que limita a no más de la mitad el número de estudiantes de una escuela privada que pueden participar del Programa, no altera el razonamiento que hemos usado para concluir que, en lo pertinente a la ayuda económica a los estudiantes para asistir a las escuelas privadas, el Programa es inconstitucional. Dicha restricción no cambia el hecho de que el Programa concede una ayuda sustancial a la escuela privada. Otorgarle peso a este factor equivaldría a adoptar una visión indebidamente restrictiva de lo que significa "sostenimiento". Como ya señalamos anteriormente, sería artificial decir que el Estado solamente "sostiene" una escuela privada cuando contribuye con más de la mitad de los ingresos que dicha escuela percibe. El concepto "sostenimiento" es mucho más amplio y flexible e impide que el Estado pueda beneficiar a las escuelas privadas de este modo.

■ Más aún, la ayuda que provee la beca especial al niño y a la escuela privada no constituye uno de los servicios no educativos que el Estado puede prestar cuando están generalmente disponibles de un modo neutral a los niños de Puerto Rico. La beca especial constituye una ayuda económica dirigida a satisfacer los gastos relacionados directamente con la educación del niño, como lo son los gastos de matrícula, libros y materiales en general. En segundo lugar, y como hemos señalado, dicha ayuda está

disponible solamente para los niños que decidan cambiarse de la escuela pública a la escuela privada, por lo que definitivamente no está generalmente disponible a todos los niños de Puerto Rico.

Además, el Art. 6(c) de la Ley Núm. 71, *supra*, tiene el efecto de favorecer indebidamente a las escuelas privadas, aislándolas para un beneficio especial no disponible para las escuelas públicas. Bajo la citada Ley Núm. 71 se conceden tres (3) tipos de beneficios. El primero consiste en otorgar libertad al estudiante para escoger la escuela pública que prefiera. El segundo consiste en recompensar a las escuelas públicas que escojan los estudiantes de escuelas privadas (o de otras escuelas públicas) con una asignación presupuestaria adicional de $1,500 por cada estudiante que la haya escogido. El tercer beneficio consiste en pagar a una escuela privada que participe del Programa los gastos de matrícula, libros, materiales y otros gastos relacionados en que incurran los estudiantes provenientes de escuela pública que se trasladen a la escuela privada.

El único gasto verdadero que realiza el Gobierno bajo esta ley va dirigido a apoyar y fortalecer la educación privada, por cuanto provee un incentivo económico directo y sustancial para que los estudiantes de escuela pública se trasladen al sistema privado de enseñanza. Los primeros dos (2) beneficios son medidas administrativas internas que no conllevan un desembolso de fondos por parte del Gobierno y cuyo impacto sobre los estudiantes no compara en magnitud con el pago que hace el Gobierno de la matrícula de un estudiante en la escuela privada. El Programa no provee un incentivo análogo o equivalente a los estudiantes de escuela pública; es decir, está parcializado hacia la escuela privada. Como hemos dicho, aunque el Programa concede ciertos beneficios a algunos estudiantes del sistema de instrucción pública, éstos son totalmente distintos en naturaleza y magnitud a los otorgados a los estu-

diantes que decidan abandonar la escuela pública y asistir a una privada. Veamos.

Por un lado, para el estudiante que decide cambiarse de una escuela pública a una privada, el Estado le provee hasta $1,500 de ayuda para sus gastos de matrícula, libros, etc. Por otro lado, al estudiante que decide cambiarse a una escuela pública, el Estado no le da un centavo de ayuda; sólo provee un "crédito" de $1,500 para la escuela pública seleccionada. El único incentivo económico que el Programa crea se le ofrece al estudiante que decide cambiarse de una escuela pública a una privada. Aún si viéramos el vale educativo o "crédito" como un incentivo económico, éste no es de ninguna manera equivalente al incentivo de la beca especial, porque el primero no es para el estudiante, sino para la escuela, fluyendo al estudiante un beneficio muy atenuado, remoto y especulativo, consistente en una escuela "mejorada" por el presupuesto adicional con que cuenta. El Art. 6(c) de la citada Ley Núm. 71, *supra*, crea un fuerte incentivo para promover el traslado de estudiantes del sistema público de enseñanza al privado, beneficiando así a la escuela privada. El Programa otorga al estudiante que decide trasladarse de una escuela pública a una privada hasta $1,500 en efectivo para cubrir gastos de escuela; en el caso inverso, el estudiante no recibe un solo centavo y su único "beneficio" es el que pueda derivarse de un ingreso adicional para la escuela seleccionada, el cual realmente es mínimo y tiene que ser compartido con todos los demás estudiantes de la escuela.

Por todo lo anterior, concluimos que el Art. 6(c) de la Ley Núm. 71, *supra*, tiene el efecto de utilizar fondos públicos para sostener las escuelas privadas. Por ende, viola los principios fundamentales de la cláusula del sostenimiento: impedirle al Estado mantener a las escuelas privadas, y evitar que el Estado favorezca indebidamente el sistema privado de enseñanza en detrimento del sistema público.

Por las razones anteriormente expuestas, resolvemos que el programa de becas especiales establecido por el Art. 6(c) de la Ley Núm. 71, *supra*, es inconstitucional por violar la Sec. 5 del Art. II de nuestra Constitución, *supra*.[9] Este dictamen no impide que el Departamento de Educación, al amparo de la Ley Núm. 71, *supra*, continúe con los otros programas establecidos por el estatuto, particularmente el que autoriza la transferencia de estudiantes de una escuela pública a cualquier otra escuela pública, incluyendo las de la comunidad.

*Se dictará sentencia que confirme el dictamen recurrido.*

La Juez Asociada Señora Naveira de Rodón emitió una opinión de conformidad. El Juez Asociado Señor Fuster Berlingeri emitió una opinión de conformidad, a la cual se unió el Juez Asociado Señor Alonso Alonso. Los Jueces Asociados Señores Negrón García y Rebollo López emitieron sendas opiniones disidentes.

— O —

Opinión de conformidad emitida por la Juez Asociada Señora Naveira de Rodón.

I

La Asamblea Legislativa aprobó la Ley Núm. 71 de 3 de septiembre de 1993 (18 L.P.R.A. sec. 911 et seq.) con el propósito de establecer el Programa de Becas Especiales y Libre Selección de Escuelas en el Departamento de Educa-

---

[9] En vista de que en la Resolución de 5 de de agosto de 1994 permitimos que tanto los estudiantes que habían participado anteriormente del Programa de Becas Especiales como los estudiantes que interesaran participar en dicho programa durante el presente año académico lo hicieran mientras se dilucidaba la constitucionalidad del mismo, consideramos necesario, por razones de equidad, permitir que los estudiantes matriculados completen este año escolar.

ción del Estado Libre Asociado de Puerto Rico (en adelante Programa). Los objetivos de esta ley de carácter experimental,([1]) según consta en su exposición de motivos, son: (1) ampliar las opciones de los padres y estudiantes en lo referente a la selección de escuelas; (2) estimular a los estudiantes talentosos a realizar un mayor esfuerzo intelectual y a iniciar estudios universitarios mientras asisten a la escuela secundaria, y (3) ofrecer incentivos económicos para que las escuelas públicas mejoren sus ofrecimientos.

Conforme con los objetivos antes enumerados, el Art. 6 de la Ley Núm. 71, *supra*, 18 L.P.R.A. sec. 911d, establece cuatro (4) tipos o modalidades de becas especiales y vales educativos. Estos son: (1) libre selección de escuelas públicas por estudiantes de otras escuelas públicas; (2) libre selección de escuelas públicas por estudiantes de escuelas privadas; (3) acceso a escuelas privadas para estudiantes de escuelas públicas; (4) adelanto educativo para estudiantes talentosos que tomen cursos universitarios acreditables tanto para programas universitarios como para programas de escuela secundaria. La Ley Núm. 71, *supra*, provee *vales educativos* para que los estudiantes puedan transferirse de una escuela pública o privada a otra escuela pública. Además, establece un programa de *becas especiales* para que estudiantes, cuyas familias tengan ingresos anuales de $18,000 o menos, puedan transferirse de una escuela pública a una privada, o para tomar cursos universitarios en instituciones públicas o privadas debidamente acreditadas.

En el caso de la modalidad de libre selección de escuelas públicas, los padres de los estudiantes presentarán los certificados de vales educativos en las escuelas seleccionadas

---

([1]) El Art. 12 de la Ley Núm. 71 de 3 de septiembre de 1993 (18 L.P.R.A. sec. 911j), dispone que el Programa de Becas Especiales y Libre Selección de Escuelas en el Departamento de Educación del Estado Libre Asociado de Puerto Rico (en adelante Programa) es de carácter experimental. Indica que se ensayará en ciertas áreas y que se podría ampliar gradualmente.

y éstas los entregarán en la oficina del Programa para recibir un crédito que no será mayor de $1,500. Dicho crédito será utilizado por la escuela para enriquecer sus ofrecimientos educativos y para financiar los gastos relacionados con la prestación de sus servicios al estudiante. Por otra parte, cuando el estudiante o sus padres seleccionan una escuela privada, las becas se redimirán mediante su presentación ante la oficina del Programa, junto con las facturas por concepto de matrículas, libros, materiales y otros gastos similares relacionados con la educación del estudiante. Arts. 8, 9 y 10 de la Ley Núm. 71, *supra*, 18 L.P.R.A. secs. 911f, 911g y 911h.

Para participar en el Programa, las instituciones privadas, tanto escuelas como universidades, deberán: (1) poseer la correspondiente licencia o acreditación; (2) mantener una política no discriminatoria de admisiones; (3) cumplir con todos los requisitos aplicables de salud y seguridad, y (4) someter informes semianuales sobre el desempeño académico de los estudiantes becados. Los estudiantes participantes en el programa no podrán exceder del 50% de la matrícula total de la escuela. Art. 11 de la Ley Núm. 71, *supra,* 18 L.P.R.A. sec. 911i.

El Art. 15 de la Ley Núm. 71, *supra,* 18 L.P.R.A. sec. 911m, faculta al Secretario del Departamento de Educación a reglamentar la forma de evaluación y seguimiento para asegurar la mejor utilización de las becas especiales, tarea que se hará en comunicación con las escuelas privadas participantes. Dicha reglamentación no debe interferir o menoscabar la autonomía funcional y la libertad académica garantizada por la Ley Núm. 49 de 30 de junio de 1988, según enmendada, 18 L.P.R.A. secs. 2111–2133. La Oficina del Contralor tiene la facultad para examinar, revisar, fiscalizar o auditar documentos, papeles o récord de las escuelas y universidades que participan en el Programa para constatar que los recursos que les lleguen por vía de las becas especiales sean utilizados conforme a lo

pautado en la ley. Art. 16 de la Ley Núm. 71, *supra*, 1993 Leyes de Puerto Rico 326.

Para implantar el Programa, el estatuto asigna $10,000,000 consignados en el Presupuesto General de Gastos del Departamento de Educación. En años sucesivos, los fondos del Programa se consignarán en el Presupuesto General de Gastos del Departamento de Educación. Art. 16 de la Ley Núm. 71, *supra.*

Tras la aprobación de la Ley Núm. 71, *supra*, la Asociación de Maestros de Puerto Rico, Inc. (en adelante Asociación) impugnó la constitucionalidad de la Ley Núm. 71, *supra.* En su demanda de Sentencia Declaratoria solicitó que el tribunal ordenara a los demandados a abstenerse de implantar el Programa.[2]

En síntesis, la Asociación alegó que la Ley Núm. 71, *supra*, al ayudar a estudiantes a sufragar los gastos de estudios en las escuelas privadas sectarias, violenta las Secs. 1, 5 y 7 del Art. II de la Constitución del Estado Libre Asociado de Puerto Rico, L.P.R.A., Tomo 1. También alegó que el estatuto carece de un fin público y, por lo tanto, es contrario a la Sec. 9 del Art. VI de nuestra Constitución, L.P.R.A., Tomo 1, y a la Primera Enmienda de la Constitución de Estados Unidos de América. Por su parte, el Estado, al contestar la demanda, señaló que la ley impugnada es neutral y no confiere beneficios en atención a unos criterios religiosos. Indicó que la ayuda se le provee al estudiante y no a la institución, y que no se estaba sosteniendo institución privada alguna con fondos públicos. Fi-

---

[2] Los demandados en este caso son el Secretario del Departamento de Educación, el Departamento de Educación, el Estado Libre Asociado de Puerto Rico, el Secretario Auxiliar de Servicio al Estudiante en el Departamento de Educación, el Director del Programa de Becas Especiales y Libre Selección de Escuelas, el Gobernador de Puerto Rico y el Secretario de Justicia.

Además del Estado, varios padres, por sí y en representación de sus hijos, figuran como demandados tras presentar una solicitud de intervención. La Unión Americana de Libertades Civiles y la organización conocida como *Americans United for Separation of Church and State* también figuran como *amicus curiae* en el pleito de autos.

nalmente, cuestionó la legitimación activa de la Asociación para presentar y promover el pleito incoado.

Luego de que las partes presentaran sendas mociones de sentencia sumaria y las respectivas mociones en oposición, el Tribunal Superior emitió su sentencia. En resumen, éste otorgó legitimación activa a la Asociación y declaró inconstitucional la modalidad de la ley que otorga becas especiales a estudiantes de escuelas públicas para lograr el acceso a las escuelas privadas. Art. 6(c) de la Ley Núm. 71, *supra*, 18 L.P.R.A. sec. 911d(c). Resolvió que dicha modalidad es inconstitucional porque sufraga con fondos públicos estudios en escuelas privadas, usando un sistema institucionalizado de educación privada paralelo al sistema de educación pública, suplantándolo parcialmente y violentando, así, la Sec. 5 del Art. II de la Constitución del Estado Libre Asociado de Puerto Rico, *supra*.[3]

El tribunal sentenciador le ordenó a las partes demandadas abstenerse de implantar o poner en vigor el Art. 6(c) de la referida ley. No obstante, permitió que se continuara con esta modalidad del Programa mientras los trescientos once (311) niños participantes completaban el año escolar.[4]

El Estado y un grupo de padres interventores apelaron la decisión del tribunal de instancia. Alegaron que el tribunal erró al conferir legitimación activa a la Asociación y al declarar inconstitucional el Art. 6(c) de la Ley Núm. 71, *supra*, puesto que el mismo no promueve el uso de fondos

---

[3] El tribunal de instancia determinó que las otras tres (3) modalidades de la ley, relativas a la libre selección de escuelas públicas por estudiantes de escuelas privadas o públicas y a las horas especiales para estudiantes talentosos que toman cursos universitarios, eran constitucionalmente válidas. Art. 6(a), (b) y (d) de la Ley Núm. 71 de 3 de septiembre de 1993 (18 L.P.R.A. secs. 911d(a), (b) y (d).

[4] Según se establece en el escrito de apelación del Procurador General, durante el presente año escolar mil ciento setenta y seis (1,176) estudiantes recibieron los vales educativos para cambiar de una escuela pública a otra; trescientos diecisiete (317) utilizaron los vales para transferirse de una escuela privada a una pública, y trescientos once (311) estudiantes recibieron las becas especiales para ayudarlos en su transferencia de una escuela pública a una privada.

públicos para el sostenimiento de las instituciones educativas privadas.

Expedimos el recurso de apelación y celebramos una vista oral el 31 de mayo de 1994.

## II

Según indicamos, el Estado impugnó la legitimación activa de la Asociación para presentar o promover el pleito de autos. Indicó que dicha organización magisterial, *como asociación*, no alegó o probó daño alguno y que sus miembros tampoco han sufrido daños a consecuencia de la aprobación de la Ley Núm. 71, *supra*. Señaló que el hecho de que la controversia planteada está revestida de un alto interés público no es suficiente para soslayar los requisitos de legitimación y que la acción de contribuyentes está expresamente prohibida por el Art. 2 de la Ley de Pleitos contra el Estado Libre Asociado de Puerto Rico, Ley Núm. 2 de 25 de febrero de 1946 (32 L.P.R.A. sec. 3074).

Por su parte, la Asociación alegó tener capacidad para presentar la acción civil de autos por ser una organización que representa los intereses de los maestros que agrupa en su matrícula. Indicó que la controversia presentada por la Asociación está íntimamente ligada a un aspecto de la educación que afecta directamente a los integrantes de la Asociación[5] y que la acción civil está revestida de un alto interés público, ya que la ley socava la política pública de rango constitucional relativa a la educación. Además, adujeron que los miembros de la Asociación son contribuyentes con capacidad para impugnar las acciones del Gobierno que violenten la Primera Enmienda federal que prohíbe al Estado ayudar o fomentar el establecimiento de religiones.

[5] La Asociación de Maestros de Puerto Rico (en adelante Asociación) alega que el maestro pierde recursos materiales y humanos (estudiantes talentosos), lo que afectará sus condiciones de trabajo, y que los objetivos y propósitos de la Asociación son promover y proteger el sistema de educación libre y no sectario en Puerto Rico.

Coincidimos, en términos generales, con la opinión de la mayoría del Tribunal que adopta la norma pautada por el Tribunal Supremo federal que permite que los contribuyentes impugnen acciones gubernamentales al amparo de la Cláusula de Establecimiento de la Primera Enmienda de la Constitución federal, y que establece que la Asociación posee legitimación activa para impugnar la constitucionalidad de la Ley Núm. 71, *supra*. Sin embargo, deseamos aclarar los fundamentos por los cuales respaldamos la adopción de dicha norma en nuestra jurisdicción. Veamos.

A. *Trasfondo histórico de la adopción de las cláusulas de establecimiento y la separación de Iglesia y Estado en Puerto Rico*

La Sec. 3 del Art. II de la Constitución del Estado Libre Asociado de Puerto Rico, L.P.R.A., Tomo 1, prohíbe la adopción de leyes que promuevan o faciliten el establecimiento de cualquier religión, y garantiza la libertad de culto y la completa separación entre la Iglesia y el Estado. A su vez, la Sec. 5 del mismo Art. II, *supra*, dispone que Puerto Rico tendrá un sistema de instrucción pública libre y no sectario, y que no se utilizará la propiedad ni los fondos públicos para sostener escuelas o instituciones educativas que no sean las del Estado.([6])

---

([6]) La Sec. 3 del Art. II de nuestra Constitución, L.P.R.A., Tomo 1, ed. 1982, pág. 262, dispone:

"No se aprobará ley alguna relativa al establecimiento de cualquier religión ni se prohibirá el libre ejercicio del culto religioso. Habrá completa separación de la iglesia y el estado."

La Sec. 5 del Art. II de nuestra Constitución, L.P.R.A., Tomo 1, ed. 1982, pág. 271, dispone:

"Toda persona tiene derecho a una educación que propenda al pleno desarrollo de su personalidad y al fortalecimiento del respeto de los derechos del hombre y de las libertades fundamentales. Habrá un sistema de instrucción pública el cual será libre y enteramente no sectario. La enseñanza será gratuita en la escuela primaria y secundaria y, hasta donde las facilidades del Estado lo permitan, se hará obligatoria para la escuela primaria. La asistencia obligatoria a las escuelas públicas primarias, hasta donde las facilidades del Estado lo permitan, según se dispone en la presente, no se interpretará como aplicable a aquellos que reciban instrucción primaria en escuelas establecidas bajo auspicios no gubernamentales. No se utilizará propiedad ni fondos públicos para el sostenimiento de escuelas o instituciones educativas que

Dichas claúsulas constitucionales fueron adoptadas tras unos extensos debates de los miembros de la Asamblea Constituyente que planteaban la controversia relativa a las restricciones del Gobierno de Puerto Rico en asuntos religiosos. Según explica el ex Juez Presidente José Trías Monge, el tema sobre la libertad de culto y la separación entre la Iglesia y el Estado fue uno de los más debatidos en la Convención Constituyente. J. Trías Monge, *Historia Constitucional de Puerto Rico*, Río Piedras, Ed. U.P.R., 1982, Vol. III, pág. 176.

Señala Trías Monge que "[l]a Iglesia Católica libró una intensa campaña, antes y durante el curso de la Convención Constituyente, en favor de que la nueva Constitución rechazase el lenguaje restrictivo de la Ley Orgánica [Jones] y reprodujese tan sólo las disposiciones de la Primera Enmienda de la Constitución de los Estados Unidos. Las iglesias protestantes abogaban con igual vehemencia en favor de una afirmación más rigurosa del principio de la separación del estado y la iglesia, en modo comparable al dispuesto en la Ley Orgánica". Trías Monge, *op. cit.*, pág. 176.

La razón de esta campaña era que la Ley Orgánica de 1917, conocida como el Acta Jones, contenía severas disposiciones relativas al principio de la separación entre la Iglesia y el Estado,[7] las cuales respondían al interés que

---

no sean las del Estado. Nada de lo contenido en esta disposición impedirá que el Estado pueda prestar a cualquier niño servicios no educativos establecidos por ley para protección o bienestar de la niñez."

(7) Los párrafos 18 y 19 del Art. 2 del Acta Jones disponían:

(18) "No se dictará ninguna ley relativa al establecimiento de cualquiera religión o que prohíba el libre ejercicio de la misma, y se permitirá en todo tiempo el libre ejercicio y goce de profesiones y cultos religiosos sin distinciones ni preferencias, y no se exigirá como condición para desempeñar cualquier cargo o puesto de confianza en el Gobierno de Puerto Rico, ningún requisito político o religioso que un juramento de defender la Constitución de los Estados Unidos y las leyes de Puerto Rico.

(19) "Jamás se asignará, aplicará, donará, usará, directa ni indirectamente, dinero o propiedad pública para el uso, beneficio o sostenimiento ... de ningún sacerdote, predicador, ministro u otro instructor o dignatario religioso, como tal." 39 Stat. 951, Documentos Históricos, Sec. 2, L.P.R.A., Tomo 1, ed. 1982, pág. 63.

surgió con el cambio de soberanía de mantener una tajante separación entre la Iglesia y el Estado. R. Serrano Geyls, *Derecho Constitucional de Estados Unidos y Puerto Rico*, San Juan, Ed. C. Abo. P.R., 1986, Vol. II, pág. 1613. Las iglesias protestantes temían que si se modificaban las cláusulas de la citada Ley Orgánica, la Iglesia Católica tendría una posición ventajosa por ser Puerto Rico un país predominantemente católico. La Iglesia Católica, por el contrario, deseaba que la cláusula religiosa fuera similar a la de la Primera Enmienda de la Constitución federal y que el Gobierno apoyase todas las instituciones educacionales y benéficas de la Isla, públicas o privadas, laicas o confesionales. *La Nueva Constitución de Puerto Rico*, Escuela de Administración Pública, Río Piedras, Eds. U.P.R., 1954, pág. 196. Precisamente las iglesias protestantes temían que la ayuda a las escuelas confesionales beneficiara la enseñanza de la fe católica. Trías Monge, *op. cit.*, pág. 178.

Finalmente, la Convención Constituyente siguió las recomendaciones de la Comisión de Carta de Derechos que favoreció el principio de la absoluta separación entre el Estado y la Iglesia, y adoptó la doctrina del beneficio a la niñez, incluyendo una oración que permitía que el Estado prestara unos servicios no educativos para la protección o el bienestar de la niñez.[8]

Al respecto explica Trías Monge, *op. cit.*, págs. 179–180:

"La Convención Constituyente ... hizo aún más clara su voluntad de cerrar todo camino a la utilización de fondos públicos para el sostenimiento o beneficio de escuelas privadas, confesionales o laicas, o de institución sectaria alguna, excepto al grado en que éstas pudiesen derivar provecho indirectamente de ser-

---

[8] La doctrina del beneficio a la niñez acogía las decisiones del Tribunal Supremo federal que validaban las donaciones de libros a estudiantes de escuelas laicas y parroquiales, y el reembolso de los gastos de transportación a dichos estudiantes. J. Trías Monge, *Historia Constitucional de Puerto Rico*, Río Piedras, Ed. U.P.R., 1982, Vol. III, pág. 178. Véanse: *Cochran v. Board of Education*, 281 U.S. 370 (1930); *Everson v. Board of Education*, 330 U.S. 1 (1947); *McCollum v. Board of Education*, 333 U.S. 203 (1948).

vicios no educativos ofrecidos para protección o el bienestar de la niñez. A tal efecto, debe señalarse que la Convención enmendó la segunda cláusula de las recomendadas por la Comisión para sustituir la palabra "enseñanza" por el vocablo "sostenimiento", lo que provocó que se dispusiese en la sección 5 del artículo II que "No se utilizará propiedad ni fondos públicos para el sostenimiento de escuelas o institutiones educativas que no sean las del Estado." La enmienda se hizo con el propósito expreso de ampliar el ámbito de la prohibición y establecer aún más el principio de la separación del estado y la iglesia.

En fin, el debate sobre la Sec. 5 del Art. II de nuestra Constitución, *supra*, junto con la discusión sobre la Sec. 3 del mismo artículo, *supra*, estuvo enmarcada en el contexto del tema de la separación entre la Iglesia y el Estado.[9] Ambas cláusulas referentes a la religión se complementan entre sí. En su conjunto, estas disposiciones son más abarcadoras que las de la Constitución federal.[10] *Díaz v. Colegio Nuestra Sra. del Pilar*, 123 D.P.R. 765 (1989).[11] Por lo tanto, es preciso concluir que cualquier

---

[9] En apoyo a esta aseveración se citan los comentarios que sobre el particular nos hace Trías Monge durante la discusión de la Convención Constituyente:

"... [A]quí hay dos principios básicos que se instituyen en esta sección. Uno es el principio de separación del Estado e Iglesia, tal como ha sido consignado en la Constitución federal y el cual seguirá su desarrollo normal vía las interpretaciones del Tribunal Supremo de los Estados Unidos

"... Del otro lado también se ha importado aquí de una forma precisa y clara la propia doctrina desarrollada por el Tribunal Supremo de los Estados Unidos ... de que el beneficio que el Estado le brinda a los niños de edad escolar no constituye establecimiento de una religión dentro del lenguaje de la primera enmienda a la Constitución de los Estados Unidos. 2 Diario de Sesiones de la Convención Constituyente 1483–1484 (1952).

[10] La Primera Enmienda dispone:

"El Congreso no aprobará ninguna ley con respecto al establecimiento de religión alguna o que prohíba el libre ejercicio de la misma ...." Emda. I, Const. EE. UU., L.P.R.A., Tomo 1, ed. 1982, pág. 184.

[11] Otras disposiciones referentes a la religión, incluidas en la Constitución del Estado Libre Asociado de Puerto Rico, son:

(a) La Sec. 1 del Art. II, Const. E.L.A., L.P.R.A., Tomo 1, que prohíbe el discrimen por razón de ideas religiosas.

(b) La Sec. 6 del Art. II, Const. E.L.A., L.P.R.A., Tomo 1, que aboga por la libre asociación.

(c) La Sec. 9 del Art. VI que dispone:

"Sólo se dispondrá de las propiedades y fondos públicos para fines públicos y para el sostenimiento y financiamiento de las instituciones del Estado ...." Const. E.L.A., L.P.R.A., Tomo 1, ed. 1982, pág. 369.

norma que se adopte para el examen de los casos en que se alegue una violación a la Sec. 3, *supra*, tiene que ser adoptada para la Sec. 5 del citado Artículo de nuestra Constitución.

B. *Legitimación activa en las acciones relativas a las cláusulas constitucionales sobre religión y separación entre la Iglesia y el Estado*

La revisión judicial es característica distintiva de nuestro ordenamiento político. *E.L.A. v. Aguayo*, 80 D.P.R. 552, 595 (1958). Sin embargo, el poder de la Rama Judicial para revisar y determinar la constitucionalidad de las leyes tiene unos límites autoimpuestos asentados en el principio de justiciabilidad. *Noriega Rodríguez v. Jarabo*, 136 D.P.R. 497 (1994). Son los propios tribunales los que analizan y deciden cuando deben examinar planteamientos constitucionales en una acción judicial sin rebasar el límite de su poder constitucional. *Com. de la Mujer v. Srio. de Justicia*, 109 D.P.R. 715, 720–721 (1980).

Ahora bien, enmarcada en el concepto de justiciabilidad, se ha desarrollado la doctrina de legitimación o capacidad jurídica.[12] Un tribunal no puede obviar los principios de legitimación activa para adjudicar los méritos de un caso. *Hernández Torres v. Hernández Colón et al.*, 131 D.P.R. 593 (1992); *Hernández Torres v. Gobernador*, 129 D.P.R. 824 (1992). Esto es así porque la doctrina de legitimación ac-

---

Para un estudio sobre la cuestión religiosa en la Constitución del Estado Libre Asociado de Puerto Rico, véanse: R. Serrano Geyls, *Derecho Constitucional de Estados Unidos y Puerto Rico*, San Juan, Ed. C. Abo. P.R., 1986, Vol. II, págs. 1608–1728; Trías Monge, *op. cit.*, págs. 176–181; *La Nueva Constitución de Puerto Rico*, Escuela de Administración Pública, Río Piedras, Eds. U.P.R., 1954, págs. 194–204; Diario de Sesiones de la Convención Constituyente, *supra*.

[12] Para un repaso sobre el desarrollo de esta doctrina en nuestra jurisdicción, véanse: *Noriega v. Hernández Colón*, 135 D.P.R. 406 (1994); *Hernández Torres v. Hernández Colón et al.*, 131 D.P.R. 593 (1982); *Hernández Torres v. Gobernador*, 129 D.P.R. 824 (1992); *Col. Ópticos de P.R. v. Vani Visual Center*, 124 D.P.R. 559 (1989); *Silva v. Hernández Agosto*, 118 D.P.R. 45 (1986); *Hernández Agosto v. Romero Barceló*, 112 D.P.R. 407 (1982); *Fund. Arqueológica v. Depto. de la Vivienda*, 109 D.P.R. 387 (1980); *Com. de la Mujer v. Srio. de Justicia*, 109 D.P.R. 715 (1980); *Salas Soler v. Srio. de Agricultura*, 102 D.P.R. 716 (1974); *E.L.A. v. Aguayo*, 80 D.P.R. 552 (1958).

tiva "gira principalmente en torno a la parte que prosigue la acción y secundariamente en cuanto a las cuestiones a adjudicarse". *Com. de la Mujer v. Srio. de Justicia*, supra, pág. 723.

Hemos resuelto que el promovente de una acción judicial debe demostrar que ha sufrido un daño claro y palpable; que el daño es real, inmediato y preciso, y no abstracto o hipotético; que la causa de acción surge bajo el palio de la Constitución o de una ley, y que existe una conexión entre el daño sufrido y la causa de acción ejercitada. *Noriega v. Hernández Colón*, 135 D.P.R. 406 (1994).[13]

Con respecto al caso de las asociaciones, éstas tienen legitimación para demandar en defensa de sus intereses colectivos o a nombre de sus miembros, aunque la propia organización no haya sufrido daños. *Col. Ópticos de P.R. v. Vani Visual Center*, 124 D.P.R. 559 (1989). Si demanda a nombre de sus miembros, la asociación deberá demostrar que éstos tienen legitimación activa propia; los intereses que se pretenden proteger están relacionados con los objetivos de la organización, y que la reclamación y el remedio solicitado no requieren la participación individual de sus miembros. Íd., pág. 566. La determinación de la legitimación activa depende del remedio solicitado y procede que se reconozca la legitimación activa de una asociación cuando la petición es de naturaleza interdictal, o una sentencia declaratoria o cualquier otro remedio interdictal que beneficie a todos los miembros realmente perjudicados.[14] Íd.

Ahora bien, tanto en la jurisdicción federal como en la nuestra se han desalentado los pleitos en los cuales el demandante impugna la constitucionalidad de una acción gu-

---

[13] Véanse, además: *Hernández Torres v. Hernández Colón et al.*, supra; *Hernández Torres v. Gobernador*, supra; *Hernández Agosto v. Romero Barceló*, supra, *Fund. Arqueológica v. Depto. de la Vivienda*, supra.

[14] Coincidimos con la opinión de la mayoría en que no es necesario abordar los argumentos de la Asociación sobre la acción legitimada de la organización a la luz de las normas de legitimación en el caso de las asociaciones. Consideramos que los mismos no demuestran un daño claro, real, palpable e inmediato.

bernamental, alegando ser un contribuyente que aporta al sostenimiento económico del acto alegadamente inconstitucional. El único remedio deseado por el demandante es que el Gobierno no invierta fondos públicos en las alegadas gestiones constitucionales. Serrano Geyls, *op. cit.*, Vol. I, págs. 132–136.

Al respecto, el profesor Serrano Geyls destaca que desde el caso *Massachusetts v. Mellon*, 262 U.S. 447 (1923), se estableció jurisprudencialmente un impedimento a las acciones de los contribuyentes en la jurisdicción federal. Dicha prohibición fue parcialmente modificada en *Flast v. Cohen*, 392 U.S. 83 (1968), interpretación que ha sido catalogada como restrictiva.[15] Añade que en Puerto Rico la Asamblea Legislativa, ante la amenaza de que se usaran los tribunales para paralizar el programa de reforma social, aprobó la Ley Núm. 2 de 25 de febrero de 1946, conocida como la Ley de Pleitos contra el Estado Libre Asociado de Puerto Rico, que prohíbe los pleitos de contribuyentes.[16]

La opinión mayoritaria concluye que la Ley de Pleitos contra el Estado Libre Asociado de Puerto Rico, no es obs-

---

[15] Sin lugar a dudas, la interpretación del Tribunal Supremo federal ha sido restrictiva, pero la norma se ha mantenido en los casos de legitimación para impugnar los gastos bajo la cláusula de establecimiento, incluso los casos en que los demandantes son contribuyentes estatales que impugnan los gastos estatales. *Board of Education of Kiryas Joel Village School District v. Grumet*, 62 L.W. 4665 (1994); *Grand Rapids School District v. Ball*, 473 U.S. 373, 380 esc. 5 (1985); *Mueller v. Allen*, 463 U.S. 388, 392 (1983); *Wolman v. Walter*, 433 U.S. 229 (1977); *Roemer v. Maryland Public Works Bd.*, 426 U.S. 736, 744 (1976); *Meek v. Pittenger*, 421 U.S. 349, 351 y 355–356 esc. 5 (1975); *Levitt v. Committee for Public Education*, 413 U.S. 472, 478 (1973); *Lemon v. Kurtzman*, 403 U.S. 602, 608 y 611 (1971).

[16] El estatuto dispone:

"La acción conocida en equidad como acción del contribuyente queda por la presente prohibida." 32 L.P.R.A. sec. 3074.

"Ningún tribunal de Puerto Rico tendrá jurisdicción para conocer, o continuar conociendo si se hubiera ya iniciado, bien en primera instancia o en grado de apelación, de ninguna acción o procedimiento en que se impugne la validez o constitucionalidad de cualquier ley o resolución de la Asamblea Legislativa de Puerto Rico o de cualquier actuación de un funcionario público autorizada por ley de la Asamblea Legislativa de Puerto Rico, cuando el demandante no alegue otro interés en la acción o procedimiento, ni otra capacidad para demandar; que la de ser contribuyente o representar a los contribuyentes como clase y que, como tal, sufre o pueda sufrir daños por virtud de dicha ley, resolución o actuación." 32 L.P.R.A. sec. 3075.

táculo para que nuestro Tribunal adopte las normas establecidas por *Flast v. Cohen*, supra, que permiten que un contribuyente pueda impugnar acciones gubernamentales al amparo de la cláusula de establecimiento. Veamos.

En *Flast v. Cohen*, supra, un grupo de contribuyentes federales impugnó la asignación de fondos federales, según establecida por el *Elementary and Secondary Act* de 1965. Dichos fondos eran utilizados para financiar la enseñanza de lectura y aritmética, y otras materias en escuelas religiosas, así como la adquisición de textos y otros materiales didácticos para ser utilizados por los estudiantes de estas escuelas. El Tribunal decidió que los contribuyentes tenían legitimación activa para incoar la acción, ya que existía un nexo lógico entre los demandantes y la controversia a ser adjudicada ya que: (1) se trataba de un gasto autorizado por el Congreso en virtud de sus poderes fiscales, y (2) la acción iba dirigida a impedir que se gastara el dinero en una actividad alegadamente prohibida específicamente por la Constitución. *Flast v. Cohen*, supra, págs. 102–103.[17]

El Tribunal resolvió que la Constitución americana fue diseñada de forma tal que la cláusula de establecimiento opera como una limitación constitucional a los poderes fiscales del Congreso, poderes que de no ser por dicha cláusula podrían ser utilizados para debilitar las cláusulas constitucionales sobre la religión.

Ciertamente, como expresa la mayoría de este Tribunal, el razonamiento del Tribunal Supremo federal en *Flast v. Cohen*, supra, debe ser empleado en nuestra jurisdicción para casos en que se aleguen unas violaciones a las Secs. 3 y 5 del Art. II de nuestra Constitución, *supra*, cláusulas que, como explicamos anteriormente, están íntimamente relacionados entre sí y fueron expresamente creadas para adelantar y fortalecer los principios de separación entre

---

[17] Véanse: Serrano Geyls, *op. cit.*, Vol. I, págs. 71–72; J.E. Nowak, R.D. Rotunda y J.N. Young, *Constitutional Law*, Minnesota, Ed. West Publishing Co., 1986, págs. 71–72; L.H. Tribe, *American Constitutional Law*, Nueva York, Ed. Foundation Press, 1988, pág. 116.

Iglesia y Estado, libertad de culto y la prohibición del establecimiento de una religión. Además, estamos de acuerdo con la adopción de la norma porque: (1) los principios constitucionales en los que se fundamenta *Flast v. Cohen*, supra, son análogos a los principios que adoptaron los delegados de la Asamblea Constituyente al crear las cláusulas sobre religión que se integraron en nuestra Constitución; (2) las claúsulas sobre religión en nuestra Constitución tuvieron una importancia crucial para los delegados de nuestra Asamblea Constituyente, al punto que fueron de las más debatidas, y dichas cláusulas son fundamentales en nuestro sistema político y democrático; (3) las cláusulas sobre religión de la Constitución patria son más estrictas y restrictivas que la Cláusula de Establecimiento de la Constitución federal; (4) nuestra Constitución provee unos derechos fundamentales más amplios que los de la Constitución federal (*Díaz v. Colegio Nuestra Sra. del Pilar*, supra); (5) mediante esta norma de excepción se protege y fortalecen unos derechos fundamentales del pueblo puertorriqueño relativos a la religión y, finalmente, (6) está a tono con la posición liberal de nuestro tribunal en cuestiones sobre legitimación activa. *E.L.A. v. P.R. Tel. Co.*, 114 D.P.R. 394 (1983).[18] Por último, aunque en *De Paz Lisk v. Aponte Roque*, 124 D.P.R. 472, 494 (1989), nos referíamos a la Ley Núm. 104 de 29 de junio de 1955, Ley de Reclamaciones y Demandas contra el Estado, señalamos que "bajo nuestro esquema constitucional de separación de poderes, la Legislatura no puede impedir que mediante los mecanismos del *injunction* o de la sentencia declaratoria este Foro pase juicio sobre la *constitucionalidad* de cualquier legislación". (Énfasis suplido y en el original.)

---

[18] Opinamos que es innecesaria la discusión que se hace en la opinión mayoritaria sobre la conveniencia de adoptar la norma sobre legitimación activa en casos en que, como el de autos, se impugnen las acciones gubernamentales al amparo del Art. II, Secs. 3 y 5 de nuestra Constitución, *supra*, con el fin de evitar que los ciudadanos se vean obligados a recurrir al foro federal. Las razones por las cuales acogemos dicha norma, según discutidas, son fundamentos de primer orden.

Sin embargo, es imperativo delinear los contornos de la norma acogida. Adoptarla en el vacío, sin guías claras y contundentes, podría trastocar el ordenamiento y obstaculizar las funciones gubernamentales, las que deben ser descargadas de una manera ordenada y eficaz. El análisis, por lo tanto, tiene que ser riguroso y restrictivo. Permisible únicamente cuando la controversia sobre las cláusulas relacionadas a religión y separación entre Iglesia y Estado, o de otro derecho constitucional fundamental, sea primaria y que ésta no pueda ser resuelta a no ser que se reclame legitimación activa mediante la norma de excepción aquí adoptada.

En el caso de autos, la Asociación representa a sus miembros, maestros contribuyentes al erario. No se requiere la participación individual de éstos para reclamar los intereses que se pretenden proteger, ya que los mismos están relacionados con los objetivos de la Asociación. La Asociación impugna un gasto autorizado por una ley de la Asamblea Legislativa que asigna unos fondos públicos en una actividad alegadamente prohibida de forma específica por las Secs. 3 y 5 del Art. II de la Constitución del Estado Libre Asociado de Puerto Rico, *supra*. Existe un nexo lógico entre los demandantes y su causa de acción. Por último, a no ser por la excepción de la norma anteriormente expuesta, los miembros de la Asociación se verían impedidos de incoar la acción de autos, ya que no pueden probar un daño claro, real, palpable e inmediato.

## III

Hemos reconocido que la educación de los niños y jóvenes puertorriqueños es de vital importancia para el Estado. Somos plenamente conscientes de que "a través de la educación, se imparte la preparación necesaria para que los ciudadanos participen en el desarrollo social y económico de nuestra vida colectiva". *Asoc. Academias y Col.*

*Cristianos v. E.L.A.*, 135 D.P.R. 150 (1994). Véase *De Paz Lisk v. Aponte Roque*, supra. Por lo tanto, el Estado tiene un interés apremiante en que las instituciones educativas del país, tanto públicas como privadas, provean una educación de excelencia. *Asoc. Academias y Col. Cristianos v. E.L.A.*, supra.

Nuestra Asamblea Legislativa, con el propósito de identificar medios eficaces para alcanzar el ideal de proveer a todo ciudadano la oportunidad de recibir una educación de excelencia con igualdad de oportunidades, tal y como anhelaban los miembros de la Asamblea Constituyente al establecer nuestra Constitución, aprobó la Ley Núm. 71, *supra*.[19] Los legisladores estimaron, como lo han hecho las legislaturas de varios estados de la Unión Americana, que un programa de becas y libre selección de escuelas revitalizaría el sistema educativo de Puerto Rico.[20] Ingeniosamente, la Ley Núm. 71, *supra*, intenta esquivar los escollos constitucionales. Sin embargo, dicha ley no tolera el escrutinio constitucional. Los postulados de nuestra Constitución, que prohíben el establecimiento de cualquier religión y la utilización de fondos públicos para el sostenimiento de las escuelas o instituciones educativas que no sean las del Estado, y que ordenan la completa separación entre la Iglesia y el Estado, Art. II, Secs. 3 y 5, Const. E.L.A., *supra*, son claros y contundentes.[21]

Reconocemos que el sistema de educación pública en Puerto Rico, al igual que en la Nación Americana, enfrenta momentos críticos y, por lo tanto, es imperativo adoptar medidas urgentes para cumplir con el mandato constitu-

---

[19] Para los miembros de la Asamblea Constituyente el derecho a la educación fue de tal importancia que, además de establecer un sistema de educación pública de rango constitucional, incluyeron "el afán por la educación" como uno de los factores determinantes en nuestra vida como pueblo democrático. Preámbulo de la Constitución del Estado Libre Asociado de Puerto Rico, L.P.R.A., Tomo 1.

[20] Sobre los programas de libre selección de escuelas, véase J.B. Egle, *The Constitutional Implications of School Choice*, 1992 (Núm. 2) Wisconsin L. Rev. 459 (1992).

[21] Íd., págs. 459–463.

cional de que "[t]oda persona [tenga] derecho a una educación que propenda al pleno desarrollo de su personalidad y al fortalecimiento del respeto de los derechos del hombre y de las libertades fundamentales". Art. II, Sec. 5, Const. E.L.A., *supra*, ed. 1982, pág. 271. Para ello es necesario revisar toda alternativa viable para mejorar y perfeccionar el sistema educativo. Este debe ser un esfuerzo colectivo de los legisladores, funcionarios del sistema de educación, asociaciones y grupos magisteriales, padres, estudiantes y todos los ciudadanos. Sin embargo, la Ley Núm. 71, *supra*, tal y como está redactada, establece un esquema para la creación de un programa educativo que requiere el desembolso de fondos públicos que irán a parar a escuelas o instituciones educativas privadas. Este esquema es contrario al texto claro de la Sec. 5 del Art. II de la Constitución del Estado Libre Asociado, *supra*, así como a la intención de los delegados de la Asamblea Constituyente. Los problemas del sistema de educación no les eran ajenos al momento de redactar dicha disposición. De hecho, los problemas eran aún mayores que los que tenemos hoy día:

> En 1949–50 el Gobierno Insular dedicó aproximadamente el 39 porciento de sus gastos anuales a elevar el nivel educacional del pueblo. A pesar de los enormes desembolsos realizados, los fondos son insuficientes para suministrar el número de maestros y de salones de clase que se necesitan. Más de 100,000 niños entre seis y doce años de edad carecen de ubicación en las escuelas elementales existentes, públicas y privadas. Entre los muchachos mayores (de trece a dieciocho años de edad) es aún mayor la diferencia que existe entre el número de los que están en edad escolar y el número de los que efectivamente están matriculados en la escuela intermedia (incluyendo la segunda unidad) y la escuela superior. Hacen falta, sin duda, más escuelas y más maestros, pero el Gobierno Insular carece de capacidad financiera para proporcionar el número necesario. *La Nueva Constitución, op. cit.*, págs. 197–198.

Los delegados de la Asamblea Constituyente tuvieron ante sí diversos puntos de vista sobre la conveniencia de estimular la expansión y el progreso de la educación pri-

vada para adelantar la política gubernamental de promover un nivel de vida más alto en el pueblo a través de la educación. También consideraron los inconvenientes de ofrecer ayuda financiera a las instituciones educativas privadas, inconvenientes tanto de carácter sustantivo relativos a la separación entre Iglesia y Estado, como de organización y enfoque de programas educacionales.[22] También tenían ante sí las decisiones del Tribunal Supremo federal de los casos *Everson v. Board of Education*, 330 U.S. 1 (1947), y *McCollum v. Board of Education*, 333 U.S. 203 (1948), sobre las cuestiones de la ayuda a las escuelas religiosas. Serrano Geyls, *op. cit.*, pág. 1613; *La Nueva Constitución de Puerto Rico, op. cit.*, págs. 200–204. Fue un problema de valores que quedó resuelto con la adopción de la Sec. 5 del Art. II de nuestra Constitución, *supra.*

Quisiéramos poder llegar a otra conclusión y validar la iniciativa de la Asamblea de la Legislatura de crear nuevos medios y alternativas para adelantar el fin de una educación de excelencia para todos los jóvenes y niños de Puerto Rico. Pero, como señaláramos antes, nuestra Constitución es clara y los precedentes judiciales, tanto de Puerto Rico como de Estados Unidos, relativos a las cláusulas de separación entre Iglesia y Estado, y Establecimiento de Religión nos lo impiden. Además, la doctrina del ámbito mínimo federal nos obliga a ofrecer mayor protección constitucional a los derechos individuales que la reconocida por la Constitución federal. *Díaz v. Colegio Nuestra Sra. del Pilar*, supra, págs. 770–771. Véase Serrano Geyls, *op. cit.*, pág. 1711.[23]

Por todo lo antes expuesto, estamos conformes con la

---

[22] Al respecto, véase *La Nueva Constitución de Puerto Rico, op. cit.*, págs. 196–200.

[23] Mientras subsista esta limitación en nuestra Constitución, esquemas experimentales como el de la Ley Núm. 71, *supra*, no podrán ser implantados. Ahora bien, nada impide que, de estimarlo necesario, se someta a referéndum una enmienda constitucional para que nuestra Constitución, con respecto a la cláusula que prohíbe ayudar o fomentar religiones y la separación entre Iglesia y Estado, tenga el mismo alcance que la cláusula de la Constitución federal.

decisión de la mayoría que resuelve que el programa de becas especiales establecido por el Art. 6(c) de la Ley Núm. 71, *supra*, que facilita el acceso de estudiantes del sistema de instrucción pública hacia las escuelas privadas, es inconstitucional por violar la Sec. 5 del Art. II de nuestra Constitución, *supra*.

— O —

Opinión de conformidad del Juez Asociado Señor Fuster Berlingeri, a la cual se une el Juez Asociado Señor Alonso Alonso.

Estoy de acuerdo con el resultado al que llega la mayoría en este caso y coincido, en general, con los pronunciamientos normativos que se formulan en la opinión del Tribunal. Por eso he dado mi voto de conformidad con la misma.

Creo necesario, sin embargo, expresar unos criterios adicionales sobre los asuntos examinados en la opinión mayoritaria. El primero de ellos versa sobre la cuestión de si la Asociación de Maestros de Puerto Rico (en adelante Asociación) tiene legitimación activa para demandar.

La mayoría, en su opinión, adopta el esquema decisorio de *Flast v. Cohen*, 392 U.S. 83 (1968), para concluir que, en efecto, la Asociación posee la capacidad necesaria para instar el recurso ante nos. Estoy de acuerdo con este enfoque. Me parece que es una manera válida de encarar la cuestión sobre la legitimación activa. Sin embargo, estimo que en este caso existe tal legitimación activa aun bajo criterios más convencionales. Los maestros que integran la Asociación tienen intereses reales y concretos que proteger en este pleito. El programa de becas educativas que aquí se impugna le cuesta muchos millones de dólares al erario. Al sustraer tales fondos del sistema educativo estatal, se reducen los recursos disponibles a los maestros en el salón de clases y se limitan aún más los medios que éstos tienen

para atender las necesidades cotidianas de su función educativa. Esta no es una circunstancia leve o especulativa. Cualquiera que conozca la situación del magisterio puertorriqueño sabe que en incontables ocasiones los muy estrechos presupuestos escolares llevan a cientos, si no a miles, de maestros a valerse de sus propios medios para atender las necesidades del aula. El abnegado maestro en Puerto Rico con frecuencia tiene que suplir él mismo los materiales y otros recursos necesarios para la docencia, que el sistema público no provee.

Por otro lado, el programa de becas impugnado tiene también el efecto de propiciar que estudiantes talentosos abandonen el sistema público, lo que tiende a empobrecer en términos humanos el proceso de enseñanza-aprendizaje en el aula pública. Los estudiantes que típicamente cualificarían para las becas son precisamente aquellos que tienen una alta capacidad intelectual y unas motivaciones de estudio muy serias. Por sus dotes, son alumnos que enriquecen el quehacer escolar cotidiano y que aportan así a mejorar el proceso educativo. Al perder tales estudiantes, la labor del maestro en la escuela pública se hace más difícil. Queda privada de un valioso recurso humano que hubiese facilitado la tarea pedagógica.

No puede negarse, pues, que el programa de becas impugnado afecta las condiciones de trabajo del maestro en el sistema público. *Tiende a empeorar lo que de por sí es una situación desventajosa.* El conocimiento de que tal es el ominoso impacto del programa de becas en cuestión, junto con el convencimiento de que tal programa es contrario al esquema constitucional del país sobre la instrucción pública, sin dudas le causa a muchos maestros que integran la Asociación unos sentimientos de agobio, frustración e indignación. Ese hondo malestar que hiere su sensibilidad, unido a los daños aludidos a sus condiciones de trabajo, le dan a los maestros que la Asociación representa un *interés especial* en el asunto ante nos, que es suficiente para reco-

nocerles legitimación activa para demandar. Véanse: *Asociación de Maestros v. Pérez, Gobernador Int.*, 67 D.P.R. 849 (1947); *Salas Soler v. Srio. de Agricultura*, 102 D.P.R. 716 (1974).

## II

En la opinión mayoritaria se explica con meridiana claridad que la Ley Núm. 71 de 3 de septiembre de 1993 destina unos fondos públicos para el sostenimiento de escuelas privadas en el país, lo que es incuestionablemente contrario al claro mandato de la Sec. 5 del Art. II de nuestra Constitución, L.P.R.A., Tomo 1. Como bien se señala en esa opinión, el programa de becas educativas indudablemente presta una ayuda sustancial a las escuelas privadas, lo cual está expresamente prohibido por la aludida disposición constitucional.

A mi modo de ver, el referido programa de becas es constitucionalmente defectuoso por otra razón que está íntimamente relacionada con la dilucidada por la mayoría en su opinión. Si se examinan todas las disposiciones de la Sec. 5 del Art. II de la Constitución, *supra*, ed. 1982, pág. 271, contextualmente, se observará que el propósito primordial de dicha sección es ordenar el establecimiento de un sistema de instrucción pública para todo el país, en el cual la enseñanza será gratuita y la educación a impartirse será una "que propenda al pleno desarrollo [de la persona] y al fortalecimiento del respeto de los derechos del hombre y de las libertades fundamentales". En. efecto, la Constitución, en esta sección, le hace una magna encomienda al Estado, tan importante ésta como compleja, que exige, para poderse llevar a cabo, que el Estado destine al sistema público *todos* los fondos que tenga disponibles para la educación primaria y secundaria.

Los que formularon nuestra Ley Fundamental conocían bien la estrecha relación que existe entre la educación y el

pleno desarrollo personal. Sabían que el bienestar general del pueblo puertorriqueño y el goce cabal de los derechos humanos dependen en gran medida de la educación de la gente. Reconocían que la educación es un medio vital para que las personas obtengan no sólo las destrezas necesarias para disfrutar de una vida productiva y decorosa sino, además, para que desarrollen una convivencia colectiva verdaderamente democrática. Por eso, en el Preámbulo de la Constitución sus redactores proclamaron "el afán por la educación" como uno de los factores determinantes en nuestra vida colectiva. Esta extraordinaria visión de que la educación comparte, junto con el ordenamiento jurídico, la protección de la esencial igualdad y dignidad del ser humano es una de las principales y auténticas contribuciones de los juristas puertorriqueños al constitucionalismo moderno. Fuster, *Constitucionalismo y Educación*, Año XXVII (102) Rev. Der. Pur. 321 (1988).

Para hacer realidad esta visión sobre el papel de la educación en la polis contemporánea, los que formularon nuestra Constitución tenían que asegurar que los recursos gubernamentales disponibles para la vital educación del pueblo estuviesen *todos* destinados al sistema de instrucción pública. Se contemplaba que para realizar la magna encomienda de la citada Sec. 5 del Art. II de nuestra Constitución se necesitarían cuantiosos recursos, que difícilmente estarían siempre disponibles en un país de limitaciones económicas como el nuestro. Había que asegurar, pues, que al menos los recursos que existiesen se dedicarían todos al sistema de instrucción pública. De ahí la tajante prohibición constitucional que veda la transferencia de los limitados recursos económicos públicos a las entidades privadas.

Desde esta perspectiva, el uso de fondos públicos para el sostenimiento de las escuelas privadas es ilegítimo, no sólo porque viola la clara y expresa prohibición constitucional, sino también porque atenta contra el mandato de nuestra

Ley Fundamental al Estado de establecer y desarrollar el sistema de instrucción pública aludido. El desvío de fondos gubernamentales para ayudar a las escuelas privadas menoscaba la obligación del Estado de fortalecer, en todo lo posible, la escuela pública. Constituye un miope repudio a la acertada visión que sobre el bien común plasma la Sec. 5 del Art. II antes citada.

Hoy más que nunca es imprescindible que el Estado haga todo lo que esté a su alcance por mejorar la escuela pública y dotarla de la mayor cantidad de recursos posibles. *Es en esa escuela donde estudia casi la totalidad de los niños y jóvenes de escasos o modestos medios económicos, los menos favorecidos de la estrata social, los que necesitan y ameritan mayor atención y consideración. Es en esa escuela, además, donde estudia la inmensa mayoría de todos los niños y jóvenes del país.* De la educación que ellos reciban dependerá que podamos resolver gran parte de los problemas de nuestra atribulada convivencia colectiva. Esos problemas se originan, en su mayoría, precisamente en los traumas y en las limitaciones que sufren nuestros jóvenes en sus años formativos. Entre estos problemas podemos mencionar la violencia y la criminalidad; la desigualdad en la calidad de vida, que resulta patente entre distintos sectores de la población, amén del resentimiento que ello genera; la poca productividad de grandes segmentos de nuestro pueblo y la ominosa dependencia y ociosidad que los caracteriza; la falta de auténtica autoestima que experimentan tantos individuos en nuestra sociedad; nuestra perenne inseguridad como pueblo; nuestra resquebrajada solidaridad; la excesiva politización y el partidismo extremo, que intentan llenar el vacío causado por la ausencia de metas y aspiraciones comunes, y el autoritarismo político que ese partidismo genera. Todos estos problemas y otros más que sufrimos en gradación ascendente hoy día, no pueden resolverse sin la aportación constructiva personal que resulta de una auténtica educación pública huma-

nista, como la que contemplaron los redactores de nuestra Constitución.

Es de conocimiento general que el sistema de instrucción pública de Puerto Rico encara serios problemas, producto primordialmente de la falta de unos recursos económicos adecuados. La escuela pública tiene fallas graves que emanan precisamente de la carestía de medios suficientes para atender su ingente encomienda. Hace tres décadas se divulgó un estudio de la Universidad de Puerto Rico que resaltaba el gravísimo problema de deserción escolar que experimentaba el país entonces. Para 1964, sólo veinticuatro (24) estudiantes terminaban la escuela superior de cada cien (100) que habían entrado a primer grado doce (12) años antes. El resto, la inmensa mayoría —setenta y seis (76) de cada cien (100)— se quedaron fuera del sistema, perdiendo la posibilidad de continuar estudios universitarios.[1] La situación hoy día, treinta (30) años después, ha mejorado, pero sigue siendo problemática. Según las estadísticas del Consejo General de Educación, en la actualidad sólo cuarenta y nueve (49) estudiantes terminan la escuela superior de cada cien (100) que entraron a primer grado doce años antes. La mayoría —cincuenta y uno (51) de cada cien (100)— sólo uno de muchos que podrían traerse a colación, intima la magnitud de los problemas que encara nuestro sistema de instrucción pública, del cual depende tanto el bienestar general de nuestro país. Difícilmente pueda concebirse una labor gubernamental de mayor urgencia e importancia que la de atender y solucionar a fondo, no con parchos superficiales, los serios problemas que padece la escuela pública en Puerto Rico. Parte de esa labor consiste en allegarle la mayor cantidad de recursos posibles sin desviar los fondos de educación para otros fines que no le compete al Estado atender.

De estas consideraciones surge claramente el grave dis-

---

[1] I. Rodríguez Bou, *¿Podrá mi hijo ingresar en la universidad?*, Publicación del Consejo Superior de Enseñanza, 1965.

loque constitucional que ocasiona el programa de becas educativo de la Ley Núm. 71, *supra*. No sólo por ser contrario a una expresa y clara prohibición constitucional, sino porque constituye un grave menosprecio a una parte fundamental del esquema que la Constitución consagra para asegurarle al pueblo puertorriqueño una buena educación para la mayor parte de sus hijos, una auténtica convivencia democrática y el goce cabal de los derechos humanos. Visto a través de este crisol, el programa de ayuda a escuelas privadas, en su fondo, atenta contra el bien común.

— O —

Opinión disidente del Juez Asociado Señor Negrón García.

I

*Marco conceptual y entorno del derecho constitucional a la educación; injusticia del decreto de inconstitucionalidad*

El subsidio directo a los padres mediante las becas educativas es uno de los medios constitucionales del Estado para propiciar una igualdad relativa y, con ello, la posibilidad real de que todos, pobres y ricos, ejerzan la libertad de escoger la educación de sus hijos. Validándolo, liberamos la enseñanza privada de un *elitismo* que ha acentuado más las diferencias de clases en Puerto Rico. A la par, ponemos un paliativo a la pobreza económica que, en la práctica, representa uno de los obstáculos mayores en las posibilidades de acceso y que más ha contribuido a que surjan permanentemente unos *ghettos educativos. El derecho constitucional a una educación de calidad no se implanta en un escritorio con loas a una libertad meramente documental o nominal.*

Al confirmar hoy la sentencia del Tribunal Superior, Sala de San Juan (Hon. Flavio Cumpiano, Juez), la mayo-

ría se hace eco de una decisión *INJUSTA* que dificulta, por no decir imposibilita, a los padres pobres y a sus hijos aproximarse a los ideales de dignidad e igualdad humana encarnados en la Carta de Derechos de la Constitución;[1] *mandato convertido en palabras huecas al no estar acompañado de la oportunidad real de una educación de calidad plena.*

De entrada, y en lo pertinente, el Art. II, Sec. 5 de la Constitución, L.P.R.A., Tomo 1, ed. 1982, pág. 271, reconoce que "[t]oda persona tiene *derecho a una educación que propenda al pleno desarrollo de su personalidad y al fortalecimiento del respeto de los derechos del hombre y de las libertades fundamentales.* Habrá un sistema de instrucción pública el cual será libre y enteramente no sectario. La enseñanza será *gratuita* en la escuela primaria y secundaria y, hasta donde las facilidades del Estado lo permitan, se hará obligatoria para la escuela primaria". (Énfasis suplido.)

Es evidente que nuestra Constitución, cuyo fundamento es la libertad, aspira a mantener una sociedad libre y democrática, fundada en el pluralismo político. *El axioma inmerso en esta sección es que la ignorancia es el mayor enemigo de la libertad, pues el ejercicio de los derechos políticos y el pleno desarrollo de la personalidad humana requieren el mayor grado de educación posible.* Por imperativo, implica un *pluralismo escolar* en su dimensión más genuina y profunda, esto es, la posibilidad real de que los padres puedan seleccionar la clase de escuela —pública, privada laica o privada sectaria— que en conciencia prefieran para sus hijos. Y ese *pluralismo escolar*, a su vez, da

---

[1] "La dignidad del ser humano es inviolable. Todos los hombres son iguales ante la Ley. No podrá establecerse discrimen alguno por motivo de raza, color, sexo, nacimiento, origen o *condición social*, ni ideas políticas o religiosas. *Tanto las leyes como el sistema de instrucción pública encarnarán estos principios de esencial igualdad humana.*" (Énfasis suplido.) Art. II, Sec. 1 de la Carta de Derechos, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1982, pág. 257.

virtualidad al derecho del niño a una educación que eventualmente le permita ser verdaderamente libre.

El sustrato y contenido esencial del *derecho constitucional a la educación* —como condición necesaria para la consecución del más elevado ideal de libertad— significa la facultad de escoger dentro de un sistema pluralista de posibilidades. Cuando los fondos públicos se circunscriben a las escuelas públicas, en cierto modo se menoscaba sustancialmente, por no decir excluye, la libertad de enseñanza en el área de la educación primaria y secundaria, habida cuenta que la gratuidad configura un deber-derecho. Si los limitamos de manera absoluta a las escuelas públicas, estamos obligando a los padres de los niños pobres a elegir la enseñanza gratuita, sacrificando la posibilidad de acudir a una escuela privada conforme sus preferencias o, en teoría, decidirse por ésta, renunciando a la gratuidad. Decimos en teoría, pues esta última sólo es opción para quienes tienen medios económicos; *a los menos favorecidos se les está privando, como cuestión de hecho, de la posibilidad de ejercitarla, compeliéndolos a renunciar al derecho que tienen de escoger entre escuelas de diferente inspiración.*

Es materia de conocimiento público la grave crisis que atraviesa la educación pública. Varios estatutos han sido dirigidos a mejorarla: concesión de una exención contributiva para gastos educacionales (Ley Núm. 10 de 24 de julio de 1985); Ley Orgánica del Departamento de Educación (Ley Núm. 68 de 28 de agosto de 1990), y Ley para el Desarrollo de las Escuelas de la Comunidad (Ley Núm. 18 de 16 de junio de 1993).

El Estado, en el descargo de su responsabilidad, está poniendo en práctica diversas alternativas para revitalizar y fortalecer el sistema de educación pública y la educación en general. No nos corresponde juzgar la sabiduría de esas leyes; sólo su validez. Debemos respetar la voluntad legislativa de cómo mejor llevar a cabo el proceso de reforma

educativa. Aunque lo nieguen, las opiniones *mayoritaria* y *las de conformidad* demuestran que están juzgando la sabiduría; traslucen una carencia de voluntad judicial para sostener su validez. No se cuestiona la importancia del sistema público de enseñanza. Así lo atestigua la historia social y política de nuestro país, pues grandes hombres y pensadores de nuestro pueblo, quienes han hecho extraordinarias aportaciones, han sido producto de este sistema. No obstante, como hemos apuntado, el sistema público de enseñanza ha sufrido un marcado deterioro. En atención a ello, la Legislatura ha creado una pieza que pretende aliviar esa grave situación. No podemos sustituir la metodología escogida por el legislador, aduciendo que la solución es destinar al sistema de educación pública *todos* los fondos disponibles para esta área.

Según señalado, sólo mediante el *pluralismo escolar* adquiere materialidad el derecho a la educación que eventualmente hará libre a la persona. Por esto discrepamos de la tesis de que la Sec. 5 del Art. II de nuestra Constitución, *supra*, fija el sistema de educación pública como *única* herramienta gubernamental para mejorar la educación. Esa percepción choca con la intención del Congreso y de la Asamblea Constituyente según el desenlace de las dos (2) enmiendas que se exigieron a nuestra Carta de Derechos.

Paradójicamente la mayoría enarbola la Constitución como principal razón para mantener insalvables los obstáculos económicos que impiden una auténtica libertad de educación. Sostienen el monopolio estatal y hablan de que la ayuda económica sólo es para las escuelas públicas, olvidándose de los seres más sufridos y marginados del proceso educativo. "El camino más fácil para dar a cada padre el máximo control sobre la escolarización primaria y secundaria es eliminar las barreras financieras que al presente restringen el uso de escuelas privadas, o permitir a los padres decidir en qué escuelas deben emplear los fondos públicos destinados a la educación en lugar de emplear direc-

tamente esos fondos en las escuelas públicas." (Traducción nuestra.) J.A. Laska, *Schooling and Education*, Nueva York, Van Nostrand, 1976, pág. 71.

## II

*Inconsistencias doctrinales incurridas por la mayoría en materia de legitimación activa y en el ambito constitucional*

Nos resulta difícil concebir la Constitución como un documento que impide ayudar económicamente a los padres y niños que tienen menos para que elijan la escuela y el tipo de educación que deseen. No podemos suscribir el decreto de inconstitucionalidad del Art. 6(c) de la Ley Núm. 71 de 3 de septiembre de 1993, Ley de Becas Especiales y Libre Selección de Escuelas. Está apuntalado en unas premisas deficientes y se incurre en unas graves inconsistencias doctrinales en materia de legitimación activa y en el ámbito constitucional.

*Primero*, para hacer viable la impugnación judicial de la Asociación de Maestros de de Puerto Rico (en adelante Asociación), abandonan la visión restrictiva imperante sobre *legitimación activa,* —liberalizándola ampliamente— invocando una doctrina decadente. Luego de utilizar ese peculiar enfoque para conceder legitimación, inexplicablemente se niegan a aplicar su contraparte al evaluar los méritos del caso.

*Segundo*, se niegan a reconocer que el *"sostenimiento"* educacional que la Asamblea Constituyente prohibió fue el brindado *directamente* a la institución educativa; *no vedó que se diera exclusivamente a los padres para beneficio de sus hijos estudiantes.*

*Tercero*, bajo la cuestionable tesis de que la Sec. 5 del Art. II de nuestra Constitución, *supra*, tiene contenido y vida independientes de la Cláusula de Establecimiento, evaden analizar la doctrina jurisprudencial del Tribunal Supremo federal en cuanto a esta última cláusula. Ignoran

así el claro historial de la Asamblea Constituyente que reconoció que estamos inextricablemente atados —al decir del Delegado Sr. José Trías Monge, "enchufados"— a esa jurisprudencia federal que "privará" y "regirá" en Puerto Rico. En esta fase específica, la intención fue que nuestra citada Sec. 5 gozara de *igual* amplitud que la Cláusula de Establecimiento de la Constitución federal. A su amparo, la jurisprudencia no prohíbe todo tipo de posibles beneficios; antes bien, se han establecido unos criterios para determinar los constitucionalmente permisibles.

Preocupa sobremanera la socorrida utilización de crónicas "históricas" del desarrollo constitucional de Puerto Rico, fundamentadas en una interpretación personalísima de los debates de la Asamblea Constituyente que no se ajustan con fidelidad al contexto y orden en que acontecieron. *Por respetables que sean, no es buena técnica adjudicativa utilizar fuentes que reflejan opiniones producto de "un revisionismo histórico", respondan o no a unos cambios legítimos de criterios, a posteriori, de su autor.*

*Cuarto*, en materia de cláusulas religiosas, la mayoría adopta una visión filosófica constitucional antagónica a la Constitución federal. Interpretan nuestras cláusulas de separación Iglesia-Estado de manera absoluta con fines de escisión y separación de ambas esferas, olvidando que son medios para garantizar la libertad de culto religioso. Nuestra Sec. 5 del Art. II, Const. E.L.A., *supra*, se aprobó imbuida de una visión demócrata-liberal para evitar que el Estado promoviera una religión particular, e incluso el secularismo. Precisamente para proteger la libertad de culto y evitar un monopolio de la educación por parte del Estado, el Congreso norteamericano exigió, para la aprobación de dicha cláusula, que se respetara la facultad de los padres de matricular a sus hijos en escuelas públicas o privadas (sectarias o laicas).

*Quinto*, el inventario mayoritario es un absurdo decisorio: *restaura el derogado Art. 19 del Acta Jones que prohi-*

*bía no sólo la ayuda directa, sino la indirecta.* En recta hermenéutica, era imperativo, por no decir lógico, concluir que la eliminación de ese texto reveló la intención *inequívoca* de la Asamblea Constituyente de *derogar la prohibición absoluta de ayuda "indirecta".*

Y *sexto,* la Ley Núm. 71, *supra,* es constitucional, pues sirve un propósito enteramente secular; no tiene el efecto primordial de adelantar la religión ni tampoco requiere que el Estado se inmiscuya excesivamente en asuntos religiosos. *Lemon v. Kurtzman,* 403 U.S. 602 (1971); *Díaz v. Colegio Nuestra Sra. del Pilar,* 123 D.P.R. 765 (1989). En la medida que nuestra interpretación de la Sec. 5 del Art. II de nuestra Constitución, *supra,* debe seguir (estamos "enchufados") las normas jurisprudenciales del más alto foro federal en cuanto a las cláusulas religiosas de la Primera Enmienda, *el programa de becas especiales no está prohibido por nuestra Constitución.* Analicemos en detalle estas conclusiones.

## III

*Súbito cambio doctrinal del Tribunal en materia de legitimación: de la visión hermética y restrictiva de Hernández Torres v. Gobernador, 129 D.P.R. 824 (1992), a una amplia y flexible*

En *Hernández Torres v. Gobernador,* 129 D.P.R. 824 (1992), la mayoría opuso el estatuto que prohíbe el "pleito del contribuyente" —Ley Núm. 2 de 25 de febrero de 1946 (32 L.P.R.A. secs. 3074–3076)— e invocó *Flast v. Cohen,* 392 U.S. 83 (1968), para injustamente[2] negar la legitima-

---

[2] Al disentir, reconocimos que el Art. VI, Sec. 7 de la Constitución, L.P.R.A., Tomo 1, imponía un deber afirmativo *compartido* al Primer Ejecutivo y a la Asamblea Legislativa de aprobar un presupuesto balanceado. En recta lógica, si la Legislatura como cuerpo no estaba en aptitud de vindicar los derechos de los legisladores individuales cuyos votos habían sido anulados por esa legislación inconstitucional,

ción activa a dos (2) representantes de la minoría que impugnaron el presupuesto por deficitario.

Ahora, en un repentino cambio doctrinario reconocen legitimación a la *Asociación* bajo el predicado de que *Flast v. Cohen*, supra, "resolvió que un contribuyente tiene legitimación activa para impugnar un gasto gubernamental cuando lo hace bajo la cláusula de establecimiento". Opinión del Tribunal, pág. 537. Así intentan salvar la prohibición *absoluta* a este tipo de pleitos contenida en la referida Ley Núm. 2. En un salto mortal al vacío, luego de evaluar los méritos de dicha decisión, adoptan igual normativa para los casos bajo el Art. II, Sec. 5 de nuestra Constitución, *supra*, dado el "vínculo estrecho" entre ambas cláusulas. Opinión del Tribunal, pág. 539.

Es conocido que la norma sentada en el citado caso *Flast v. Cohen* requiere que el contribuyente demuestre que la legislación excede unas limitaciones constitucionales específicas al poder congresional de imponer contribuciones y gastar dinero. En la práctica, únicamente la Cláusula de Establecimiento ha sido considerada una limitación a dicho poder, aun cuando el más alto foro federal cautelarmente ha dicho que si la Constitución "contiene otras limitaciones específicas se podrá determinar sólo en el contexto de futuros casos". (Traducción nuestra.) Íd., pág. 105.

Una interpretación rígida de la doctrina de *Flast v. Cohen*, supra, en los casos *United States v. Richardson*, 418 U.S. 166 (1974); *Schlesinger v. Reservists to Stop the War*, 418 U.S. 208 (1974), y *Valley Forge College v. Americans*

---

éstos podían hacerlo mediante una reclamación judicial directa. Resaltamos, además, distinto a la Constitución federal, el derecho constitucional expresamente concedido a las minorías para fiscalizar los actos de las mayorías legislativas.

*United,* 454 U.S. 464 (1982),[3] llevó a algunos a estimarla casi inoperante.[4]

Nos inquieta, pues, cómo la mayoría se sirve de una doctrina de contornos restrictivos y capa caída para crear una excepción a una ley cuyo texto claro e inequívoco prohíbe los pleitos de contribuyentes, sin excepciones, *y cuya constitucionalidad no ha sido atacada.*[5]

---

[3] Allí el Tribunal Supremo federal señaló:

"Cualquier duda que pueda haber existido respecto al rigor con el cual se debe aplicar la excepción de *Flast* con respecto al principio de *Frothingham* debe haberse borrado como consecuencia de las recientes decisiones de este Tribunal en *United States* v. *Richardson,* 418 U.S. 166 (1974), y *Schlesinger* v. *Reservists Committee to Stop the War, supra.*" (Traducción nuestra.) *Valley Forge College v. Americans United,* 454 U.S. 464, 481 (1982).

[4] Un constitucionalista del patio acertadamente nos dice:

"La interpretación que el Tribunal Supremo federal ha mantenido en los casos posteriores a *Flast* ha sido catalogada de interpretación restrictiva y se ha dicho que la misma ha eliminado virtualmente la acción del contribuyente en la jurisdicción federal. Egan, *op. cit.,* 741.

"Véanse, además, Chayes, *The Supreme Court: 1981 Term,* 96 Harv. L. Rev. 8 (1982); *Nota, Taxpayer Standing to Litigate,* 61 Geo. L.J. 747 (1973); Scott, *Standing in the Supreme Court–A Functional Analysis,* 86 Harv. L. Rev. 645 (1973); Bittker, *The Case of The Fictitious Taxpayer: The Federal Taxpayer Suit Twenty Years After Flast v. Cohen,* 36 U. Chi. L. Rev. 364 (1969)." (Énfasis en el original.) R. Serrano Geyls, *Derecho constitucional de Estados Unidos y Puerto Rico,* San Juan, Ed. C. Abo. P.R., 1986, Vol. I, pág. 135.

De otra parte, también se ha dicho que "la aplicación del Tribunal Supremo de la normativa de *Flast* en los tres casos arriba mencionados se puede describir mejor como limitada. La forma literal y formalista en que el Tribunal ha empleado la prueba del doble nexo en efecto ha eliminado la legitimación de contribuyentes. La letra, y no el espíritu, de *Flast* ha gobernado todos los intentos posteriores de establecer la legitimación de contribuyentes". (Traducción nuestra.) N. Leon, *The Second Circuit's Application of Standing in In Re United States Catholic Conference: Another Plea for Clarity and Consistency,* 57 (Núm. 2) Brooklyn L. Rev. 429, 458 (1991).

Si bien *Bowen v. Kendrick,* 487 U.S. 589 (1988), reconoció legitimación a un contribuyente bajo la Cláusula de Establecimiento, ello no tuvo el efecto de expandir la norma de *Flast v. Cohen,* 392 U.S. 83 (1968), sino aclararla. Leon, *supra,* pág. 459.

En *Bowen v. Kendrick, supra,* pág. 618, el Tribunal reiteró que se ha adherido consistentemente a la "estrecha excepción" contenida en *Flast v. Cohen, supra.*

De hecho, incluso luego de haberse conferido legitimación en *Bowen v. Kendrick, supra,* bajo la doctrina de *Flast v. Cohen, supra,* se ha dicho que *"Flast* parece ser un caso limitado precisamente a sus hechos". 1 *Treatise on Constitutional Law: Substance and Procedure* Sec. 2.13(f), pág. 204 (1992).

[5] Mientras aquí la Asociación de Maestros de Puerto Rico alega un posible menoscabo a su interés genérico institucional de proteger el sistema de instrucción pública y mantener en la mejor condición posible las escuelas del Estado, en *Hernández Torres v. Gobernador,* 129 D.P.R. 824 (1992), los legisladores de minoría demostraron claramente haber sufrido un perjuicio constitucional a su derecho al voto y un entorpecimiento a su función fiscalizadora, cuya esencia dimana de la Constitución.

Más aún, en lógica adjudicativa, ¿cómo pueden utilizar la Cláusula de Establecimiento *nominalmente* de puente para la legitimación y luego analizar los méritos a base de una cláusula cuyo contenido, nos dicen, es *independiente* a la de Establecimiento? Elaboremos.

Al discutir *Flast v. Cohen*, supra, resaltan su relación con la Cláusula de Establecimiento. Acto seguido afirman que, por su "vínculo estrecho" con la cláusula que prohíbe el sostenimiento de escuelas privadas por parte del Estado (Art. II, Sec. 5, Const. E.L.A., *supra*), debemos adoptar igual norma en materia de pleitos de contribuyentes. Acomodaticiamente se apropian *provisionalmente* del análisis de la Cláusula de Establecimiento para fines de *legitimación*, pero rehúsan utilizarlo al entrar en los méritos del caso. O sea, el vínculo es suficientemente estrecho entre la Cláusula de Establecimiento y el Art. II, Sec. 5 de nuestra Constitución, *supra*, para abrir las puertas a quienes impugnan la constitucionalidad de la ley, pero niegan eficacia a la jurisprudencia federal sobre la Cláusula de Establecimiento al analizar sus méritos.

La cuestión es crucial. Ante el reclamo del Estado de que apliquemos la jurisprudencia del Tribunal Supremo federal en el análisis del Art. II, Sec. 5 de nuestra Constitución, *supra* —dado su *vínculo estrecho* con la Cláusula de Establecimiento, según la intención de la Asamblea Constituyente— *cambian la configuración del panorama dibujado exclusivamente para legitimación.*

De la nada, de repente, aparece *fantasmalmente* la Cláusula de Sostenimiento con un "contenido independiente y adicional al de la cláusula de establecimiento de la Primera Enmienda de la Constitución federal". Opinión del Tribunal, pág. 547. Nos dicen:

Aunque es cierto que en el debate hubo unas expresiones aisladas a estos efectos, ello no es suficiente para concluir que nues-

tra cláusula de sostenimiento está vacía de contenido porque ya
está todo incorporado en la cláusula de la separación de nues-
tra Constitución (Art. II, Sec.3). Las expresiones sobre la ma-
nera en que la cláusula del sostenimiento refleja el principio de
separación de Iglesia y Estado no significa que incorporar y
fortalecer dicho principio, según se ha desarrollado en el ám-
bito federal, haya sido el *único* objetivo y propósito de nuestra
cláusula. (Énfasis en el original y escolio omitido.) Opinión del
Tribunal, pág. 546.

Carece de toda lógica decisoria que la mayoría confiera
legitimación a la *Asociación* bajo una rígida doctrina de
contribuyentes —casi en desuso— que se *apuntala exclusi-
vamente* en la Cláusula de Establecimiento,(6) y luego se-
cularizar completamente el análisis en los méritos, desli-
gándose por completo de la Cláusula de Establecimiento,
no obstante el "vínculo estrecho" que dicha cláusula guar-
daba en materia de legitimación.

*Este errático obrar se aparta de la norma de revisión
judicial clásica y, lejos de demostrar un esfuerzo razonable
para sostener la presunción de constitucionalidad que
acompaña toda ley, demuestra una voluntad —rayana en
descoordinada proeza quijotesca— de abrir las puertas ju-
diciales a quienes pretenden impugnar los programas que
la mayoría considera inconstitucionales.*

## IV

*Imperativo constitucional; aplicación de jurisprudencia fe-
deral sobre la Cláusula de Establecimiento*

El "vínculo estrecho" que guarda el Art. II, Sec. 5 de
nuestra Constitución, *supra*, con la Cláusula de Estableci-
miento requiere ineludiblemente que sigamos el análisis
del Tribunal Supremo federal en los casos que incluyan la
Cláusula de Establecimiento. 2 Diario de Sesiones de la

---

(6) Aún ese contexto ha sido restringido. J.J. Egan, *Analyzing Taxpayer Stan-
ding in Terms of General Standing Principles: The Road Not Taken*, 63 (Núm. 3) B.U.
L. Rev. 717, 740 (1983).

Convención Constituyente 1483–1484 (1961). En palabras anteriores del propio Juez Asociado Señor Hernández Denton, las cláusulas religiosas "fueron redactadas como objetivos generales para ser interpretadas a través de la historia del país en forma consistente con los pronunciamientos del Tribunal Supremo federal sobre la Primera Enmienda". *Díaz v. Colegio Nuestra Sra. del Pilar*, supra, pág. 775. Y en la pág. 774 de este caso dijo que el Art. II de la Sec. 5 de la Carta de Derechos, Const. E.L.A., L.P.R.A., Tomo 1, es una de esas cláusulas religiosas.

Precisamente en *Díaz v. Colegio Nuestra Sra. del Pilar*, supra, págs. 780–781, aunque el análisis fue bajo nuestra cláusula sobre separación de Iglesia y Estado, fijamos así los criterios:

> Para que el Estado pueda prevalecer frente a una alegada infracción a esta cláusula, se requiere que la ley o conducta atacada tenga un propósito secular, que su efecto primario o principal no sea promover o inhibir la religión y, finalmente, que no conlleve la posibilidad de provocar una intromisión o interferencia (*entanglement*) excesiva del Gobierno en los asuntos religiosos. *Lemon v. Kurtzman*, 403 U.S. 602, 612–613 (1971); *Meek v. Pittenger*, 421 U.S. 349, 358 (1975); *Committee for Public Education v. Regan*, 444 U.S. 646, 653 (1980).

El análisis delineado en *Lemon v. Kurtzman*, supra, se usa en todo caso que involucre la Cláusula de Establecimiento, independientemente de que el acceso a los tribunales (legitimación) se haya logrado bajo la excepción a la doctrina de pleitos de contribuyentes. Además, sirve como criterio rector bajo la Sec. 5 del Art. II (sector público *vis–á–vis* sector privado), e igualmente bajo el Art. II, Sec. 3 de nuestra Constitución, L.P.R.A., Tomo 1, lo esbozado por este Tribunal:

> En el curso de nuestra vida cotidiana, los campos de acción de la Iglesia y del Estado suelen entremezclarse, con la inevitable consecuencia de que las actuaciones de cada poder pueden repercutir en la zona del otro. *Agostini Pascual v. Iglesia Católica*, supra, pág. 177; *Lemon v. Kurtzman*, supra, pág. 614. Esa

interrelación no convierte automáticamente esas actuaciones en inconstitucionales. Mientras los actos gubernamentales puedan justificarse en términos seculares y no constituyan una *excesiva* intromisión con las autoridades eclesiásticas, serán perfectamente armonizables con la Constitución. *Díaz v. Colegio Nuestra Sra. del Pilar*, supra, págs. 781-782.

A la luz de lo expresado, hagamos una incursión en los debates de la Asamblea Constituyente para demostrar que de acuerdo con la jurisprudencia federal sobre la Cláusula de Establecimiento, el Art. 6(c) de la Ley Núm. 71 es constitucional.

## V

*Debate de la Asamblea Constituyente: mito de "Factura más Ancha" del Art. II, Sec. 5 de la Constitución, L.P.R.A., Tomo 1; Reconocimiento expreso que rige la doctrina federal*

En lo pertinente, el Art. II, Sec. 5 de nuestra Constitución, *supra*, pág. 271, dispone: "No se utilizará propiedad ni fondos públicos para el *sostenimiento* de escuelas o instituciones educativas que no sean las del Estado." (Énfasis suplido.) Aflora de inmediato, como clave decisoria, determinar el verdadero significado atribuido a la palabra "sostenimiento".

Originalmente el vocablo propuesto era "enseñanza". El cambio obedeció a que no se quería limitar la prohibición únicamente a los gastos docentes de las instituciones privadas, sino extenderla a los gastos administrativos, planta física, etc. Diario de Sesiones, *supra*, pág. 1483. Esta intención quedaba mejor expresada utilizando la palabra "sostenimiento" en vez de "enseñanza". El objetivo de la enmienda, claro está, fue que el Estado no subsidiara las escuelas privadas pagándoles los gastos que no estuviesen directamente relacionados con la enseñanza, para de esa forma justificar su ayuda a estas entidades. Con la palabra

"sostenimiento" se quiso evitar un subterfugio para ayudar *directamente* a las instituciones educativas que no fuesen las del Estado, sufragándoles los gastos ordinarios operacionales en que necesariamente la institución tendría que incurrir y de cuyo cumplimiento podría depender su existencia o funcionamiento. *En este extremo, no cabe duda que "sostenimiento" es más abarcador que "enseñanza".*

Aprobada la palabra "sostenimiento", el Delegado Sr. Virgilio Brunet Maldonado —entonces presidente de la Asociación— propuso que se agregara la palabra "beneficio", de modo que leyera "sostenimiento o beneficio de escuelas o instituciones educativas ...." Diario de Sesiones, *supra*, pág. 1477. Ello generó discusión y debate. Aunque el Delegado señor Trías Monge interpretaba que *la enmienda era de estilo*, para utilizar el lenguaje de la Constitución de Hawaii y otros estados, *y no expandía el concepto de sostenimiento* (íd., pág. 1477), el Delegado Sr. Celestino Iriarte Miró se opuso por entender que cambiaba completamente el propósito (íd., págs. 1477–1478). Explicó que la inclusión de la palabra "beneficio" *podía malinterpretarse como que prohibía que se beneficiaran indirectamente las instituciones que no fueran del Estado, significado que no se pretendía dar.* Ante esa posible interpretación, el Delegado Sr. José M. Dávila Monsanto inquirió sobre quién se beneficiaría del otorgamiento de una beca: el estudiante o la institución. El señor Iriarte Miró respondió que *el beneficiado era el becado*, si bien reconocía que en varios estados se había interpretado que se beneficiaban las instituciones. Precisamente "para evitar esas interpretaciones traídas así tan a la brava" recomendó no se añadiera la frase "o beneficio". Íd., pág. 1478. *Dejó claramente manifestado que las becas otorgadas a estudiantes no representaban el "sostenimiento" de escuelas privadas que se quería prohibir.*[7]

---

[7] "Sr. IRIARTE: *Benefician al becado*, pero ya se ha interpretado en distintos casos que fueron citados ante la carta de derechos, el Comité de la Carta de Derechos, en los distintos estados de la Unión que *beneficiaban a las instituciones* en las

De hecho, el propio señor Brunet Maldonado, autor de la propuesta enmienda, resaltó que las becas otorgadas beneficiaban a los estudiantes, no las escuelas. Diario de Sesiones, *supra*, pág. 1480. Conforme su interpretación, nada en la Constitución prohibía este tipo de ayuda a los estudiantes, pues el concepto de "beneficio" que propuso incluir no vedaba la ayuda al estudiante. Incluso resaltó cómo bajo la más estricta Cláusula 19 del Acta Jones, que prohibía expresamente cualquier beneficio o sostenimiento "directo o indirecto", se concedían becas a niños pobres para estudiar en las escuelas elementales en los pueblos. Íd., pág. 1479.

El significado que el señor Brunet Maldonado atribuyó a la expresión "sostenimiento o beneficio" quedó ilustrado en los ejemplos citados en el debate con el Sr. José R. Gelpí Bosch,([8]) a saber: que el Estado no facilitara los materiales ni los fondos para su adquisición a la escuela, ya que dicha acción redundaría en el beneficio de la institución. Ahora, si los materiales se le concedían al niño, el que éste los destinara a su educación en una escuela pública o en una privada no implicaba que estuviese usando fondos públicos para el sostenimiento de la institución; *el beneficio era al estudiante.* Diario de Sesiones, *supra*, pág. 1480.

*Es claro, pues, que el concepto de "sostenimiento o beneficio" que se quiso prohibir fue el que se diera directamente*

---

cuales esos becados recibían la enseñanza, la instrucción. *Por eso es que para evitar esas interpretaciones traídas así tan a la brava, sería conveniente no agregar esa frase 'o beneficio',* sino que no se inviertan fondos públicos en Puerto Rico para el sostenimiento de escuelas que no sean las del Estado. En eso estoy de acuerdo. Pero *si se pone 'o beneficio', podría entenderse que una beca concedida a un estudiante era un beneficio que se le estaba dando indirectamente a esa institución en la cual ese becado recibía la instrucción.* Por eso entiendo que no debe ponerse esa frase 'o beneficio'." (Énfasis suplido.) 2 Diario de Sesiones de la Convención Constituyente 1478 (1961).

([8]) "Sr. BRUNET: Cuando se le da una beca a un muchacho para ir a estudiar medicina a una universidad de Estados Unidos que está gobernada por la religión católica o religión protestante, la ayuda no es a la escuela. La escuela le da un servicio por el cual cobra, al estudiante. *El pueblo de Puerto Rico lo que hace es darle, prestarle una ayuda económica a ese estudiante. Y no hay nada en la constitución que prohíba eso.*" (Énfasis suplido.) Diario de Sesiones, *supra*, pág. 1480.

*a la escuela; no se pretendió extenderlo al brindado direc-*
*tamente al estudiante.*(⁹)

Ello explica que, acto seguido, el Delegado Sr. Jaime Benítez Rexach propusiera la eliminación de "o beneficio", pues el que se intentaba prohibir estaba cubierto dentro de la palabra "sostenimiento" —Diario de Sesiones, *supra*, pág. 1481— esto es, *los mismos beneficios* que se pretendieron abarcar al sustituir la palabra "sostenimiento" en vez de "enseñanza". Ciertamente la frase "o beneficio" era susceptible de ser interpretada como que prohibía cualquier ayuda directa al estudiante que incidentalmente beneficiara a la escuela. Quedarían vedadas, así, las ayudas de becas y libros aludidas por los Delegados señores Brunet Maldonado e Iriarte Miró. *El concepto "beneficios" no pretendió ampliar el de "sostenimiento", razón por la cual se eliminó al adjudicársele el mismo alcance que sostenimiento.*

Ese debate llevó al Delegado Sr. Ramiro L. Colón Castaño a indagar el "sostenimiento" vedado por la disposición. Expresamente solicitó que se abundara sobre la validez de un programa de becas para sufragar los costos de matrícula de estudiantes que quisieran asistir a la escuela privada.(¹⁰)

---

(⁹) Aunque en el anterior ejemplo las becas en discusión fuesen otorgadas a estudiantes de medicina (u otras profesiones), *lo importante es que se consideró que la ayuda era al estudiante,* no a la institución. El que el niño asista a una escuela primaria o secundaria no cambia la visión sobre quién se beneficia de la beca.

(¹⁰) "Sr. RAMIRO COLON: Simplemente quiero ilustrarme en cuanto al propósito del cambio de la palabra 'enseñanza', por 'sostenimiento'. ... en caso de que esta enmienda se apruebe como está, podría darse becas a estudiantes puertorriqueños para que vayan a escuelas o universidades privadas o sectarias, sin afectar el texto de la constitución. Si eso es así, pregunto yo ahora al compañero Benítez, ¿podría también el Gobierno resolver pagarle la matrícula a niños puertorriqueños para escuelas privadas en Puerto Rico sin violar el texto de la constitución?

"Sr. BENITEZ: Esta cuestión becaria a la cual usted se refiere, es un aspecto que se circunscribe a un rango sumamente reducido de situaciones dentro de las cuales el Estado provee facilidades de estudio fuera de sus aulas en la situación donde ... en casos excepcionales no puede brindar esos servicios en sus propias aulas.

. . . . . . . .

"Sr. RAMIRO COLON: *No me ha contestado.* La pregunta era la siguiente: Si de acuerdo con esta constitución, quedando enmendada como se ha propuesto, *¿puede o*

Lamentablemente, la pregunta específica del señor Colón Castaño no quedó expresa ni concluyentemente contestada en la afirmativa o negativa; a juicio nuestro *no se quiso adelantar conclusiones ni trabas referentes a su interpretación.* Sí es claro que el Delegado señor Benítez Rexach concluyó que la prohibición de la Cláusula de Sostenimiento consistía en que el Estado no podía crear un sistema becario como subterfugio para sustituir el sistema de instrucción pública que tenía que establecer. Diario de Sesiones, *supra*, págs. 1482–1483. El delegado señor Trías Monge abundó así:

> ... [L]a idea es simplemente hacer más clara y tajante la separación entre la Iglesia y el Estado, pero sin del otro lado, naturalmente, afectar el principio de que los servicios *no educativos* que se le prestan a la niñez puedan seguir prestándosele.
>
> O sea, aquí hay dos principios básicos que se instituyen en esta sección. Uno es el principio de separación del Estado e Iglesia, *tal como ha sido consignado en la Constitución federal y el cual seguirá su desarrollo normal vía las interpretaciones del Tribunal Supremo de los Estados Unidos.*

---

*no puede el gobierno de Puerto Rico por medio de alguna ley o de algunos fondos, pagarle a niños puertorriqueños, matrícula, no darle beca, pagarle la matrícula, en escuelas privadas en Puerto Rico?*

"Sr. BENITEZ: *Esto dependerá, esto dependerá de cuál sea la situación de hecho que exista, en esa circunstancia.* Esto es, el gobierno de Puerto Rico no podría, dentro de estas disposiciones, tomar el sistema becario, o *el artilugio* de sistemas becarios, para *sostener* escuelas privadas; o, tampoco podría el Gobierno proveer un sistema becario para producir a través de él enseñanza religiosa a sus estudiantes. Como tampoco podría utilizar el sistema becario para llevar a cabo un programa de educación en el cual se violara el sentido fundamental de la disposición que rige todo el párrafo de que 'habrá un sistema de instrucción pública el cual será libre y enteramente no sectario'.

"Sr. RAMIRO COLON: Permítame el compañero decirle en qué consiste mi confusión, ahora, y lo que trato yo es de hacer, meramente, [claridad] en este asunto, para votar con conciencia.

"Se ha dicho aquí, que, al darse una beca a un estudiante, lo que equivale a pagarle una matrícula, *no se beneficia el colegio donde va a estudiar, sino al estudiante,* y me parece a mí que si ése es el sentido, nada de esta constitución ha de prohibir que el gobierno de Puerto Rico le pague matrícula en Puerto Rico a los niños cuando vayan a las escuelas privadas. *Y yo quiero que me digan si eso puede ser así, para entonces saber cómo debo votar.*

"Sr. BENITEZ: Mi criterio es ... ya lo expresé anteriormente. *El gobierno de Puerto Rico no puede establecer un sistema becario que sustituya el sistema de instrucción pública que tiene la obligación el Estado de establecer, y que tiene la obligación de ser completamente no sectario.*" (Énfasis suplido.) Diario de Sesiones, *supra*, págs. 1482–1483.

Naturalmente que [en] distintas situaciones que pudiésemos imaginar en estos momentos, pues sería difícil una contestación precisa [en] muchos [casos] a estas situaciones, *porque estamos enchufados ante el sistema constitucional norteamericano en esta fase específica.* O sea, son nuestras las garantías en cuanto a libertad de religión que se han instituido en la Constitución de los Estados Unidos. *Estamos idénticamente, formando parte de ese sistema constitucional. En cuanto a la libertad de religión y a otros aspectos también se refiere, ése es el primer principio.* Del otro lado también *se ha importado aquí de una forma precisa y clara* la propia doctrina desarrollada por el Tribunal Supremo de los Estados Unidos; o sea, *la doctrina de beneficios a la niñez, de que el beneficio que el Estado le brinda a los niños de edad escolar, no constituye sostenimiento, no constituye establecimiento de una religión dentro del lenguaje de la primera enmienda a la Constitución de los Estados Unidos.*

Esos son los dos grandes principios que se establecen en esta sección y, naturalmente, muchas veces no se podrá predecir exactamente el impacto en ciertas áreas, en ciertos problemas que podrán desarrollarse; pero ahí están, naturalmente, *las decisiones del Tribunal Supremo de Estados Unidos, y sus decisiones sobre esta área tan importante de los derechos humanos privarán y regirán a Puerto Rico en este sentido.* (Énfasis suplido.) Diario de Sesiones, *supra*, págs. 1483–1484.

· Ciertamente, el propósito de la Asamblea Constituyente fue darle la misma amplitud dada por el Tribunal Supremo federal a la Cláusula de Establecimiento. *No cabe hablar, por lo tanto, que en Puerto Rico se buscó hacer una doctrina de "factura más amplia" que la federal.*

Aunque es harto conocido que los derechos consagrados en la Constitución federal establecen un mínimo de protección susceptible de ser ampliado, en esta materia específica nuestros delegados quisieron dejar establecido que estamos *"enchufados"* a la doctrina federal. La misma delimita el margen de interpretación de la cláusula.

Recuérdese que el Congreso de Estados Unidos intervino directamente en la redacción de la citada Sec. 5 de nuestra Carta de Derechos[11] y eliminó la Sec. 20,[12] en-

---

[11] La enmienda a la Sec. 5, insertada después de la tercera oración, dispone: "La asistencia obligatoria a las escuelas públicas primarias, hasta donde las facili-

miendas de alta relevancia que reflejan una intención congresional de asegurarse que la Asamblea Legislativa no adoptase leyes que establecieran una separación de Iglesia y Estado tan rígida que violentase el derecho a la libertad de culto de las personas. Además, estas enmiendas sugieren que el Congreso buscó evitar que el Estado usara el derecho a la educación como subterfugio para crear un monopolio de facto sobre la educación.

## VI

*Significado verdadero del concepto "Sostenimiento"*

Reafirma este principio el uso de la palabra "sostenimiento". La misma no fue escogida por accidente o como fundamento de derecho autóctono; *su fin fue acoger e "incorporar" a nuestro sistema la doctrina federal de la Cláusula de Establecimiento tal y como había sido concebida en "Everson v. Board of Education", 330 U.S. 1 (1946).*

La palabra misma, "sostenimiento," tiene su origen en esa jurisprudencia federal, que considera el sostenimiento (*support*) de una religión como una forma de establecimiento.[13] Aparece prominentemente en *Everson v. Board of Education*, supra, precedente federal que más

---

dades del Estado lo permitan, según se dispone en la presente, no se interpretará como aplicable a aquellos que reciban instrucción primaria en escuelas establecidas bajo auspicios no gubernamentales."

El Congreso, en la Resolución Conjunta de 3 de julio de 1952, cap. 567, 66 Stat. 327, también conocida como la Ley Pública Núm. 447, requirió que se añadiese como condición para que la Sec. 5 pudiese cobrar vigencia.

El objeto inmediato de la enmienda fue establecer de forma explícita la regla jurisprudencial anunciada en *Pierce v. Society of Sisters*, 268 U.S. 510 (1925), de que aunque el Estado pueda hacer compulsoria la educación primaria, esto *no* le permite establecer un monopolio sobre la educación y que, por lo tanto, no se le puede prohibir a los padres enviar sus hijos a escuelas privadas, sean laicas o sectarias.

[12] Esta sección disponía, en lo pertinente: "El Estado Libre Asociado reconoce, además, la existencia de los siguientes derechos humanos: El derecho de toda persona a recibir gratuitamente la instrucción primaria y secundaria."

[13] *"Supports* apoyo, soporte, sostén; sustento; *va* apoyar, soportar, *sostener*; sustentar; aguantar ...." *The Williams Spanish & English Dictionary*, Expanded Edition, Nueva York, Charles Scribner's Sons, 1963.

influyó en la fisonomía de las cláusulas referentes a la religión adoptadas por nuestra Asamblea Constituyente. En el mismo texto de *Everson*, supra, se hacen varias referencias al *sostenimiento* de la religión.([14]) Igualmente, en el apéndice se cita un folleto publicado por James Madison, quien poco después pasó a ser el autor principal de las cláusulas religiosas de la Primera Enmienda, que habla del *sostenimiento* de la religión.([15]) Y la palabra se usa frecuentemente en las decisiones recientes del Tribunal Supremo federal.([16])

Precisamente en *Everson v. Board of Education*, supra, se pone de manifiesto la conveniencia de prohibir el "sostenimiento" de escuelas privadas, no sólo las religiosas. Al evaluar la doctrina desarrollada por el Tribunal Supremo federal hasta ese entonces sobre la Cláusula de Estableci-

---

([14]) A modo ilustrativo: "Con el poder del gobierno *sosteniéndolos*, en varias épocas y lugares, católicos habían perseguido a protestantes, protestantes habían perseguido a católicos, sectas protestantes habían perseguido a otras sectas protestantes, católicos de un matiz de fe habían perseguido a católicos de otro matiz de fe, y todos éstos habían, de vez en cuando, perseguido los judíos." (Traducción nuestra.) *Everson v. Board of Education*, 330 U.S. 1, 9 (1946); "Y todos estos disidentes fueron forzados a pagar diezmos e impuestos para *sostener* iglesias patrocinadas por el gobierno ...." (Traducción nuestra.) Íd., pág. 10; "Casi todas las colonias exigían algún tipo de impuesto para el *sostenimiento* de iglesias." (Traducción nuestra.) Íd., pág. 10 esc. 8; "Sus decisiones, por otro lado, demuestran la dificultad que encontramos en trazar la línea entre una ley de contribuciones que provee fondos para el bienestar del público en general y aquella que está diseñada para *sostener* instituciones que enseñan religión." (Traducción nuestra.) Íd., pág. 14, y otras citas adicionales.

([15]) Madison usa la palabra por lo menos en dos (2) pasajes: "¿Serán los cuáqueros y menonitas las únicas sectas que consideran innecesario e injustificable el *sostenimiento* compulsivo de sus religiones?"; Protestamos contra esta ley "porque el establecimiento en cuestión es innecesario para el *sostenimiento* del Gobierno Civil. Si se argumenta que es necesario para el *sostenimiento* del Gobierno Civil solamente en cuanto sea un medio para el *sostenimiento* de la religión, y no sea necesario para este último propósito, tampoco puede ser necesario para el primero." (Traducción nuestra.) *A Memorial and Remonstrance against Religious Assessments* (1786), reproducido íntegramente como apéndice en *Everson v. Board of Education*, supra, págs. 66 y 68.

([16]) *Zobrest v. Catalina Foothills School Dist.*, 509 U.S. 1 (1993) ("*sostenimiento* financiero para instituciones privadas sectarias"); *Committee for Public Education v. Nyquist*, 413 U.S. 756, 772 (1973) ("El primero entre esos males ha sido 'el patrocinio, el *sostenimiento* financiero y la intervención activa del soberano en actividades religiosas.") (Traducción nuestra.); *Lemon v. Kurtzman*, 403 U.S. 602, 613 (1971) ("restricciones estatutarias diseñadas para garantizar la separación entre las funciones educativas seculares y religiosas y asegurar que la ayuda financiera del Estado solamente *sostenga* la primera.") (Traducción nuestra.).

miento, resulta evidente que la razón de ser de dicha cláusula fue establecer la separación entre la Iglesia y el Estado, a la vez de no interferir con el libre ejercicio de la religión de los individuos. *Se requiere el balance y la armonía de ambos principios para no infringir indebidamente los derechos consagrados en la Constitución federal, eventual y oportunamente incorporados en nuestra Constitución.*

El Art. II, Sec. 5 de nuestra Constitución, *supra*, así lo recoge en materia de educación. *La Asamblea Constituyente, al prohibir el sostenimiento de las escuelas privadas, capturó la esencia de la doctrina del Tribunal Supremo federal en este campo.* De haberse limitado a las escuelas religiosas, nada en la Constitución hubiese prohibido el sostenimiento por parte del Estado de las escuelas privadas laicas o no sectarias. En la medida que el Estado sostuviese las instituciones no sectarias, estaría creando una clasificación sospechosa fundamentada en la afiliación o no a una religión, actuación sujeta al escrutinio estricto del foro judicial. Al decretarse la prohibición de sostenimiento de *todas las escuelas privadas*, se plasmó correctamente el resultado de *Everson v. Board of Education*, supra. El uso de la palabra "privadas" no requiere que nos apartemos del análisis bajo la Cláusula de Establecimiento; sólo exige que el trato de las escuelas no sectarias dependa paralelamente del de las religiosas. *La Ley Núm. 71, supra, no sostiene inconstitucionalmente a las escuelas religiosas; tampoco a las escuelas "privadas" en violación a la citada Sec. 5.*

*Carece de todo fundamento la conclusión mayoritaria que atribuye a la Convención Constituyente la intención de ampliar el ámbito de la doctrina federal sobre la Cláusula de Establecimiento.* El desacierto mayoritario consiste en concluir, sin aducir razones, que la palabra "sostenimiento" debe ser interpretada de forma "tan ancha" que incluya todo beneficio, por indirecto que sea, que reciban las insti-

tuciones privadas.([17]) Así, hacen caso omiso a todos los antecedentes que revelan que la palabra "sostenimiento" (*support*) se derivó de la jurisprudencia federal, en la cual se han trazado unas distinciones cuidadosas entre los beneficios permisibles e impermisibles a base de unos criterios que oportunamente discutiremos.

La mayoría acoge el principio de sostenimiento según el Tribunal Supremo federal cuando está en controversia la separación entre Iglesia y Estado —*Díaz v. Colegio Nuestra Sra. del Pilar*, supra— pero, paradójicamente, le atribuye un significado más amplio y abarcador cuando el conflicto versa entre escuelas públicas y privadas; *y todo ello tratándose de una misma cláusula. Configuran así el absurdo de que la "factura más ancha" de nuestra Constitución, cuyo propósito es ampliar los derechos ciudadanos, los restringe. Como consecuencia, hacen más marcada la diferencia en oportunidades y alternativas educacionales entre ricos y pobres.*

Trazar los horizontes correctos del contenido jurídico del término *"sostenimiento"* de la citada Sec. 5, conlleva examinar el desarrollo de la jurisprudencia federal sobre la Cláusula de Establecimiento.

## VII

*La Cláusula de Establecimiento de la Primera Enmienda de la Constitución federal no prohíbe las becas especiales de la Ley Núm. 71*

Sabido es que las cláusulas religiosas de la Primera Enmienda —Libre Ejercicio y Establecimiento— fijan de forma complementaria un balance sabio entre el Estado y el ciudadano con el fin de garantizar la libertad de conciencia de todos. La separación entre la Iglesia y el Estado no

---

([17]) Meramente nos dicen que "[u]n examen del historial ... apoya una interpretación amplia del alcance de la prohibición". Opinión del Tribunal, págs. 544-545.

es un fin en sí mismo. *La Cláusula de Establecimiento, lejos de encarnar una visión hostil hacia la religión, está diseñada para preservar a largo plazo la libertad de culto.*

No toda acción gubernamental que beneficie a grupos religiosos revela un favoritismo prohibido. Aunque se ha hablado mucho de una "murralla" de separación entre el Estado y la religión, la separación nunca se ha acercado a ser absoluta: "la línea de separación, lejos de ser una 'muralla', es una barrera borrosa, indistinta y variable que depende de la totalidad de las circunstancias de una relación en particular." (Traducción nuestra.) *Lemon v. Kurtzman,* supra, pág. 614.([18]) Así, dentro del ámbito de la educación, se ha resuelto que el Estado puede reembolsar los gastos de transportación a la escuela,([19]) prestar libros no sectarios a estudiantes,([20]) permitir que se deduzcan de los ingresos tributables algunos gastos de educación,([21]) proveer becas a jóvenes con incapacidades físicas para que cursen estudios universitarios([22]) e intérpretes en el salón de clase a estudiantes sordos,([23]) aun cuando en todos estos

---

([18]) La inexactitud de la metáfora de la muralla es precisamente que se puede interpretar como si se prohibiesen *todos* los contactos Estado-Iglesia, interpretación que resulta absurda, pues algunos contactos son inevitables y otros deseables. Al fin, la metáfora es tan sobreinclusiva que no nos ayuda a determinar cuáles contactos son o no permisibles.

([19]) *Everson v. Board of Education,* supra.

([20]) *Board of Education v. Allen,* 392 U.S. 236 (1968). Pero no se le pueden prestar ni regalar libros, aún seculares, *directamente* a escuelas sectarias. *Meek v. Pittenger,* 421 U.S. 349 (1975).

([21]) *Mueller v. Allen,* 463 U.S. 388 (1983). En este caso, la deducción estaba disponible a todos los padres de estudiantes, mientras que en *Committee for Public Education v. Nyquist,* supra, una ley casi idéntica, fue declarada inconstitucional porque la deducción estaba disponible *solamente para los padres de niños que estudiaban en escuelas privadas.*

([22]) *Witters v. Wash. Dept. of Services for Blind,* 474 U.S. 481 (1986). No debemos dejar de destacar que en este caso el Tribunal Supremo federal validó que el estudiante usara su beca para estudiar en una universidad cristiana para prepararse para una carrera como ministro de una iglesia.

([23]) *Zobrest v. Catalina Foothills School Dist.,* supra. El Tribunal no encontró violación a la Cláusula de Establecimiento, aun cuando el intérprete, quien era un empleado público, estaba presente en clase para traducirle al estudiante sordo lo que decía el maestro en la clase de religión.

casos los estudiantes cursaban sus estudios en escuelas sectarias.

Como anticipáramos, el análisis sustantivo a efectuarse en el contexto de las cláusulas religiosas es el delineado en *Lemon v. Kurtzman*, supra, según adoptado en *Díaz v. Colegio Nuestra Sra. del Pilar*, supra. "*Lemon*, por amedrentante que le sea a algunas personas, no ha sido revocado." (Traducción nuestra.) *Lamb's Chapel v. Center Moriches Union Free School District*, 508 U.S. 384, 395 esc. 7 (1993). En todo caso, el mismo análisis tripartita debe enfocar el estatuto en su totalidad, para ver si a ese nivel existe un "establecimiento" prohibido.([24]) Acometamos suscintamente esa tarea.

La *primera* parte del análisis de *Lemon v. Kurtzman*, supra, consiste en asegurar que la ley "refleje un propósito claramente secular". (Traducción nuestra.) *Committee for Public Education v. Nyquist*, 413 U.S. 756, 773 (1973).([25]) La Ley Núm. 71, *supra*, satisface este requisito plenamente, pues la educación de los niños no es un fin público cualquiera, sino uno de los más importantes que tiene el Estado, proclamado constitucionalmente en la Sec. 5 del Art. II de nuestra Constitución E.L.A., *supra*, pág. 271, como que "[t]oda persona tiene derecho a una educación que propenda al pleno desarrollo de su personalidad y al fortalecimiento del respeto de los derechos del hombre y de las libertades fundamentales".

*Segundo*, según el análisis de *Lemon v. Kurtzman*, supra, la Ley Núm. 71, *supra*, no tiene el efecto primordial de avanzar o sostener la religión. *No podemos usar como excusa un imaginario sostenimiento de la religión para discriminar contra los pobres del país.* "En vista de que una

---

([24]) *Zobrest v. Catalina Foothills School Dist.*, supra.

([25]) Véanse, también: *Lemon v. Kurtzman*, supra, pág. 613 ("Primero, el estatuto debe tener un propósito legislativo secular."); *Zobrest v. Catalina Foothills School Dist.*, supra ("aplicando el análisis tripartita anunciado en *Lemon v. Kurtzman* .... [el Tribunal de Apelaciones] determinó que el IDEA tiene un propósito claramente secular."). (Traducciones nuestras.)

regla en contrario conllevaría resultados tan absurdos, hemos decidido consistentemente que programas gubernamentales provean beneficios a un amplio grupo de ciudadanos, sin relación alguna con la religión, no están propensos a una impugnación fundamentada en la Cláusula de Establecimiento meramente porque instituciones sectarias también puedan recibir un beneficio financiero atenuado." (Traducción nuestra.) *Zobrest v. Catalina Foothills School Dist.*, 509 U.S. 1, 8 (1993), citando a *Bowen v. Kendrick*, 487 U.S. 589 (1988).

Este importante pronunciamiento y la normativa jurisprudencial informan los dos (2) criterios primordiales que debemos tomar en cuenta al determinar si una ley tiene los efectos prohibidos. *Uno*, que la ayuda sea dirigida a individuos, no directamente a instituciones religiosas, de suerte que cualquier ayuda que perciban las instituciones religiosas sea indirecta o incidental, como resultado de decisiones libres e independientes de los beneficiarios individuales.

> *Cuando, como aquí, la ayuda a escuelas sectarias está disponible sólo como resultado de las decisiones de los padres en su carácter individual, no puede pensarse que se ha conferido un "imprimátur de aprobación estatal" ... a una religión en particular, ni a la religión en general.* (Traducción nuestra y cita omitida.) *Mueller v. Allen*, 463 U.S. 388, 399 (1982).

Obviamente, la Cláusula de Establecimiento está dirigida a evitar el peligro del sostenimiento *de la religión por el Estado*, lo cual disminuye notablemente cuando la decisión final de cómo usar los fondos está en manos de individuos.

Y *dos*, la ley debe ser de aplicación *neutral* a una clase general de ciudadanos no definida con referencia a la religión. En *Mueller v. Allen*, supra, pág. 730, citando a *Committee for Public Education v. Nyquist*, supra, se dijo: "sugerimos que 'asistencia pública (e.g., becas) hechas disponibles generalmente sin consideración de la naturaleza sectaria-religiosa, o pública-privada de la institución bene-

ficiada,' *ibid.*, podría no ofender la Cláusula de Establecimiento".[26] De hecho, el problema en *Committee for Public Education v. Nyquist*, supra, fue precisamente que la ley en cuestión estaba disponible solamente a padres de niños que estudiaban en escuelas privadas; al excluir los estudiantes de escuelas públicas, el programa no podía considerarse general.

*Bajo este prisma jurisprudencial, concluimos que la Ley Núm. 71, supra, no tiene como efecto el sostenimiento de las instituciones religiosas. Cualquier beneficio que reciba una escuela sectaria bajo el programa de becas especiales se deberá a decisiones independientes de los beneficiarios directos del programa; o sea, los padres y sus niños.*[27] *Cada niño tendrá la oportunidad de asistir a la escuela que crea le provee la mejor educación. Igualmente podrá escoger una escuela pública, una privada laica o una sectaria y, en todo momento, su decisión será libre de presión gubernamental a favor de una u otra opción.*

La Ley Núm. 71, *supra*, al igual que la deducción por los gastos educacionales al ingreso bruto permitida por la Ley Núm. 10 de 24 de julio de 1985,[28] no tiene el efecto de sostener a instituciones sectarias porque el programa establecido es de aplicación *neutral* disponible a una clase general de ciudadanos definida, sin referencia a la religión.

Es un error decir que la Ley Núm. 71, *supra*, crea incen-

---

[26] Criterio reiterado desde entonces en *Witters v. Wash. Dept. of Services for Blind*, supra, y *Zobrest v. Catalina Foothills School Dist.*, supra.

[27] Nuestro análisis no queda afectado por el mero hecho de que lo que recibe el niño no es dinero en efectivo, sino un documento becario. El uso de tales documentos queda plenamente justificado por la necesidad práctica de fiscalizar el programa para asegurar que los fondos se usen para la educación. Además, al usarlos, se deja abierta la posibilidad de que el estudiante no necesite los $1,500 completos, lo cual resultaría ser un ahorro para el erario.

[28] Haciendo referencia a *Mueller v. Allen*, supra, la Exposición de Motivos de la Ley Núm. 10 de 24 de julio de 1985, Leyes de Puerto Rico, págs. 696–697, dispone: "Es menester señalar que en la preparación de esta medida se utilizó como modelo un estatuto del Estado de Minnesota ... cuya validez, frente a un ataque constitucional basado en la violación a la cláusula de separación entre la iglesia y el estado, fue recientemente sostenida por el Tribunal Supremo de los Estados Unidos." (Cita omitida.)

tivos para que los niños asistan a escuelas privadas. La mayoría no alcanza perfilar correctamente el *concepto incentivo*, que significa "[q]ue mueve o excita a desear o hacer una cosa", o "[e]stímulo que se ofrece a una persona, grupo o sector de la economía para elevar la producción". *Diccionario de la Lengua Española*, 21ra ed., Madrid, Ed. Espasa-Calpe, 1992, pág. 813. A fin de cuentas, según explicado, no todo incentivo está prohibido, pues lo determinante es si la ley promueve que se favorezcan las escuelas sectarias por encima de las no sectarias privadas o públicas. *Zobrest v. Catalina Foothills School Dist.*, supra. Siempre y cuando el programa no establezca preferencias a favor de las escuelas privadas sobre las públicas, no hay el tipo de incentivo prohibido que equivale al sostenimiento. *La Ley Núm. 71, supra, trata a todas las escuelas de forma sustancialmente igual, excepto aquellas diferencias incidentales que surjan de las necesidades administrativas del programa.*

Finalmente, la *tercera* parte del análisis de *Lemon v. Kurtzman*, supra, no presenta problema alguno porque la Ley Núm. 71, *supra*, no conlleva que el Estado se inmiscuya excesivamente en los asuntos religiosos. Aunque es cierto que las escuelas privadas laicas o sectarias que participen en el programa de becas especiales están sujetas a unos requisitos administrativos adicionales, éstos son necesarios para fiscalizar adecuadamente al programa y no interfieren en manera alguna con el aspecto religioso de las escuelas.[29] Más involucramiento del Estado en asuntos

---

[29] Solamente tienen que certificar los servicios educativos prestados cuando sometan las facturas para cobro (Art. 9 (18 L.P.R.A. sec. 911g)); "(a) Estar licenciadas o acreditadas por las organizaciones acreditadoras reconocidas en Puerto Rico; (b) Mantener una política de admisión libre de discrimen por razón de raza, sexo, color, origen o condición social, impedimentos físicos, ideas políticas o creencias religiosas; (c) Cumplir con la legislación y reglamentación vigente en Puerto Rico sobre salud y seguridad aplicables a instituciones educativas; (d) Someter a la Oficina por lo menos dos (2) informes anuales sobre el desempeño académico de los estudiantes que participan en el Programa y la integración de éstos a su nuevo grupo escolar; y (e) La proporción de estudiantes participantes del Programa no podrá exceder del cincuenta por ciento (50%) de la matrícula total de una escuela privada." (Art. 11 (18 L.P.R.A. sec. 911i)).

religiosos son los trámites que generan el requisito de Certificación que otorga el Departamento de Educación, cuya constitucionalidad fue sostenida recientemente por este mismo Tribunal en *Asoc. Academias y Col. Cristianos v. E.L.A.*, 135 D.P.R. 150 (1994).

## VIII

*Consideraciones finales*

"Interpretamos una Constitución, no los Rollos del Mar Muerto." *P.R. Tel. Co. v. Martínez*, 114 D.P.R. 328, 350 (1983).

Dolor, angustia, frustración y un desesperante sentimiento de impotencia nos embargan al ver cómo no hemos podido, con la razón y la empatía humana, convencer y lograr mayoría numérica para realizar la justicia social confiada a nuestras manos. Se ha dado la espalda no sólo a la Constitución y al Derecho —que en última instancia únicamente son instrumentos imperfectos al servicio de nuestros conciudadanos— sino que se han tronchado las esperanzas de tantos niños en nuestro país que, por nacer en condiciones de pobreza económica, no tienen los mecanismos para alcanzar la igualdad social y, naturalmente, con sus padres, veían en estas becas la forma para educarse mejor y así alcanzar vindicación humana y social.

En vez de la mayoría esforzarse por sostener la constitucionalidad evidente de toda la ley, han hecho lo posible por vulnerarla, anulando un programa fundamentalísimo que recogía y hacía realidad parte del ideario constitucional. Nos negamos a aceptar que la Constitución —inspirada en los más elevados y sublimes derechos y aspiraciones humanas— pueda ser utilizada para lo contrario. Nuestra Ley Fundamental contiene importantes enunciados de dignidad e igualdad. Para que esos ideales

adquieran virtualidad y no permanezcan en el mundo de lo abstracto y teórico, hace falta una educación de calidad, integral y completa.

Como no vivimos estrictamente en el universo de las ideas y sí en una cotidianidad ricamente matizada de los más variados elementos, reconocemos que, si bien nuestra Carta de Derechos defiende *a todos* (ricos y pobres), muchas veces los primeros cuentan con mayores recursos para hacer realidad las aspiraciones humanas contenidas en la Constitución, pero en la mayoría de las ocasiones para los pobres es sólo letra muerta a menos que el Estado, a través de sus recursos, convierta en realidad lo que de otra forma sólo sería un sueño.

Rechazamos interpretaciones rígidas y elitistas que propenden hacia la fragmentación, no hacia la integración. No debemos olvidar que los cimientos de unidad e integración social que fomentan la convivencia armoniosa de los ciudadanos no surgen espontáneamente; antes bien son el resultado de un proceso paulatino y gradual generacional que se logra por la interacción efectiva de individuos de las diferentes clases sociales desde sus inicios en el proceso de socialización.

Si pretendemos lograr una visión y unos objetivos comunes entre los adultos del mañana, es menester crear las condiciones de solidaridad y unión, que van internalizándose en los años iniciales del niño, cuando la mente es fértil e inocente y aún no ha sido viciada con el germen del prejuicio, la envidia y el egoísmo que carcomen el alma. Cuando el ser humano aprende que es igual a sus semejantes, no superior ni inferior, entonces comprende que debe colaborar en unión y armonía para lograr aspiraciones e ideales comunes. La parte del programa de becas educativas hoy destruido tenía el potencial de hacer viable ese proceso. Desafortunadamente, una vez más, nuestra prédica ha sido en el desierto y sólo nos ha quedado el

camino del disenso para descargar nuestra conciencia judicial.

*Recapitulando*, reiteramos la constitucionalidad de las becas educativas del Art. 6(c) de la Ley Núm. 71, *supra*. Como opción, sus beneficios están dirigidos *exclusivamente* a los padres y estudiantes, no directamente a la institución educativa; no configuran el "sostenimiento" a las escuelas privadas vedado por nuestra Ley Fundamental.

La decisión mayoritaria desvirtúa el fundamento filosófico en que se ampara la Cláusula de Establecimiento, esto es, hacer viable la libertad de culto religioso. La conciben sólo como instrumento de separación de Iglesia y Estado, visualizando de esa forma una relación tirante y antagónica entre ambas esferas, no contemplada por los autores tanto de la Constitución federal como de la nuestra. *INVENTIVAMENTE NOS HABLAN DE UNA "FACTURA MÁS ANCHA"*.

*El Art. 6(c) de la Ley Núm. 71, supra, interpretado dentro de los parámetros constitucionales: buscaba ampliar las opciones educativas de los padres pobres para sus hijos; buscaba hacerles realidad el postulado constitucional de que toda persona tiene derecho a una educación de calidad; buscaba desarrollar plenamente la personalidad, y buscaba garantizarles, de igual forma, el respeto a los derechos de igualdad y dignidad consustanciales a la esencia humana. ¿POR QUÉ IMPEDIRLO? Por décadas los pobres del país han clamado por una educación de calidad. Al anularles sus becas, la mayoría del Tribunal acaba de pasarles una "FACTURA ANCHA".*

¡CUÁN COSTOSA PARA LOS NIÑOS POBRES!

— O —

Opinión disidente emitida por el Juez Asociado Señor Re-
bollo López.

El pasado 30 de septiembre de 1994, al *disentir* de la
actuación mayoritaria que determinó que la Ley Habilita-
dora del Referéndum de 1994 era *parcialmente* inconstitu-
cional, *expresamos*, entre otras cosas, que dicha decisión
mayoritaria

> ... conlleva, no hay duda, *un mensaje claro y preciso a las res-
> tantes Ramas del Gobierno de Puerto Rico*. La mayoría de los
> integrantes del Tribunal ha dejado hoy *claramente establecido*
> que entiende que tiene el *poder último* en nuestro País *y que
> está en disposición de enmendar, rehacer y deshacer —a su an-
> tojo y capricho— el fruto o producto final del trabajo y labor de
> las Ramas Ejecutiva y Legislativa de nuestro Gobierno.* Esto es,
> en el día de hoy el Tribunal *hace alarde del "mollero judicial",
> que entiende posee y que obviamente está en disposición de uti-
> lizar, respecto a las labores y funciones que la Constitución ex-
> presamente delega en el Poder Ejecutivo y la Rama Legislativa.*
> (Énfasis en el original.) *Berríos Martínez v. Gobernador II*, 137
> D.P.R. 195, 293–294 (1994).

Nuestra "advertencia" —al igual que *lo erróneo* de la
decisión mayoritaria emitida, la cual invalidó, *de forma in-
necesaria y parcial*, la referida legislación— *pasó práctica-
mente desapercibida.* De hecho, la gran mayoría de nuestra
ciudadanía, la cual *esperaba y temía* que el Tribunal inva-
lidara *todo* el referéndum, *respiró aliviada*; tal y como lo
hace el ciudadano que, al ser asaltado a mano armada,
*suspira con tranquilidad* al realizar que los ladrones, *pu-
diendo* haberle quitado la vida, *sólo* lo despojaron de su
cartera.

El Tribunal, sin embargo, *no tardó mucho en confirmar
plenamente la advertencia, y predicción, que hiciéramos el
30 de septiembre de 1994.* Esto es, en el día de hoy este
Foro, haciendo uso del "poder último" que entiende tener
para hacer y deshacer, y del "mollero judicial" del que ha-

blamos el pasado 30 de septiembre, *erróneamente invalida
la Ley Núm. 71 de 3 de septiembre de 1993,* conocida la
misma como la Ley de Becas Especiales y Libre Selección
de Escuelas. *Procede señalar, sin embargo, que existe una
abismal diferencia entre la decisión mayoritaria que se
emite en el presente caso y la que fuera emitida en relación
con el asunto del referéndum.*

Mediante la equivocada decisión que se emitiera en re-
lación con la Ley Habilitadora del Referéndum de 1994,
este Foro *meramente* evitó que el pueblo expresara su pre-
ferencia sobre *un* asunto de interés público. La decisión
mayoritaria que hoy se emite, por el contrario, *lesiona y
lastima a un sector particular de nuestra ciudadanía de
manera directa e incalculable.* Nos referimos, natural-
mente, *a la clase más necesitada de nuestro País desde un
punto de vista económico.* La decisión mayoritaria emitida
*no sólo troncha las legítimas aspiraciones, y la ilusión, de
unos niños y jóvenes humildes de recibir una mejor educa-
ción, sino que le niega a éstos un futuro mejor, futuro al que
tienen legítimo derecho.*

Ello se lleva a cabo, esto es, dicha lamentable conse-
cuencia se logra, por el Tribunal a base de la *acomodaticia*
ignorancia de una jurisprudencia, propia y reciente, sobre
"legitimación activa"; de la *conveniente* no aplicación de
una legislación netamente nuestra; de la *aplicación* de una
jurisprudencia federal que puede ser distinguida; de la
*errada* "impartición de contenido amplio" a una disposición
específica de nuestra Constitución; y de la *innecesaria-
mente restrictiva* interpretación de dicha Constitución.

El papel, naturalmente, aguanta todo lo que sobre el
mismo se escribe. Hay que aceptar el hecho de que noso-
tros los abogados nos podemos "ganar la vida", después de
todo, precisamente debido a que toda controversia legal,
como toda moneda, tiene "dos caras"; razón por la cual la
misma se puede argumentar de dos formas distintas de
manera igualmente fundamentada. Hoy, *de manera som-*

*bría y en alegada estricta juridicidad*, se anula una ley que este Tribunal debió de sostener, *a toda costa*, en beneficio de la clase humilde y oprimida de Puerto Rico. *El Tribunal le ha hecho un "flaco servicio" a nuestra sociedad. Este Foro se olvida de que no somos autómatas del derecho. Se supone que seamos Jueces que hacemos justicia, entre otras formas, protegiendo al desvalido*. La decisión mayoritaria hoy emitida, *alegadamente* en defensa de la Constitución, *lo que hace es perjudicar a los ciudadanos a los cuales la misma se supone que proteja y beneficie.*

Atrás, y olvidado, ha quedado el *reiterado principio* a los efectos que, después de todo, "la vitalidad de nuestra Constitución depende, en última instancia, *de su capacidad para responder con acierto a los distintos problemas sociales, políticos y económicos que de tiempo en tiempo aquejan al país*, y al aplicarla debemos recordar que '[i]nterpretamos una Constitución, no los Rollos del Mar Muerto' ". (Énfasis suplido.) *Caquías v. Asoc. Res. Mansiones Río Piedras*, 134 D.P.R. 181, 189 (1993). Véanse, además: *Nogueras v. Hernández Colón*, 127 D.P.R. 405 (1990); *De Paz Lisk v. Aponte Roque*, 124 D.P.R. 472 (1989); *P.I.P. v. C.E.E.*, 120 D.P.R. 580 (1988).

Tal parece ser que dicho reiterado principio, *la aplicación del cual en el caso de autos tendría la consecuencia inexorable de sostener la validez de la legislación en controversia*, únicamente se expone y *selectivamente* se aplica por la Mayoría cuando el hacerlo *adorna* la ponencia que en determinado momento se suscribe, y publica, por uno de los integrantes de esa Mayoría.

## I

*De entrada*, nos vemos obligados a examinar, y resolver, el *planteamiento* del Procurador General sobre si la demandante, Asociación de Maestros de Puerto Rico (en adelante Asociación), *efectivamente posee "legitimación acti-*

*va"*; elemento *indispensable* para la correcta adjudicación de una controversia en particular. El *principio de justiciabilidad* así nos lo requiere. *Hernández Torres v. Gobernador*, 129 D.P.R. 824 (1992).(1) Como es sabido, nuestra facultad de evaluar la validez de una ley, a la luz de las disposiciones pertinentes de nuestra Constitución, *únicamente* puede ser ejercitada dentro de los parámetros de una *controversia real y verdadera* entre partes adversas que pretenden que se le conceda un remedio judicial. *E.L.A. v. Aguayo*, 80 D.P.R. 552 (1958).

Esto es, a pesar de que bajo nuestro sistema de gobierno cualquier ley está sujeta a ser declarada inconstitucional, *no* basta la mera alegación, o el hecho, de que la ley es, o sea, inconstitucional. *Hernández Torres v. Hernández Colón et al.*, 131 D.P.R. 593 (1992). Ello así, debido a que las puertas de los tribunales *no* están abiertas, de par en par, "para la consideración de *cualquier* caso que desee incoar *cualquier* ciudadano en *alegada* protección de una política pública". (Énfasis suplido.) *Salas Soler v. Srio. de Agricultura*, 102 D.P.R. 716, 723–724 (1974).

Al amparo de la antes mencionada normativa, *hemos requerido* que la "persona que pretende ser parte [demandante en un pleito] ha de tener *una capacidad individualizada y concreta* 'en la reclamación' procesal" que inste. (Énfasis suplido.) *Col. Ópticos de P.R. v. Vani Visual Center*, 124 D.P.R. 559, 563 (1989). Es por ello que, en ausencia de un estatuto que expresamente le confiera "legitimación activa" a una persona, *reiteradamente hemos resuelto que la parte que solicita un remedio judicial ante los tribunales viene obligada a demostrar*: (1) que ha *sufrido un daño claro y palpable*; (2) que el referido daño *es uno*

---

(1) Resulta, cuando menos, curioso que, no obstante el Estado levantar y discutir, en el *recurso de apelación* que el Procurador General radicara ante este Tribunal, el aspecto de falta de "legitimación activa" (*standing*) de la demandante Asociación de Maestros de Puerto Rico, *durante la vista oral que este Tribunal celebrara el Estado no argumentó en absoluto dicho punto legal*. Dicho asunto, conforme veremos, es uno de umbral y de singular importancia en el caso, *razón por la cual no debió el mismo ser "ignorado" por el Estado en dicha vista oral.*

*real, inmediato y preciso, y no uno abstracto o hipotético;* (3) que existe *conexión entre el daño sufrido y la causa de acción ejercitada;* y (4) que la causa de acción *surge* bajo el palio de la Constitución o de una ley. *Hernández Torres v. Gobernador,* ante; *Noriega v. Hernández Colón,* 135 D.P.R. 406 (1994).

Respecto a la obligación que tiene la parte actora o demandante, de probar los antes mencionados cuatro requisitos sobre "legitimación activa" (*standing*), *resulta verdaderamente significativo e importante lo resuelto por el Tribunal Supremo de los Estados Unidos en Lujan v. Defenders of Wildlife,* 504 U.S. 555, 60 U.S.L.W. 4495 (1992), *decisión que este Foro citó con aprobación e incorporó a nuestro acervo jurisprudencial* en el segundo de los casos de *Hernández Torres v. Hernández Colón et al.,* ante. En *Lujan v. Defenders of Wildlife,* ante, pág. 4497, el Supremo Nacional expresó, respecto a los requisitos sobre *standing* con los cuales todo demandante viene en la obligación de cumplir, que:

> Debido al hecho de que *no* se trata de meros requisitos en la etapa de las alegaciones, sino que éstos constituyen una parte indispensable del caso de la parte demandante, *cada elemento o requisito exigido [respecto a "standing"] debe ser sostenido por la parte demandante de la misma manera en que ésta viene obligada a probar cualquier otro asunto en relación con el cual recae sobre dicha parte la obligación del peso de la prueba,* es decir, de la misma manera y el grado de prueba requeridos en las etapas subsiguientes del litigio.
>
> En la etapa de las alegaciones, pueden ser suficientes alegaciones generales de hecho sobre el daño [sufrido por el demandante] resultante de la acción del demandado ya que presumimos que, en relación con una moción de desestimación, las alegaciones generales cubren los hechos específicos requeridos para sostener la reclamación.
>
> En respuesta a una moción de sentencia sumaria, *sin embargo,* la parte demandante no puede descansar en esas alegaciones generales y viene obligado a exponer hechos específicos mediante declaración jurada u otra evidencia ... que para efectos

de una solicitud de sentencia sumaria serán tomados como ciertos. *En la etapa final, esos hechos deben ser demostrados adecuadamente por evidencia, presentada a esos efectos, durante el juicio.* (Traducción y énfasis nuestros.)

Igualmente pertinente y significativo, al caso hoy ante nuestra consideración, resulta ser el hecho de que *constituye norma trillada* de que estos

> ... criterios son *especialmente más rigurosos* si se pretende reclamar los *derechos de terceros* al revisar la constitucionalidad de leyes. Esto corresponde a "la *regla general* de que un litigante *no* puede impugnar la constitucionalidad de una ley aduciendo que la misma infringe los derechos constitucionales de terceras personas que *no* son parte en la acción". *Zachry International v. Tribunal Superior*, 104 D.P.R. 267, 271 (1975). *Como corolario de esta norma*, en el caso particular de las *agrupaciones o colectividades*, cuando demandan a nombre de sus miembros *requerimos* (1) *que sus miembros tengan legitimación activa para demandar a nombre propio*; (2) que los intereses que se pretenden proteger estén relacionados con los objetivos de la organización, y (3) que la reclamación y el remedio solicitado no requieran la participación individual de los socios en el pleito. (Énfasis suplido.) *Hernández Torres v. Gobernador*, ante, pág. 836. Véase *Lujan v. Defenders of Wildlife*, ante.

¿Qué *consecuencia*, o *significado*, tiene lo anteriormente expresado respecto a los hechos específicos de los recursos hoy ante nuestra consideración? *La contestación resulta ser, sorprendentemente, sencilla*: la demandante Asociación *tenía, y tiene, la obligación de alegar y probar que ha cumplido, y cumple, con los requisitos de legitimación activa a través de todas las etapas procesales del pleito*; esto es, que sus *miembros* han *sufrido* —y, por ende, ella— un daño claro, real y preciso, *no* abstracto e hipotético, como consecuencia de la acción de los demandados; que existe *conexión* entre el daño sufrido y la causa de acción ejercitada; y que ésta *surge* bajo el palio de la Constitución o una ley. *Igualmente significativo* resulta ser que la demandante viene en la obligación de probar lo anteriormente señalado en relación a cada una de sus alegaciones o señalamientos de inconstitucionalidad respecto a la Ley de Becas Especia-

les y Libre Selección de Escuelas. Véase *Chicago Board of Trade v. Olsen*, 262 U.S. 1 (1922).

## II

*¿Cumple la demandante recurrida Asociación con el requisito de "legitimación activa" (standing) en el presente caso?* La contestación en la *negativa* "salta a la vista y hiere la retina". *In re Roldán González*, 113 D.P.R. 238, 242 (1982).

La demandante Asociación, como su propio nombre lo indica, es una agrupación o asociación. Siendo ello así, y conforme la jurisprudencia vigente, ésta viene en la obligación de cumplir, en relación con el asunto de *standing*, con los *tres requisitos* exigidos por dicha jurisprudencia en casos de agrupaciones, *a saber*: que sus miembros *individualmente* tienen *standing* en el presente caso, que los intereses que se pretenden proteger tengan relación con los objetivos de la organización, y que la reclamación y el remedio solicitado no requieran la participación individual de dichos miembros en el pleito.

Procede, en consecuencia, que nos *cuestionemos* de entrada si los *miembros* de la Asociación tienen *standing; en otras palabras, si esos miembros han sufrido un daño claro, palpable, y real, esto es, uno no abstracto e hipotético.* Es materia de récord que en la *vista oral* que este Tribunal celebrara, en relación con el recurso de apelación hoy ante nuestra consideración, *tres* diferentes Jueces de este Tribunal, en *tres* ocasiones distintas, *específicamente requirieron* del representante legal de la Asociación durante dicha vista *que les indicara en qué consistía el "daño", si alguno, que habían sufrido los miembros de la Asociación* como consecuencia de la aprobación, e implementación, de la Ley Núm. 71 de 3 de septiembre de 1993.

En esas *tres* ocasiones, *la contestación de dicho abogado siempre fue la misma, a saber*: que el "daño" sufrido por los

miembros de la Asociación lo era *"la pérdida de sus estudiantes talentosos"*, los cuales se habían trasladado a las escuelas privadas y de la comunidad. *¿Constituye ese "daño" alegadamente sufrido por los miembros de la Asociación el daño real, claro y palpable que requiere la jurisprudencia?* La contestación en la *negativa* se "cae de la mata", *no* requiriendo el asunto ulterior elaboración.

Consciente de ese hecho, la Mayoría acude, motu proprio, al "pleito del contribuyente". Claro está, igualmente consciente de la existencia en nuestro ordenamiento de la Ley Núm. 2 de 25 de febrero de 1946, la cual expresamente le niega *standing* a un ciudadano para radicar un pleito contra el Estado que "no alegue otro interés en la acción ... ni otra capacidad para demandar" que no sea la de ser un contribuyente que objeta el uso de fondos públicos, *la Mayoría expone que* está "obligada" a concederle *standing* a la ·Asociación debido a la decisión que emitiera el Tribunal Supremo federal de los Estados Unidos en *Flast v. Cohen,* 392 U.S. 83 (1968); decisión mediante la cual dicho alto Foro federal resolvió, en síntesis y en lo pertinente, que procedía establecer una *excepción* a la *norma general* de negarle *standing* a un ciudadano, que solamente tiene interés en el pleito por su condición de "contribuyente", *cuando se trata de un pleito radicado bajo la "cláusula de establecimiento" de la Constitución federal*; esto es, la base constitucional de la doctrina de "separación de iglesia y estado" en la jurisdicción federal.

Ahora bien, *no* podemos perder de vista el hecho de que la Asociación propiamente *está impedida* de reclamar "standing" bajo la decisión emitida en *Flast v. Cohen,* ante. Ello así ya que la Asociación, conforme surge de la propia demanda que radicara, es una asociación con fines *no* pecuniarios. En consecuencia, la misma *no* puede ser considerada como un "contribuyente" con el propósito de concederle *standing* bajo la Primera Enmienda de la Constitución federal y al amparo de la decisión emitida en *Flast*

*v. Cohen*, ante. Alega la Mayoría, sin embargo, que los que sufren el "daño" en el presente caso —exigido como requisito, por la jurisprudencia, a los fines de *standing*— lo son precisamente los miembros de la Asociación, los derechos de los cuales ésta reclama.

El *obstáculo insalvable* al que se enfrenta el razonamiento de la Mayoría lo es que la demandante Asociación *nunca alegó, ni reclamó, ni probó que* su acción estaba fundada en la "condición de contribuyente" de sus miembros *ni, mucho menos, que* el pleito estaba predicado en la excepción establecida en la "cláusula de establecimiento" de la Constitución federal y/o en las disposiciones de la Sec. 5 del Art. II de nuestra Constitución, L.P.R.A., Tomo 1; *alegación, y demostración, que conforme la jurisprudencia sobre la materia resulta indispensable que se exponga y se haga.* Véanse: *Flast v. Cohen*, ante; *Valley Forge College v. Americans United*, 454 U.S. 464 (1982); *Hernández Torres v. Hernández Colón et al.*, ante; *Lujan v. Defenders of Wildlife*, ante.

*No* habiendo la demandante Asociación de Maestros cumplido con el *requisito indispensable* de *alegar, y demostrar*, que sus miembros efectivamente sufrieron un daño real, palpable y concreto, *resulta inescapable* la conclusión de que la Asociación *no* tiene *standing* en el presente pleito; *razón por la cual lo procedente en derecho es decretar la desestimación de la acción radicada por la referida Asociación.* Véanse: *Zachry International v. Tribunal Superior*, ante; *Hernández Torres v. Hernández Colón et al.*, ante; *Lujan v. Defenders of Wildlife*, ante.

Estamos conscientes de que se nos puede imputar que estamos siendo demasiado técnicos al insistir en la aplicación de la norma vigente en esta jurisdicción a los efectos de que, independientemente del hecho de que una ley pueda o no ser constitucional, el foro judicial no puede entrar a resolver los méritos de la impugnación que a esos efectos se haga a menos que exista una "controversia real y

verdadera" entre las partes; esto es, y entre otras cosas, que dichas partes tengan *standing* para litigar la cuestión planteada ante el foro judicial y que así éstas lo hayan alegado y demostrado. *E.L.A. v. Aguayo*, ante.

En relación con dicho posible señalamiento, procede que se *enfatice* el hecho, *en primer lugar*, de que el requisito de *standing, al igual que otras "limitaciones" similares que nuestro ordenamiento reconoce respecto al foro judicial*, tienen una *extraordinaria importancia* que nunca debe ser subestimada. *Dichas "limitaciones" son las que fomentan, y permiten, que funcione el sistema de "pesos y contrapesos" en nuestro sistema republicano de gobierno.* En otras palabras, estas "limitaciones", o autorestricciones, al inmenso poder que tienen los tribunales *son los que se supone que impidan que la Rama Judicial se convierta en una rama de gobierno autoritaria y déspota.*

A esos efectos, conviene recordar —*una vez más*— las *ilustrativas expresiones* que hiciera el Tribunal en *E.L.A. v. Aguayo*, ante, pág. 597, donde, *en lo pertinente*, expresamos:

> *¿Qué fundamento tienen esas limitaciones?* ¿Han sido creadas para satisfacer las exigencias de un preciosismo técnico, o están por el contrario sustentadas por una convicción, a la cual abonan la razón y la experiencia, *de cómo debe ejercitarse la gravísima responsabilidad judicial de juzgar la constitucionalidad de las actuaciones legislativas?* Es indudable que constituyen un mínimo de condiciones para *el ejercicio discreto y tolerable de un poder que de otro modo constituiría una clara amenaza para la calidad democrática del sistema y convertiría a los jueces en guardianes de la comunidad.* Factores determinantes de estas normas son las falibilidad del juicio humano, *la condición negativa del poder judicial que no posee la autoridad directa que adviene a las otras dos ramas por ser electas por el pueblo,* y la convicción de que la Corte *perdería su influencia y prestigio* y finalmente su autoridad, *si, a diario, y fuera de los estrictos límites de un genuino procedimiento judicial, estuviese pasando juicio sobre la validez constitucional de las actuaciones legislativas y ejecutivas.* (Énfasis suplido y escolio omitido.)

*Esto es, no tenemos la "culpa" de que la norma sobre*

*standing rija en Puerto Rico, al igual que en todo ordena-*
*miento donde impera el principio de justiciabilidad. No*
*debe olvidarse, repetimos, que la misma constituye uno de*
*los pilares fundamentales sobre la cual se levanta y sostiene*
*nuestro sistema judicial.* Dicha norma fue aplicada, *sin*
*contemplación de clase alguna,* por la mayoría de los inte-
grantes de este Tribunal en el año de 1992 en el segundo de
los casos de *Hernández Torres v. Hernández Colón et al.,*
ante, con el *propósito y fin* de resolver que la hoy Presi-
denta de la Cámara de Representantes, Hon. Zaida Her-
nández Torres, *no tenía standing* en dicho caso para im-
pugnar la creación, por la Administración del Lcdo. Rafael
Hernández Colón, del Departamento de Asuntos de la Co-
munidad Puertorriqueña en la Ciudad de Nueva York.(²)

*Tampoco* tenemos la "culpa" del hecho de que la deman-
dante Asociación, y sus abogados, *no* cumplieran con dicha
norma jurisprudencial a nivel de instancia *ni* a nivel
apelativo. Debe recordarse que el derecho en Puerto Rico
es "rogado y de carácter adversativo". Véase *Rodríguez*
*Cruz v. Padilla Ayala,* 125 D.P.R. 486 (1990). *La función*
*del juez no es "salvarle" el caso a un litigante que no cumple*
*con lo preceptuado en nuestro ordenamiento.* Por otro lado,
*la ciudadanía tiene derecho a que este Tribunal sea consis-*
*tente en la aplicación de las normas de derecho que existen*
*en nuestra jurisdicción.* En otras palabras, *este Tribunal no*
*puede caprichosamente aplicar "dos varas" distintas a si-*
*tuaciones similares, dependiendo de quienes son las partes*
*en los casos que resuelve.*

La actuación de la Mayoría en el presente caso, respecto
al planteamiento de ausencia de "legitimación activa" de
parte de la Asociación, *resulta ser caprichosa, inaudita y*

---

(²) Procede que se señale que —no obstante el Juez suscribiente haber disentido
en el citado caso de *Hernández Torres v. Hernández Colón et al.,* 131 D.P.R. 593
(1992)— por razón de constituir la norma allí establecida *precedente obligatorio* en
nuestra jurisdicción, *seguimos y aplicamos la misma* —como Juez ponente— en la
decisión que este Tribunal emitiera en *Noriega v. Hernández Colón,* 135 D.P.R. 406
(1994).

*altamente cuestionable.* De la misma manera en que cualquier persona razonable tiene derecho a preguntarse cómo es que hoy en día el Tribunal sostiene, a toda costa, el *standing* de una parte demandante cuando tan sólo hace dos años se le denegó a otros bajo criterios que ahora se echan a un lado, *cabe que esa persona razonable se cuestione si el resultado al que hoy se llega en el presente caso hubiera sido el mismo si el caso hubiera sido resuelto hace algunos años atrás y las partes en el mismo se hubieran llamado de distinta manera.*

La Mayoría se olvida de que esta actuación, *caprichosa y selectiva,* de concederle *standing* a la Asociación en el presente pleito *a quienes, verdadera y realmente, lastima y perjudica es a una niñez y juventud de escasos recursos, la cual está deseosa de recibir una educación que el Estado no le puede proveer en el sistema de educación pública.* Esto es, la "parte perdidosa" en el presente pleito *no* lo es el demandado Estado Libre Asociado de Puerto Rico; *la misma lo es la juventud puertorriqueña y, por ende, el futuro mismo de este País.*

Después de todo, ¿no se supone que interpretemos nuestra Constitución teniendo *siempre presente* que la misma es una de gran vitalidad con "capacidad para responder con acierto a los distintos problemas sociales, políticos y económicos que de tiempo en tiempo aquejan al país" y, *sobre todo,* que "al aplicarla debemos recordar que '[i]nterpretamos una Constitución, no los Rollos del Mar Muerto' "? *Caquías v. Asoc. Res. Mansiones Río Piedras,* 134 D.P.R. 181, 189 (1993).

De la misma manera que *estamos conscientes* del hecho que la criminalidad que hoy azota a este noble pueblo no es la misma a la cual nos enfrentamos en el 1952, *razón por la cual* recientemente sostuvimos la constitucionalidad de la legislación que permite el cierre de urbanizaciones *a pesar de* los derechos constitucionales de los ciudadanos de este País que dichos cierres afectan —tales como el derecho

a la libre asociación, uso y disfrute de la propiedad pública, etc.— *tenemos que tener presente* que la educación que hoy se le brinda a nuestra niñez y juventud en el sistema de educación pública *no* es de la misma calidad que la que se brindaba en la década de los cincuenta; *situación que amerita que este Tribunal haga lo indecible por sostener la validez de programas educativos, como los aquí en controversia, que tienen el deseable resultado de mejorar la educación de esa juventud.*

La Constitución, *repetimos*, debe ser interpretada *a la luz de los cambios, y problemas, sociales, políticos y económicos que de tiempo en tiempo aquejan al País*. Estas *no* son meras expresiones bonitas para ser aplicadas en forma selectiva. Las mismas representan *una visión, un patrón de conducta, un curso de acción* que viene obligado a seguir este Tribunal en todos los casos en que este Foro interpreta la Constitución de Puerto Rico.

En resumen, *no* teniendo *standing* la Asociación para radicar la acción que originó el recurso hoy ante nuestra consideración, *resulta mandatoria que la misma sea desestimada si es que el Tribunal interesa cumplir con la obligación que le impone nuestro ordenamiento jurídico.* Véase *Hernández Torres v. Hernández Colón et al.*, ante.

Ahora bien, *asumiendo* a los fines de la argumentación que la Asociación efectivamente tiene *standing* en el presente caso, *¿es correcto el resultado al que, en los méritos, llega la mayoría de los integrantes del Tribunal en el mismo?* Somos del criterio que dicho resultado *es uno erróneo*; veamos por qué.

### III

*¿Viola la citada Ley Núm. 71 de 3 de septiembre de 1993 la Sec. 3 del Art. II de la Constitución del Estado Libre Asociado de Puerto Rico*, ante? Contestamos dicha interrogante *en la negativa.*

La referida Sec. 3 establece:

No se aprobará ley alguna relativa al establecimiento de cualquier religión ni se prohibirá el libre ejercicio del culto religioso. Habrá completa separación de la iglesia y el estado. Const. E.L.A., ante, pág. 262.

*¿Qué tuvieron en mente los integrantes de la Asamblea Constituyente al incorporar a nuestro ordenamiento la antes transcrita disposición constitucional?* El historial al respecto de la Constituyente, aun cuando algo parco, es sumamente revelador: *llana y sencillamente incorporaron en su totalidad la teoría constitucional norteamericana referente a la Primera Enmienda de la Constitución federal según ésta ha sido interpretada por el Tribunal Supremo de los Estados Unidos.* Ello así diáfanamente surge de un examen del Diario de Sesiones de la Convención Constituyente de Puerto Rico. En palabras del delegado Lcdo. José Trías Monge:

O sea, aquí hay dos principios básicos que se instituyen en esta sección. Uno es el principio de separación del Estado e Iglesia, *tal como ha sido consignado en la Constitución federal y el cual seguirá su desarrollo normal vía las interpretaciones del Tribunal Supremo de los Estados Unidos.*

*Naturalmente que [en] distintas situaciones que pudiésemos imaginar en estos momentos, pues sería difícil una contestación precisa [en] muchos [casos] a estas situaciones, porque estamos enchufados ante el sistema constitucional norteamericano en esta fase específica. O sea, son nuestras las garantías en cuanto a libertad de religión que se han instituido en la Constitución de los Estados Unidos.* Estamos idénticamente, formando parte de ese sistema constitucional. (Énfasis suplido.) 2 Diario de Sesiones de la Convención Constituyente 1483 (1952).

A esos mismos efectos, en *Agostini Pascual v. Iglesia Católica*, 109 D.P.R. 172, 175 (1979), este Tribunal expresó que:

La primera oración [de la transcrita Sección 3] incluye dos cláusulas familiares de la primera enmienda de la Constitución de Estados Unidos: la referente a la libertad de culto y la que

prohíbe el establecimiento de una religión oficial. La tercera disposición guarda estrechos vínculos con las otras dos y, aunque es nueva en su forma, tiene una larga historia. *Esta tercera cláusula refleja fundamentalmente la teoría de Madison de que la relación ideal entre el Estado y la Iglesia exige el reconocimiento de dos esferas de acción separadas.* (Énfasis suplido.)

Conforme surge del *excelente análisis histórico* que realizara el hoy Juez Presidente del Tribunal Supremo de los Estados Unidos, Hon. William Rehnquist, en la opinión disidente que emitiera en *Wallace v. Jaffree,* 472 U.S. 38, 91 (1985), James Madison y Thomas Jefferson *nunca tuvieron en mente que entre el Estado y la Iglesia debería de existir una "pared de separación" ("the Wall");* por el contrario, y conforme demuestra el Juez Presidente Rehnquist en su ponencia, *el pensamiento de éstos fue a los efectos de que la prohibición contenida en la Primera Enmienda de la Constitución federal únicamente iba dirigida a impedir el establecimiento de una religión oficial nacional y prohibir que el Estado discriminara entre sectas religiosas.*

La Opinión del Tribunal en el presente caso erróneamente revive, *de manera indirecta pero con toda su fuerza,* la hoy *obsoleta, maltrecha,* y *desacreditada* teoría de la "pared de separación" (*the Wall*) entre Iglesia y Estado que hace muchos años elaboró el Tribunal Supremo Federal en *Everson v. Board of Education,* 330 U.S. 1, 16 (1947). Dicha Opinión mayoritaria *pasa por alto, e ignora,* el hecho de que *inclusive* el propio Tribunal Supremo de los Estados Unidos, *en posteriores decisiones,* ha reconocido que la referida teoría de la "pared de separación" *meramente constituye* una "borrosa, indistinta y variable barrera" que "no es enteramente precisa" y que "apenas puede ser percibida" (*Lemon v. Kurtzman,* 403 U.S. 602, 614 (1971); *Tilton v. Richardson,* 403 U.S. 672, 677–678 (1971); *Wolman v. Walter,* 433 U.S. 229, 236 (1977); *Lynch v. Donnelly,* 465 U.S. 668, 673 (1984)); *y pierde de perspectiva* que la teoría de la "separación absoluta" entre Iglesia y Estado ha sido *prácticamente abandonada* por el Tribunal Supremo federal,

*acercándose cada día más dicho Foro judicial a la teoría de neutralidad de parte del Estado. Cf. Roemer v. Maryland Public Works Bd.*, 426 U.S. 736, 747 (1976); L.H. Tribe, *American Constitutional Law*, 2da ed., Nueva York, Ed. Foundation Press, 1988, págs. 1166–1167.

*Dicha tendencia ha cobrado fuerza en los últimos años.* Tan *reciente* como en el año de 1993, el Tribunal Supremo federal, en *Zobrest v. Catalina Foothills School Dist.*, 509 U.S. 1 (1993), ha hecho expresiones que así lo demuestran. A esos efectos, el Juez Presidente de ese Tribunal, Hon. William Rehnquist, *hablando esta vez por la mayoría de dicho alto Foro judicial*, expresó en dicho caso que

> ... consistentemente hemos resuelto que programas de gobierno que *neutralmente proveen beneficios* a una *clase amplia de ciudadanos definidos, sin* hacerse referencia alguna a la religión, *no* están sujetos a impugnación bajo la cláusula de establecimiento *meramente debido a que* instituciones sectarias también reciben [bajo dichos programas] beneficios financieros atenuados.

> ... Cuando el gobierno ofrece un *servicio neutral* en las facilidades de una escuela sectaria *como parte de un programa general* "que de ninguna forma está dirigido hacia la religión", *Witters*, ante, a la página 448, *el proveer ese servicio, bajo nuestras decisiones anteriores, no ofende la cláusula de establecimiento.* (Énfasis y traducción nuestros.) *Zobrest v. Catalina Foothills School Dist.*, ante, págs. 8–10.

*¿Qué importancia tiene lo antes expuesto en relación con el recurso hoy ante nuestra consideración?* Debe mantenerse presente que la legislación aquí en controversia *no favorece* a una escuela privada perteneciente a una denominación religiosa en particular *sobre* otras escuelas privadas pertenecientes a otras denominaciones religiosas. *Todas las escuelas religiosas* —bautistas, protestantes, católicas, etc.— *son tratadas en forma igual por la legislación en controversia.*

De hecho, la citada Ley Núm. 71 trata, *de forma igual*, tanto a las escuelas privadas religiosas como a las escuelas

privadas laicas como a las escuelas pertenecientes al sistema de educación pública. Dicho de la manera más sencilla posible, *la Ley de Becas Especiales y de Libre Selección de Escuelas es una ley total y completamente neutral*; esto es, *no* favorece a una "iglesia" sobre la otra, *ni* a la escuela privada sobre la pública, *ni* viceversa.

*Por otro lado*, la citada Ley *no sólo* ofrece esos beneficios, *de manera neutral y como parte de un programa general*, a un *amplio sector* de nuestra ciudadanía *sino que* la misma *no* está dirigida, *de ninguna forma*, a ayudar la religión; *razón por la cual este Tribunal, al amparo de lo resuelto en Zobrest v. Catalina Foothills School Dist.*, ante, *podría sostener la validez de dicha legislación.*

Estamos conscientes, *naturalmente*, del *test*, consistente el mismo de tres requisitos, establecido por el Tribunal Supremo federal en *Lemon v. Kurtzman*, ante; el cual establece que, para satisfacer la Cláusula de Establecimiento, la ley o práctica gubernamental tiene que: (1) tener un propósito legislativo secular, (2) su efecto principal o primario debe ser uno que no adelante ni inhiba la religión, y (3) el estatuto no debe crear un envolvimiento excesivo del Estado y la religión. *Lo que sostenemos es que la citada Ley Núm. 71 de 1993 plenamente satisface los mencionados tres requisitos*; esto es, la Ley Núm. 71 tiene un claro propósito legislativo secular, cual es el mejoramiento de la educación en general en Puerto Rico; su efecto principal o primario es, precisamente, el adelantar y mejorar dicha educación y no el de adelantar o inhibir la religión en Puerto Rico; y la misma definitivamente no crea un envolvimiento excesivo del Estado con la religión.

En adición, *cabe preguntarse*: ¿qué daños sufriría la ciudadanía con dicha actuación judicial? Esto es, ¿qué derechos constitucionales de los ciudadanos de este País se afectarían por esta interpretación? *Acaso debemos ser tan y tan puristas como para perjudicar a unos niños y a una juventud, sedienta de poder recibir una mejor educación,*

*por "salvar" la pureza etérea, utópica y abstracta de una disposición constitucional?*

Está *al alcance* del Tribunal, *en consecuencia*, sostener la constitucionalidad de los tan necesitados vales educativos, y becas, a estudiantes de escasos recursos económicos en relación con las escuelas privadas religiosas. *Todo lo que se necesita es interpretar nuestra Constitución en forma imaginativa y vibrante y con la buena intención de resolver los* "distintos problemas sociales, políticos y económicos que, de tiempo en tiempo aquejen al País ...". *Caquías v. Asoc. Res. Mansiones Río Piedras*, ante, pág. 189. *La mayoría del Tribunal obviamente se ha olvidado del hecho de que la Constitución es para servir al pueblo, no para perjudicarlo.*

## IV

Pero, *aún hay más*. En adición a asumir, a los fines de la argumentación, que *los miembros* de la Asociación, al amparo de lo resuelto por el Tribunal Supremo de los Estados Unidos en *Flast v. Cohen*, ante, efectivamente poseen *standing* para impugnar la constitucionalidad de la citada Ley de Becas Especiales y Libre Selección de Escuelas, *e igualmente asumiendo* que en vista de la doctrina "vigente" en Puerto Rico sobre "separación de iglesia y estado" realmente resultaba insalvable la validez de la citada Ley Núm. 71 respecto a las escuelas privadas religiosas, *resulta ser un hecho incuestionable que está enteramente en manos del Tribunal anular dicha Ley, única y exclusivamente, en relación con las referidas escuelas religiosas y no, como adicionalmente lo hace la Mayoría, en lo referente a escuelas privadas laicas.* Nos explicamos.

La Mayoría sostiene que la Sec. 5 del Art. II de la Constitución de Puerto Rico, ante, en específico la "cláusula de sostenimiento" contenida en la misma, tiene "contenido independiente y adicional al de la cláusula de estableci-

miento de la Primera Enmienda de la Constitución federal"; afirmación que constituye el *fundamento principal* del Tribunal para, a su vez, sostener que la referida "cláusula de sostenimiento impide que el Estado provea beneficios, ayudas o apoyo a una escuela privada". Opinión del Tribunal, pág. 547. Dicha *asombrosa, y errónea,* conclusión está basada, *de manera exclusiva,* en unas raquíticas e infundadas expresiones tomadas de una obra literaria del Lcdo. José Trías Monge, quien fue uno de los miembros de la Asamblea Constituyente, titulada *Historia Constitucional de Puerto Rico.*

Al así resolver, el Tribunal *convenientemente ignora* el *sustrato o esencia* del debate que se llevó a cabo en la mencionada Asamblea Constituyente al momento en que precisamente se discutió la citada Sec. 5 del Art. II, *en específico,* al discutirse en dicha Asamblea el significado, y consecuencias jurídicas, del término "sostenimiento" contenido en la referida Sec. 5. En dicho debate, *se aceptó* por los delegados que la referida cláusula constitucional *no constituía impedimento de clase alguna* para que el Gobierno de Puerto Rico le concediera becas a estudiantes para que cursaran estudios en universidades privadas —religiosas o laicas— *de los Estados Unidos.* El debate entre, o "confusión" de, los delegados *realmente fue* respecto a si el Gobierno *podría hacer lo mismo,* esto es, darle becas a estudiantes, en relación con escuelas y universidades —religiosas o laicas— *situadas en Puerto Rico.*

En relación con esa interrogante en particular, uno de los delegados, el Sr. Ramiro Colón, *específicamente* planteó, o preguntó, si bajo la terminología propuesta de la referida Sec. 5 podría el Gobierno "resolver pagarle la matrícula a niños puertorriqueños para escuelas privadas en Puerto Rico sin violar el texto de la constitución"? Diario de Sesiones, ante, pág. 1482.

No habiéndole resultado satisfactoria, de momento, la contestación que le brindara a su pregunta el delegado

Jaime Benítez, *figura cimera y principalísima del sistema de educación pública del País*, el delegado Ramiro Colón volvió a insistir en su planteamiento. A esos efectos, preguntó:

> Sr. RAMIRO COLON: Permítame el compañero decirle en qué consiste mi confusión, ahora, y lo que trato yo es de hacer, meramente, [claridad] en este asunto, para votar con conciencia.
>
> Se ha dicho aquí, que, al darse una beca a un estudiante, lo que equivale a pagarle una matrícula, *no* se beneficia el colegio donde va a estudiar, sino al estudiante, *y me parece a mí que si ese es el sentido, nada de esta constitución ha de prohibir que el gobierno de Puerto Rico le pague matrícula en Puerto Rico a los niños cuando vayan a las escuelas privadas. Y yo quiero que me digan si eso puede ser así, para entonces saber cómo debo votar.* (Énfasis suplido.) Diario de Sesiones, ante, pág. 1483.

La contestación del Delegado Jaime Benítez, *la cual resulta extremadamente ilustradora a la controversia hoy ante nuestra consideración*, no se hizo esperar:

> Sr. BENITEZ: Mi criterio es ... ya lo expresé anteriormente. El gobierno de Puerto Rico *no puede establecer un sistema becario que sustituya el sistema de instrucción pública que tiene la obligación el Estado de establecer, y que tiene la obligación de ser completamente no sectario.* (Énfasis suplido.) Diario de Sesiones, ante, pág. 1483.

Como dice el refrán popular, "al buen entendedor, con pocas palabras basta". Resulta *meridianamente claro* que el término "sostenimiento", contenido en la mencionada Sec. 5 del Art. II de la Constitución, ante, *no* prohíbe *ni* impide —*por lo menos, conforme al historial de la Asamblea Constituyente y la informada opinión de sus miembros*— que el Gobierno de Puerto Rico le provea becas, o vales educativos, a la niñez y juventud puertorriqueña con el propósito de que éstos cursen estudios en escuelas privadas; es más, conforme a ese historial, *no* está prohibida la concesión de dichas becas *ni* aún en relación con escuelas privadas religiosas. Lo que *sí* está prohibido por la ci-

tada Sec. 5 —*y esa fue la clara intención de los Constitu-yentes*— es que el Gobierno *sustituya* el sistema de educación pública del País por uno de índole privado. *En otras palabras*, lo que el Gobierno *no* puede hacer es *"pri-vatizar"* totalmente el sistema de educación pública del País, el cual siempre deberá ser *no* sectario.

*¿Por qué esa "preocupación" de los Constituyentes?* Obviamente ellos quisieron *evitar*, a toda costa, la posibilidad de que el Gobierno le *entregara* el sistema público de enseñanza, digamos, a una secta religiosa en particular para que ésta se hiciera cargo de dicho sistema; secta religiosa que obviamente estaría receptiva a dicha oferta por el beneficio que dicha situación le representaría: la posibilidad de ganar más adeptos en una "audiencia cautiva". Esto es, *el obvio y principal propósito* de los Constituyentes al aprobar la Sec. 5 del Art. II de la Constitución, ante, fue el de *complementar* el principio de "separación de iglesia y estado" contenido en la citada Sec. 3 del referido Art. II de la Constitución. Ahí, precisamente, la razón para las expresiones, claras y reveladoras, del Delegado Jaime Benítez a los efectos de que el Estado tiene la *obligación* de *establecer* y *mantener* un sistema de instrucción pública que *siempre* deberá ser no sectario. Ese, *repetimos*, es el verdadero propósito y objetivo de la "cláusula de sostenimiento" de nuestra Constitución; no el que alega y sostiene la Opinión mayoritaria.

*Dados los hechos específicos del asunto ante nuestra consideración, la acción de la Mayoría* —so color, y bajo el pretexto, de que se le debe brindar un significado amplio al término "sostenimiento" contenido en la Sec. 5 del Art. II de la Constitución— *de anular el programa educativo en controversia en relación, inclusive, en relación con las escuelas no religiosas carece totalmente, y está huérfana, de todo fundamento jurídico y lógica judicial adjudicativa; sobre todo cuando se considera que la función judicial se supone que se ejercite en beneficio de la ciudadanía*

*puertorriqueña.* Aquí *no* se trata de *apropiaciones irrestrictas* de dinero a las escuelas privadas de parte de la Asamblea Legislativa *como tampoco* de un intento de *privatizar* el sistema de eduacación pública del País, que es lo que prohíbe la citada Sec. 5.

*Para sostener la validez de dicha legislación, en lo referente a escuelas privadas no religiosas, todo lo que se necesita es una interpretación restrictiva, de parte del Tribunal, del término "sostenimiento" contenido en la antes citada disposición constitucional; interpretación que es una enteramente plausible y procedente en derecho cuando se interpreta, de buena fe, una Constitución y no los "Rollos del Mar Muerto".*

La acción de la Mayoría de interpretar de "manera amplia" el término en controversia, resulta lamentable pero necesario decirlo, "dice mucho" y *únicamente* puede ser explicada por el deseo, *aparentemente insaciable*, de esa Mayoría de *totalmente anular* los beneficios que le brinda la mencionada Ley de Becas Especiales y Libre Selección de Escuelas a los estudiantes de escasos recursos de nuestro País. *¿A qué se debe ese deseo insaciable?* Podríamos "especular" al respecto; preferimos no hacerlo.

## V

En resumen, la decisión que hoy se emite por el Tribunal no sólo es una *jurídicamente errónea* sino que la misma resulta ser *trágica* para nuestro País *ya que, de manera totalmente innecesaria, troncha las legítimas aspiraciones de una niñez y juventud que tienen el potencial para, y el derecho a, recibir una educación de excelencia*; educación que el sistema público de enseñanza *no* le puede brindar. *La decisión hoy emitida, en fin, va mucho más allá de meramente anular una legislación aprobada por la presente administración de gobierno; la misma, al afectar a nuestra juventud, lesiona el futuro mismo de nuestro País.*